**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUDGE KIMBERLY PROST; JUDGE SOLOMY BALUNGI BOSSA; and JUDGE REINE ADELAIDE SOPHIE ALAPINI-GANSOU, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States <br> 1600 Pennsylvania Ave., N.W. <br> Washington, D.C. 20500; <br><br> UNITED STATES DEPARTMENT OF STATE <br> 2201 C St., N.W. <br> Washington, D.C. 20520; <br><br> MARCO A. RUBIO, in his official capacity as Secretary of State <br> 2201 C St., N.W. <br> Washington, D.C. 20520; <br><br> UNITED STATES DEPARTMENT OF THE TREASURY <br> 1500 Pennsylvania Ave., N.W. <br> Washington, D.C. 20220; <br><br> SCOTT K. H. BESSENT, in his official capacity as Secretary of the Treasury <br> 1500 Pennsylvania Ave., N.W. <br> Washington, D.C. 20220; <br><br> UNITED STATES DEPARTMENT OF JUSTICE <br> 950 Pennsylvania Ave., N.W. <br> Washington, D.C. 20530; <br><br> TODD BLANCHE, in his official capacity as Acting United States Attorney General <br> 950 Pennsylvania Ave., N.W. <br> Washington, D.C. 20530; | Civil Action No. 25-cv-5305 |

OFFICE OF FOREIGN ASSETS CONTROL
1500 Pennsylvania Ave., N.W.
Washington, D.C. 20220; and

BRADLEY T. SMITH, in his official capacity
as Director, Office of Foreign Assets Control
1500 Pennsylvania Ave., N.W.
Washington, D.C. 20220,

       Defendants.

## COMPLAINT

### INTRODUCTION

1. Plaintiffs Judge Kimberly Prost, Judge Solomy Balungi Bossa, and Judge Reine Adelaide Sophie Alapini-Gansou are judges of the International Criminal Court ("ICC"). The Trump Administration has subjected each of these distinguished jurists to sanctions under the International Emergency Economic Powers Act ("IEEPA"), pursuant to Executive Order 14,203, *Imposing Sanctions on the International Criminal Court,* 90 Fed. Reg. 9369 ("EO 14,203") and its implementing regulations, by placing them on the Specially Designated Nationals List ("SDN List") maintained by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") (collectively, "Sanctions Regime").

2. The Sanctions Regime, which punishes Judges Prost, Bossa, and Alapini-Gansou for their impartial adjudication of cases, is designed to exert extra-judicial pressure on these judges and their colleagues on the ICC bench by targeting their financial and other personal interests, with

the objective of punishing them for prior judicial decisions and coercing them into prioritizing their private interests over deciding cases on the basis of the law and facts.[1]

3.   The Sanctions Regime does so through Section 1(a) of the Executive Order.  This, among other things, "block[s]" "[a]ll property and interests in property" of Judges Prost, Bossa, and Alapini-Gansou that "are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person."  As a result, their property and interest in property "may not be transferred, paid, exported, withdrawn, or otherwise dealt in."  This prohibits, *inter alia*, "the making of any contribution or provision of funds, goods, or services by, to, or for the[ir] benefit."  EO 14,203 § 3(a).  Those who violate these prohibitions face criminal penalties that include up to 20 years of imprisonment.

4.   Being subjected to such sanctions under IEEPA is tantamount to the financial death penalty.  Due to the sanctions, Judges Prost, Bossa, and Alapini-Gansou are no longer able, among other things, to use credit cards; access banking services; use common online platforms, such as Amazon and Google; book travel; and in some cases, obtain health insurance.

5.  Moreover, the Sanctions Regime threatens the carefully constructed system of international criminal justice of which the ICC is the cornerstone.  By prohibiting U.S. persons from providing any "services" for the "benefit" of Judges Prost, Bossa, and Alapini-Gansou, and by subjecting to designation any non-U.S. person who materially assists or provides services to those judges, the sanctions bar the submission of evidence and argument in any pending or future

---

[1] In addition to Plaintiffs, the Administration has designated under EO 14,203 five additional ICC judges and placed them on the SDN List: Judge Luz del Carmen Ibáñez Carranza; Judge Beti Hohler; Judge Nicolas Yann Guillou; Judge Gocha Lordkipanidze; and Judge Erdenebalsuren Damdin.

proceeding before them, including in cases that the United States has hailed as critical for achieving accountability for the worst crimes known to humankind.

6.    The imposition of such draconian sanctions on international judges is unprecedented. Judges Prost, Bossa, and Alapini-Gansou are not terrorists, narcotics traffickers, weapons proliferators, corrupt officials, human rights abusers, or any of the other types of persons whose conduct Congress intended to address through the sanctioning power it delegated to the President under IEEPA.  To the contrary: they have devoted decades to the administration of justice through the investigation, prosecution, and adjudication of international crimes, including genocide, war crimes and crimes against humanity, and to the causes of counterterrorism, human rights, and the rule of law.

7.    The Sanctions Regime punishes Judges Prost, Bossa, and Alapini-Gansou for having done nothing more than—when called upon to adjudicate matters before them—faithfully discharge their judicial offices by rendering decisions with which the Administration disagrees. And they are so punished for an entirely improper purpose: to punish these judges for past decisions and to pressure them and their colleagues on the bench to render future decisions more to the Administration's liking, by targeting the judges' finances and other private interests.

8.    Judges Prost, Bossa, and Alapini-Gansou have resisted this immense pressure because they are committed to upholding the rule of law, including by discharging their judicial duties faithfully and independently, despite the great personal cost.  Nonetheless, in view of the mounting harm they are suffering, the enormity of the stakes involved, and the manifest illegality of the Sanctions Regime, Plaintiffs are compelled to bring this action.

9.    The Sanctions Regime is unlawful.  It is *ultra vires* under IEEPA because it is outside the scope of Congress' delegation of authority, including because it violates international law,

4

conflicts with acts of Congress, and is not based on a genuine national emergency or unusual or extraordinary threat; it violates the Due Process Clause of the Fifth Amendment to the Constitution; and it is arbitrary, capricious, not in accordance with the law, and an abuse of discretion, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559.  For all these reasons, the Sanctions Regime must be declared unlawful and enjoined.

## JURISDICTION AND VENUE

10. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201-02, and 5 U.S.C. § 706.

11. The Court has authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*; 5 U.S.C. § 702; and the Court's inherent equitable powers.  *See also* Fed. R. Civ. P. 57, 65.

12.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to the claim occurred and a substantial part of the property that is the subject of the action is situated in this District.

## PARTIES

13. **Plaintiff Judge Kimberly Prost** is a citizen of Canada, residing in The Hague, The Netherlands.  She has served as a judge of the ICC since March 2018.  Prior to her election to the ICC, Judge Prost had a distinguished career, including serving as a prosecutor with the Canadian Department of Justice; as a senior official with intergovernmental agencies and organizations dedicated to combatting terrorism and other transnational crimes; as the Ombudsperson for the U.N. Security Council Al-Qaida Sanctions Committee; and as an *ad litem* judge of the International Criminal Tribunal for the former Yugoslavia.

14. **Plaintiff Judge Solomy Balungi Bossa** is a citizen of the Republic of Uganda, residing in The Hague, The Netherlands.  She has served as a judge of the ICC since March 2018.  Prior to

her election to the ICC, Judge Bossa had a distinguished career as a domestic and international jurist, including serving as a judge on the Court of Appeals of Uganda and on the International Criminal Tribunal for Rwanda.

15. **Plaintiff Judge Reine Adelaide Sophie Alapini-Gansou** is a citizen of the Republic of Benin, residing in The Hague, The Netherlands. She has served as a judge of the ICC since March 2018 and currently serves as the Second Vice-President of the Court. Prior to her election to the ICC, Judge Alapini-Gansou had a distinguished career as a human rights litigator, Chair of the African Commission on Human and Peoples' Rights, and member of United Nations investigative commissions charged with investigating human rights abuses in Côte d'Ivoire and Burundi.

16. **Defendant Donald J. Trump** is President of the United States and is sued in his official capacity.

17. **Defendant United States Department of State** is a United States agency headquartered in Washington, D.C.

18. **Defendant Marco A. Rubio** is the United States Secretary of State and is sued in his official capacity.

19. **Defendant United States Department of the Treasury** is a United States agency headquartered in Washington, D.C.

20. **Defendant Scott K. H. Bessent** is the United States Secretary of the Treasury and is sued in his official capacity.

21. **Defendant United States Department of Justice** is a United States agency headquartered in Washington, D.C.

6

22. **Defendant Todd Blanche** is the Acting Attorney General of the United States and is sued in his official capacity.

23. **Defendant Office of Foreign Assets Control** is a United States agency headquartered in Washington, D.C.

24. **Defendant Bradley T. Smith** is the Director of the Office of Foreign Assets Control and is sued in his official capacity.

**FACTUAL ALLEGATIONS**

**I.   The Global System for Addressing Violations of International Criminal Law**

*History of International Criminal Law*

25. The movement for international criminal justice emerged from the aftermath of World War II and the horrors of the Holocaust.  The United States was a driving force behind the effort to hold that era's war criminals to account through the Nuremberg Tribunal and the International Military Tribunal for the Far East.  In the years that followed, international criminal law rapidly developed, codifying the prohibition on genocide, war crimes, and crimes against humanity, as well as related obligations to investigate and prosecute such crimes.

26. In 1948, the international community adopted the Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention"), which the United States signed and later ratified, implementing it domestically through the Genocide Convention Implementation Act, 18 U.S.C. § 1091.  Article I of the Genocide Convention provides that "genocide, whether committed in time of peace or in time of war, is a crime under international law which the [signatories] undertake to prevent and to punish."  Article IV further provides that individuals who commit genocide or other enumerated acts "shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals."  Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277.

7

27.  In 1949, the international community adopted the four Geneva Conventions, codifying individual criminal responsibility for grave breaches of international humanitarian law, *i.e.*, war crimes.  The Geneva Conventions, which have been universally ratified, obligate States to search for individuals alleged to have committed grave violations and to bring alleged perpetrators to trial.[2]  The United States has ratified these treaties and adopted domestic legislation to give them effect.  *See* War Crimes Act, 18 U.S.C. § 2441(c)(1) (criminalizing "grave breach[es]" of the Geneva Conventions).

### *The International Criminal Court*

28. Throughout the latter half of the 20th century, as mass atrocities unfolded in Cambodia, the former Yugoslavia, Rwanda, Sierra Leone, and other conflict zones, the United States supported the creation of international and hybrid criminal tribunals to provide accountability for genocide, war crimes, and crimes against humanity.  These efforts culminated in 1998 with the adoption of the Rome Statute for the International Criminal Court ("Rome Statute"), the treaty which established the ICC.  Within four years, the necessary 60 ratifications were achieved and the Statute took force on July 1, 2002.

29. The ICC is a permanent court, based in The Hague, The Netherlands.  It is governed by the Rome Statute, which currently has 125 States Parties from every region of the world.  Thirty NATO members are States Parties to the Rome Statute.

---

[2] Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field art. 49, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; Geneva Convention For the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea art. 50, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; Geneva Convention Relative To The Treatment of Prisoners of War art. 129, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; Geneva Convention Relative to the Protection of Civilian Persons in Time of War ("Fourth Geneva Convention") art. 146, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; Department of Defense, Law of War Manual ¶ 3.1.1.1 (June 2015, Updated July 2023) (incorporating the Geneva Conventions in U.S. military regulations).

### *The ICC's Jurisdiction*

30. The ICC may exercise jurisdiction over the investigation and prosecution of individuals accused of serious international crimes, including war crimes, crimes against humanity, and genocide.  Under the principle of complementarity, the ICC may exercise jurisdiction only if the States where the alleged crimes could otherwise be investigated and prosecuted are "unwilling or unable genuinely to carry out the investigation or prosecution."  Rome Statute of the International Criminal Court, arts. 5, 17(a), Jul. 17, 1998, 2187 U.N.T.S. 90.  The principle of complementarity ensures that the ICC remains a court of last resort.

31. States that ratify or accede to the Rome Statute, or otherwise accept the jurisdiction of the Court, consent to the investigation and prosecution of crimes within the ICC's jurisdiction that are alleged to have occurred in their territory or by their nationals.  *Id*., art. 12.  The ICC may therefore exercise jurisdiction in a situation where such alleged crimes were committed by a national, or in the territory of a State Party or a State that has accepted the jurisdiction of the Court.

32. A State Party may refer a "situation" in which crimes within the ICC's jurisdiction appear to have been committed to the ICC Prosecutor for investigation and prosecution.  *Id*., arts. 13(a), 14.  The ICC may also exercise jurisdiction over situations referred to the ICC Prosecutor by the U.N. Security Council, of which the United States is a permanent member, pursuant to a resolution adopted under Chapter VII of the U.N. Charter, *id*., art. 13(b), and over alleged crimes concerning which the ICC Prosecutor has opened an investigation *proprio motu*, subject to judicial review and authorization, *id*., arts. 13(c), 15.

*The ICC's Judicial Divisions*

33. The ICC's Judicial Divisions, which conduct judicial proceedings, constitute one of the organs of the Court.  There are three divisions: the Pre-Trial Division, the Trial Division, and the Appeals Division.  *Id*., art. 34.

34. The Judicial Divisions comprise 18 judges who are elected by the Rome Statute's Assembly of States Parties ("ASP") following their nomination by a State Party.  *Id*., art. 35. Judges are elected to serve a nine-year term which is not renewable.  A judge's term can be extended if necessary to complete an ongoing trial or appeal proceeding.  The elections are held on a staggered basis so that every three years six judges complete their terms and six are elected. To qualify as a judge, one must demonstrate "high moral character, impartiality and integrity" and "possess the qualifications required in their respective State[] for appointment to the highest judicial offices."  *Id*., art. 36.

35. The Rome Statute mandates that judges "shall be independent in the performance of their functions" and "shall not engage in any activity which is likely to interfere with their judicial functions or to affect confidence in their independence."  *Id*., art. 40.

36. Before undertaking their respective duties, all ICC judges make a solemn undertaking in open court:

> I solemnly undertake that I will perform my duties and powers as judge of the [ICC] honourably, faithfully, impartially and conscientiously, and that I will respect the confidentiality of investigations and prosecutions and the secrecy of deliberations.

*Id*., art. 45; ICC Rules of Procedure and Evidence, Rule 5 (adopted Sept. 9, 2002).

37. In addition to their solemn undertaking, the judges must abide by a Code of Judicial Ethics, which enshrines their judicial independence, impartiality, integrity, the confidentiality of

10

their consultations and deliberations, the diligence in exercising their duties, and their conduct during proceedings.[3]

38. Three of the Court's judges make up the Presidency following their election by an absolute majority of the judges.  The Presidency's functions include, *inter alia*, coordinating judicial matters such as assigning judges, situations and cases to divisions.  The current President of the ICC is Judge Tomoko Akane, a national of Japan who, prior to her election to the ICC, had served as a prosecutor in Japan and in senior positions in the Japanese Ministry of Justice.

39. The Presidency of the Court assigns judges to one of the three aforementioned divisions, with each judge's assignment being based on the function of each division and the relevant qualification and experience of each judge.  Rome Statute, art. 39.  In accordance with Article 39(4) of the Rome Statute, the Presidency sometimes assigns judges from the Trial Division to cases in the Appeals Chamber for the efficient management of the Court's workload.

40. Judges are assigned to specific situations or cases, with three judges composing panels at the Pre-Trial and Trial levels, and five judges (one of whom is the ICC President) at the Appeals level.  *Id.*  The Pre-Trial and Trial Divisions are composed of multiple chambers which generally have fixed benches of three judges.  With the exception of judges already assigned to the Appeals Chamber, every three years, after the election of new judges, the Presidency will assign existing and new judges to the Trial and Pre-Trial Divisions to serve for a period of three years, and thereafter until the completion of any case the hearing of which has already commenced.

41. The Pre-Trial Chamber addresses jurisdictional challenges and determines whether the Prosecution's evidence is "sufficient" to proceed to trial, among other issues.  The Trial Chamber

---

[3] International Criminal Court, Code of Judicial Ethics, arts. 3-8, ICC-BD/02-01-05 (Mar. 9, 2005), https://www.icc-cpi.int/sites/default/files/2024-11/2005-03-09-code-judicial-ethics-eng.pdf.

oversees the trial and sentencing of an accused person, as well as any award of reparations to eligible victims. *See id.*, art. 75. All parties may appeal or seek leave to appeal any decisions of the Pre-Trial and Trial Chambers.

42. When adjudicating the cases before them, ICC judges apply Article 21 of the Rome Statute, which prescribes the applicable law. Further, the judges have adopted a Chambers Practice Manual that sets out agreed practices in regard to procedural issues not covered in detail by the Rome Statute or the Rules of Procedure and Evidence.

43. Pursuant to Rules 33 and 34 of the Court's Rules of Procedure and Evidence, judges may recuse themselves from a particular case or situation, but only for exceptional reasons, such as a conflict of interest impacting upon the judge's impartiality or independence. Any recusal must be approved by the Presidency, following the judge's reasoned application.

### *The Office of the Prosecutor*

44. The ICC's Office of the Prosecutor ("OTP") is responsible for examining situations in which international crimes under the jurisdiction of the ICC are alleged to have been committed; carrying out investigations of such situations; and prosecuting individuals who are allegedly responsible for those crimes. The OTP "shall act independently." Rome Statute, arts. 42, 54. The OTP may not delegate its investigative and prosecutorial functions to external parties or other departments and is obligated to investigate incriminating and exonerating circumstances equally. *See id.*, arts. 42, 54.

45. In all aspects of its work, the OTP must fully respect the rights accorded to persons under investigation or subject to prosecution, which include the right not to incriminate themselves; to be subjected to coercion, duress, threat or torture; to not be subjected to arbitrary arrest or detention; to be informed of the right to remain silent and to have legal counsel of their

choosing, including legal assistance provided without payment if warranted. *Id.*, arts. 54(1)(c), 55.

46. The OTP is led by the Prosecutor and Deputy Prosecutors, who must "be highly competent … and have extensive practical experience" and cannot "engage in any activity which is likely to interfere with his or her prosecutorial functions or to affect confidence in his or her independence." *Id.*, art. 42. They are supported by advisors and staff, who can "represent [the Prosecutor or a Deputy Prosecutor] in the exercise of his or her functions," but to whom he or she may not delegate certain "inherent powers," ICC Rules of Proc. and Evid., Rule 11, such as the power to "initiate an investigation," Rome Statute, art. 53.

47. Before taking up their office, the Prosecutor and Deputy Prosecutors "make a solemn undertaking" to exercise their functions "impartially and conscientiously," *id.*, art. 45; ICC Rules of Proc. and Evid., Rule 6. The Prosecutor and Deputy Prosecutors take their oath in open court, stating:

> I solemnly undertake that I will perform my duties and exercise my powers as [Prosecutor] of the International Criminal Court honourably, faithfully, impartially and conscientiously, and that I will respect the confidentiality of investigations and prosecutions.

ICC Rules of Procedure and Evidence, Rule 5 (adopted Sept. 9, 2002).

48. The Prosecutor may initiate an investigation of a situation referred to them by a State Party or the United Nations Security Council following a preliminary examination. If the Prosecutor wishes to initiate a formal investigation without a referral from a State Party or the United Nations Security Council under Article 15 of the Rome Statute, they must request authorization from the judges of the ICC's Pre-Trial Chamber. Rome Statute, art. 13(c), 15. To authorize a formal investigation, following a request by the ICC Prosecutor under Article 15 of the Rome Statute, the Pre-Trial Chamber must verify that the Rome Statute's preconditions to an

13

investigation are satisfied, including that the case appears to fall within the ICC's temporal, territorial and subject matter jurisdiction, and that there is a reasonable basis to proceed to a formal investigation.  The Pre-Trial Chamber has the power to reject the Prosecutor's request to initiate an investigation.

49. Under Article 15(3) of the Rome Statute, victims of the alleged crimes that the Prosecutor seeks authorization to investigate may make written representations to the ICC's Pre-Trial Chamber.  In conducting preliminary examinations, investigations, and prosecutions, the OTP seeks and obtains information and assistance from a range of state and non-state actors and individuals, including victims and their legal representatives and members of civil society, all of whom may submit information to the OTP.

50. In the investigation stage, the OTP often sends investigators, cooperation advisers, and prosecutors to relevant countries with the consent of the relevant domestic authorities to collect evidence of alleged crimes.

### *The Stages of ICC Proceedings and their Safeguards*

51. Matters before the ICC proceed in several stages, including:

    a. *preliminary examination*, involving an initial assessment by the OTP of available information, including reports and submissions from victims, civil society organizations, United Nations experts and fact-finding missions, among other sources against various preconditions to a formal investigation, including jurisdictional criteria, the quality and quantity of information regarding alleged crimes, the gravity of the alleged crimes, the interests of justice and victims, as well as an initial review of whether the matter is being addressed in genuine proceedings in a national system that would normally exercise jurisdiction over the crimes;

b. *investigation*, involving evidence-gathering, identification of possible suspects, and the issuance of arrest warrants or summonses to appear;

c. *pre-trial*, involving a determination by the ICC judges of whether there is sufficient cause to take the case to trial and on what charges, following submissions by the OTP, defense, and victims, including during a dedicated hearing;

d. *trial*, during which the OTP, defense, and victims may present evidence, and which requires proof of guilt beyond a reasonable doubt by the OTP before the ICC judges may convict and impose a sentence;

e. *appeals*, in which the OTP, accused and victims can participate;

f. *reparations*, in which the Trial Chamber, after submissions, awards and oversees the implementation of reparation orders for the benefit victims of the crimes of which the accused was found guilty; and

g. *enforcement* of any sentence in a country that has agreed to enforce ICC sentences.

52. When a situation has been referred to the Prosecutor by a State Party to the Rome Statute or the Prosecutor has initiated an investigation, the Prosecutor must notify all relevant States who could exercise jurisdiction over the crimes concerned in the first instance. Within a set time period, a State may inform the Court that it is investigating individuals over whom the State has jurisdiction for criminal acts that relate to the information provided in the Prosecutor's notification. If it does, and the State so requests, the Prosecutor is required to defer its investigation in favor of the national proceedings, unless the Pre-Trial Chamber, on the application of the Prosecutor, decides there is good cause to authorize the investigation. Rome Statute, art. 18.

53. Throughout, as with courts at the national level, the Court must satisfy itself of its jurisdiction. An accused person or any State with jurisdiction over a case may challenge the ICC's exercise of jurisdiction. *Id.*, art. 19.

54. The Prosecutor may apply for an arrest warrant, which the Pre-Trial Chamber must review to determine whether "[t]here are reasonable grounds to believe that the person has committed a crime within the jurisdiction of the Court." *Id.* art. 58(1)(a). The ICC has no independent enforcement power and relies on States to arrest individuals who are named in its arrest warrants. *Id.* arts. 59, 89. Non-States Parties, including the United States, have provided critical assistance in facilitating the transfer of suspects to ICC custody.

55. To date, the ICC has issued arrest warrants and/or summonses to appear for at least 70 individuals suspected of crimes falling within the Court's jurisdiction. The ICC has conducted 12 trials, resulting in the conviction of 13 defendants. Four defendants have been acquitted.

56. Pursuant to Rule 103 of ICC Rules of Procedure and Evidence, a Chamber adjudicating a case may invite or entertain *amicus curiae* submissions by a State or non-States Party (like the United States), organization, or person.

57. Once an accused person is transferred to the ICC and has a first appearance in a language the person understands, the Pre-Trial Chamber sets a date for a confirmation of charges hearing where the accused person may object to the charges, challenge the Prosecution's evidence, and present their own evidence. Victims may participate in these proceedings. If the Pre-Trial Chamber confirms some or all of the charges, upon a finding that there is sufficient evidence to establish that the person committed the crimes charged, then the case is sent to trial. Rome Statute, art. 61.

16

58. Criminal defendants at the ICC are afforded fair trial and due process rights, including the presumption of innocence; the right to counsel of their own choosing or, if they lack means to retain counsel, to have Court-appointed counsel and adequate time for the preparation of their defense; to be informed in detail of the charges; to be tried without undue delay; not to be compelled to testify; to examine witnesses; and to disclosure of exculpatory or mitigating evidence. *See generally id.*, arts. 64, 66, 67. An accused person may be convicted only if the charges are proven beyond a reasonable doubt. *Id.* art. 66(3).

### *The United States and the ICC*

59. The United States played a key role in drafting the Rome Statute. The United States signed the treaty but has not ratified it. At the same time, over the last twenty-five years, both Democratic and Republican administrations have supported some of the Court's investigations and prosecutions as well as its overarching mission.

60. The United States has a long-standing objection to the ICC's ability to exercise jurisdiction over nationals of non-States Parties to the Rome Statute, albeit one that it has not uniformly pressed, as detailed below in regard to the situations in Ukraine, Libya, and Sudan, among others.

61. In 2002, Congress enacted the American Servicemembers' Protection Act ("ASPA"), 116 Stat. 899 (codified at 22 U.S.C. §§ 7421 *et seq.*), to address the risk of U.S. persons and nationals of other countries that are not members of the Rome Statute being investigated and prosecuted by the ICC. The imposition of sanctions is not among the actions authorized by Congress to address this risk. *See* 22 U.S.C. §§ 7423-7425, 7427. The list of actions that the President is authorized to take is limited to providing "legal representation and other legal

17

assistance," "exculpatory evidence on behalf of that person," and "defense of the interests of the United States through appearance before the International Criminal Court."  *Id*. § 7427(c).

62. With respect to the limited circumstance of "[c]overed allied persons" "being detained or imprisoned by, on behalf of, or at the request of the International Criminal Court," *id*. § 7427, ASPA provides that the "President is authorized to use all means necessary and appropriate to bring about the release" of that person.  However, even then, the statute expressly provides that this "does *not* authorize the payment of bribes or the provision of other such incentives to induce the release" of such persons.  *Id*. § 7427(d) (emphasis added).

63. Congress amended ASPA to permit the United States to support ICC investigations: "Nothing in this subchapter shall prohibit the United States from rendering assistance to international efforts to bring to justice Saddam Hussein, Slobodan Milosovic, Osama bin Laden, other members of Al Queda [*sic*], leaders of Islamic Jihad, *and other foreign nationals* accused of genocide, war crimes or crimes against humanity, or from rendering assistance to the International Criminal Court to assist with investigations and prosecutions of foreign nationals related to the Situation in Ukraine."  *Id.* § 7433(a) (emphasis added).

64. Notwithstanding its awareness of the manner in which the ICC can exercise jurisdiction, Congress has enacted further legislation that does not authorize sanctions, including legislation supporting the work of the ICC:

   a. In 2008, Congress repealed ASPA's prior constraints on providing military assistance to States Parties of the ICC.  *See* National Defense Authorization Act for Fiscal Year 2008, 122 Stat. 3 § 1212.

   b. Congress has authorized the State Department to offer monetary rewards to individuals who provide information that facilitates the arrest of foreign individuals

18

wanted by the ICC. *See* Department of State Rewards Program Update and Technical Corrections Act of 2012, 126 Stat. 2492.

c. As described in ¶¶ 66-80, Congress has endorsed the work of the ICC in several joint and chamber-specific resolutions.

d. In 2024, Congress appropriated funds to support the ICC directly. This included "not less than $2,500,000 as a contribution to the [ICC's] Trust Fund for Victims." Congress additionally appropriated $2,500,000 for "Assistance to International Efforts" that include supporting the ICC's investigations and prosecutions of foreign nationals related to the situation in Ukraine. *See* Further Consolidated Appropriations Act, 2024, § 7034(r), Pub. L. No. 118-47, 138 Stat. 460, 793 (2024).

65. U.S. courts have cited the Rome Statute and judicial decisions of the ICC to interpret international law, *see, e.g.*, *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 261 (2018); *Nahl v. Jaoude*, 968 F.3d 173, 188 (2d Cir. 2020); *Simon v. Republic of Hungary*, 812 F.3d 127, 143 (D.C. Cir. 2016), *vacated*, 604 U.S. 115 (2024); *Hamdan v. United States*, 696 F.3d 1238, 1250 (D.C. Cir. 2012), *overruled on other grounds by Al Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014); *Doe v. Exxon Mobil Corp.*, 391 F. Supp. 3d 76, 90 (D.D.C. 2019), and to evaluate applications for asylum, *see, e.g.*, *Wanjiru v. Holder*, 705 F.3d 258, 260 (7th Cir. 2013).

66. Both Democratic and Republican administrations have endorsed ICC investigations and prosecutions, including providing direct support for them. That support has not turned on whether the targets of the investigation or prosecution are nationals of States Parties to the Rome Statute or whether the State on whose territory the alleged crimes occurred is a State Party to the Rome Statute.

67. In October 2024, in a statement to the United Nations General Assembly, the Legal Advisor to the United States Mission stated: "The United States remains steadfast in its commitment to international justice and promoting accountability for violations of international humanitarian law…. The work of the International Criminal Court is vital to this mission, and we welcome the ICC's continued efforts … to deliver justice in situations where atrocities have been committed with impunity, including in Ukraine, Darfur, and the Central African Republic."[4] Such investigation and prosecutions include, *inter alia*:

68. **Uganda**: In December 2003, the Government of Uganda (a State Party to the Rome Statute) referred the situation in its territory concerning the Lord's Resistance Army ("LRA") to the ICC, consisting of alleged war crimes and crimes against humanity, including enlistment of children, sexual enslavement, and rape occurring since it ratified the Rome Statute in 2002.  In July 2004, the OTP opened an investigation.

      a.  In January 2015, the United States played a leading role in facilitating the transfer to the ICC of Dominic Ongwen, a commander of the LRA.  The State Department stated that "[t]he United States welcomes [Ongwen's] transfer … by Central African authorities to the International Criminal Court" and that the surrender "give[s] hope—to the survivors, to the four countries affected by the LRA, and to their partners around the world—that the nightmare of the LRA can be brought to an end."[7]

---

[4] U.S. Mission to the U.N., *Remarks at a U.N. General Assembly Meeting on a Report of the International Criminal Court*, (Oct. 28, 2024), https://web.archive.org/web/20250623003742/https://usun.usmission.gov/remarks-at-a-un-general-assembly-meeting-on-a-report-of-the-international-criminal-court-2/.

[7] U.S. Dep't of State, *Transfer of Dominic Ongwen to the International Criminal Court* (Jan. 20, 2015), https://2009-2017.state.gov/r/pa/prs/ps/2015/01/236142.htm.

b.  Upon his conviction of 61 crimes comprising crimes against humanity and war crimes, in February 2021, the State Department "welcome[d] the verdict" against Mr. Ongwen as a "a significant step for justice and accountability for atrocities committed by the LRA."[8]

c.  In December 2022, the State Department "welcomed" the "judgment affirming [Mr. Ongwen's] conviction" and expressed "hope" that the "judgment demonstrates that justice must and will be done" for "the thousands of abducted young women and girls subjected to horrific sexual violence, torture, and forced labor in the Lord's Resistance Army."[9]

d.  Congress has endorsed the ICC's investigation in Uganda.  *See* S. Con. Res. 16, 153 Cong. Rec. S2540 (2007) (Joint resolution citing the ICC's work to condemn the LRA in Uganda); S. Res. 402, 158 Cong. Rec. S6007 (2012) (reiterating the Senate's support for the prosecution of Joseph Kony).

69. **The Democratic Republic of the Congo**: In March 2004, the Government of the Democratic Republic of the Congo (a State Party to the Rome Statute) referred the situation in its territory to the ICC, consisting of alleged war crimes and crimes against humanity, including the recruitment of child soldiers, rape, and murder.  In June 2004, the OTP opened an investigation.

a.  One of the defendants, Bosco Ntaganda, surrendered himself to the U.S. Embassy in Rwanda in March 2013.  The United States facilitated the transfer of Mr. Ntaganda to the ICC.  The State Department stated that it "welcome[d]

---

[8] U.S. Dep't of State, *Welcoming the Verdict in the Case Against Dominic Ongwen for War Crimes and Crimes Against Humanity* (Feb. 4, 2021), https://2021-2025.state.gov/welcoming-the-verdict-in-the-case-against-dominic-ongwen-for-war-crimes-and-crimes-against-humanity/.

[9] U.S. Dep't of State, *Judgment in the Appeal of Dominic Ongwen at the International Criminal Court* (Dec. 15, 2022), https://2021-2025.state.gov/judgment-in-the-appeal-of-dominic-ongwen-at-the-international-criminal-court/.

21

the removal of one of the most notorious and brutal rebels in the Democratic Republic of the Congo, Bosco Ntaganda, … to the International Criminal Court."[11]  In November 2013, the State Department stated that the United States had "played a key role in the surrender of Bosco Ntaganda to the ICC."[12]

b. This action was unanimously endorsed in a resolution by the Senate. S. Res. 144, 159 Cong Rec. S5302 (2013).

c. The ICC issued arrest warrants against leaders of the Democratic Forces for the Liberation of Rwanda, Callixte Mbarushimana and Sylvestre Mudacumura, who are Rwandan nationals, for crimes committed in the DRC, even though Rwanda is not a State Party.  In October 2010, the U.S. State Department issued a statement welcoming the arrest of Mr. Mbarushimana and expressing the United States' support for the ICC's ongoing investigations into atrocities committed in the DRC.[13]

70. **The Central African Republic**: The Government of the Central African Republic (a State Party to the Rome Statute) made two referrals to the ICC, the first in December 2004 consisting of alleged international crimes occurring during an armed conflict between 2002 and 2003, and later, crimes committed since August 2012.  The Prosecutor opened an investigation into both: in May 2007, into alleged war crimes and crimes against humanity, including mass rapes

---

[11] U.S. Dep't of State, *Bosco Ntaganda's Expected Surrender to the International Criminal Court* (Mar. 22, 2013), https://2009-2017.state.gov/secretary/remarks/2013/03/206556.htm.

[12] U.S. Dep't of State, *Statement of the U.S. at the Twelfth Session of the Assembly of States Parties of the International Criminal Court* (Nov. 21, 2013), https://2009-2017.state.gov/j/gcj/us_releases/remarks/2013/218069.htm.

[13] U.S. Dep't of State, *Democratic Republic of the Congo: Arrest of Callixte Mbarushimana* (Oct. 13, 2010), https://2009-2017.state.gov/r/pa/prs/ps/2010/10/149362.htm.

22

and killings; and then in September 2014, into alleged later war crimes and crimes against humanity, which led to thousands of deaths and left hundreds of thousands displaced.

    a.  In March 2016, the State Department expressed the United States' support for "the ICC's investigations in the Central African Republic [(CAR)]" and stated that "we commend CAR's commitment to ensuring accountability for serious crimes, including through its cooperation with the ICC in this matter."[16]

71. **Mali:** In July 2012, the Government of Mali (a State Party to the Rome Statute) referred to the ICC the situation regarding alleged international crimes occurring during the armed conflict in its territory.  In January 2013, the Prosecutor opened an investigation into alleged war crimes committed in Mali since January 2012, including with regard to the destruction of cultural heritage sites in the city of Timbuktu.

    a.  In October 2015, the State Department stated: "We welcome the announcement by the Prosecutor of the International Criminal Court (ICC) that Ahmad Al Faqi Al Mahdi … has been surrendered to the Court by Nigerien authorities.  This is an important step toward holding accountable those responsible for serious crimes in Mali."[19]  Ahmad Al Faqi Al Mahdi later admitted guilt as to the war crime consisting of the destruction of historical and religious monuments in Timbuktu.

    b.  The State Department further stated: "The United States strongly condemns the destruction of Muslim shrines and other religious and historic sites in Timbuktu

---

[16] U.S. Dep't of State, *ICC Convicts Jean-Pierre Bemba Gombo of War Crimes and Crimes against Humanity* (Mar. 22, 2016), https://2009-2017.state.gov/r/pa/prs/ps/2016/03/254958.htm.

[19] U.S. Dep't of State, *ICC Announces Case on Destruction of Cultural Sites in Mali* (Oct. 1, 2015), https://2009-2017.state.gov/r/pa/prs/ps/2015/10/247741.htm.

by extremist militants.… We are outraged by the destruction of these World Heritage Sites. These are assaults not just on Mali and its people, but on the common cultural heritage of all humankind, and those responsible for these acts—and all those responsible for atrocity crimes—should face justice.… We commend Mali's commitment to ensuring accountability for serious crimes and its cooperation with the ICC in this matter."[20]

c. In September 2016, the State Department stated: "The United States supports efforts by the ICC and Malian authorities to provide justice for these serious crimes committed in Mali. We commend Mali for its cooperation with the ICC in this matter, and we encourage continued national and international efforts to bring to justice senior extremist leaders who led the campaign to terrorize northern Mali and destroy symbols of its rich history of tolerance and cultural pluralism."[21]

72. **Venezuela:** In 2018, six States Parties to the Rome Statute referred the situation in Venezuela, a Party to the Rome Statute, to the ICC. This includes allegations of crimes against humanity—including arbitrary detention, torture, rape and sexual violence, and persecution—committed by the government of Venezuela led by former President Nicolás Maduro against its political opponents. In November 2021, the Prosecutor requested authorization to open an investigation, which the Pre-Trial Chamber granted.

---

[20] *Id.*

[21] U.S. Dep't of State, *ICC Judgment in Mali Cultural Destruction Case* (Sep. 27, 2016), https://2009-2017.state.gov/r/pa/prs/ps/2015/10/247741.htm.

24

a. In December 2022, the U.S. Ambassador-at-Large for Global Criminal Justice announced the United States' support for the investigation.[22]

b. According to the 2023 edition of the Digest of United States Practice in International Law, quoting a public delegate for the U.S. Mission to the UN, the U.S. "welcomed … the Court's reauthorization of the Prosecutor's investigation in Venezuela.  Victims of these atrocities continue to demand justice."[23]  The U.S. Ambassador reiterated the United States support in December 2023, along with progress in a host of other OTP investigations and prosecutions.[24]

73. **Philippines:** In September 2021, the ICC's Pre-Trial Chamber authorized the Prosecutor to investigate alleged crimes against humanity committed in the Philippines between November 2011 and March 2019 (during the time that the Philippines was a State Party to the Rome Statute), in the context of the Philippines' "war on drugs" campaign.  Following a request by the Philippines for a deferral of the investigation, in January 2023, the Pre-Trial Chamber confirmed that the Prosecutor could continue the investigation.

a. In May 2024, a spokesperson for the U.S. State Department said that "[t]he United States is aware of the ICC's decision to continue their inquiry in the

---

[22] U.S. Amb.-at-Large for Glob. Crim. Just., *Building Justice: Criminal Accountability and the Road to Peace, Questions on Justice in Libya and Beyond* (Dec. 1, 2022), https://2021-2025.state.gov/building-justice-criminal-accountability-and-the-road-to-peace-questions-on-justice-in-libya-and-beyond.

[23] U.S. Dep't of State, *Digest of the United States Practice in International Law* (2023), p. 102, https://2021-2025.state.gov/wp-content/uploads/2024/12/2023-Digest-of-United-States-Practice-in-Internation-Law-Full.pdf.

[24] U.S. Amb.-at-Large for Glob. Crim. Just., *Statement of the United States at the 22nd Session of the Assembly of States Parties of the International Criminal Court* (Dec. 8, 2023), https://2021-2025.state.gov/statement-of-the-united-states-at-the-22nd-session-of-the-assembly-of-states-parties-of-the-international-criminal-court.

Philippines," adding that the United States "appreciates the openness" of current President Marcos to that investigation.[27]

b.  In March 2025, following an application by the Prosecutor, the ICC's Pre-Trial Chamber issued an arrest warrant against former President Rodrigo Duterte for the crime against humanity of murder which led to his arrest and surrender to the ICC a few days later.

74. **Sudan**: In March 2005, the UN Security Council referred the situation in the Darfur region of Sudan (not a State Party to the Rome Statute) to the ICC; the U.S. abstained from, rather than vetoed, the resolution referring the matter.  In June 2005, the Prosecutor opened an investigation into alleged genocide, war crimes, and crimes against humanity committed in Darfur.

a.  In 2007, a State Department spokesperson stated that the United States "fully support[s] bringing to justice those responsible for crimes and atrocities … that have occurred in Darfur.  We are at a point in the process now where we would call upon the Sudanese Government to cooperate fully with the ICC under the aegis of UN Security Council Resolution 1593.  So, it is now incumbent upon the Government of Sudan, we believe, to cooperate with the ICC."[30]

b.  Congress has supported the ICC's Darfur investigation and prosecution through resolutions.  *See, e.g.*, S. Res. 188, 165 Cong. Rec. S4736 (Senate resolution approving of the work of the ICC in prosecuting former Sudanese president Al-Omar Al-Bashir).

---

[27] Lian Buan, *US 'appreciates openness' of Marcos to ICC drug war probe*, Rappler (May 14, 2024), https://www.rappler.com/philippines/us-state-department-statement-openness-marcos-icc/.

[30]  U.S.  Dep't  of  State,  *Daily  Press  Briefing*  (Feb.  27,  2007),  https://2001-2009.state.gov/r/pa/prs/dpb/2007/feb/81127.htm.

75. Since fighting resumed in April 2023, the Prosecutor indicated in January 2025 that the OTP expects to request arrest warrants based on investigations into crimes committed since April 2023 in West Darfur. The ICC is the only tribunal currently mandated to hold such individuals responsible, and the OTP is conducting the only international criminal investigation into these matters.

a. In November 2024, the United States House of Representatives passed, by a super-majority voice vote, a resolution to "support[] tribunals and international criminal investigations to hold the [Sudanese Rapid Support Forces] and allied militias accountable for war crimes, crimes against humanity, and genocide."[32]

b. During a U.N. Security Council Briefing by the Prosecutor that took place on January 27, 2025, the U.S. Chargé d'affaires ad interim to the United Nations stated: "Those responsible for these terrible crimes must be held accountable. Many responsible for atrocities over 20 years ago in Sudan remain at large. We urge the international community to work to bring those individuals to trial so they can be publicly held to account for their alleged crimes."[33]

76. **Libya**: In February 2011, the United States voted in favor of U.N. Security Council resolution 1970, which referred the situation in Libya (not a State Party to the Rome Statute) to the ICC. In March 2011, the Prosecutor opened an investigation into alleged war crimes and crimes against humanity committed in Libya, including widespread and systematic killings and disappearances.

---

[32] Recognizing the Actions of the Rapid Support Forces and Allied Militias in the Darfur Region of Sudan Against Non-Arab Ethnic Communities as Acts of Genocide, H. Res. 1328 (Nov. 20, 2024).

[33] U.S. Mission to the U.N., *Remarks by Ambassador Dorothy Shea, Chargé d'Affaires ad interim, at a U.N. Security Council Briefing by the ICC Prosecutor for Sudan* (Jan. 27, 2025), https://usun.usmission.gov/remarks-by-ambassador-dorothy-shea-charge-daffaires-ad-interim-at-a-un-security-council-briefing-by-the-icc-prosecutor-for-sudan/.

a. Speaking on the occasion of the unanimous U.N. Security Council referral to the ICC, the U.S. Permanent Representative to the United Nations stated: "[T]he Security Council has responded to the Libyan people's cry for help. This Council's purpose is clear—to protect innocent civilians."[34]  The Permanent Representative added: "for the first time ever, the Security Council has unanimously referred an egregious human rights situation to the International Criminal Court."[35]

b. In a subsequent Security Council session, the United States stated that the referral to the ICC "reflected the importance that the international community attaches to ensuring that those responsible for the widespread and systematic attacks against the Libyan people are held accountable."[36]  The United States commended the OTP, stating that the United States "welcomes the swift and thorough work of the Prosecutor…. The spectre of ICC prosecution is serious and imminent, and should serve as a warning to those around [former Libyan leader Muammar] Al-Qadhafi of the perils of continuing to tie their fate to his."[37]

---

[34] U.S. Mission to Int'l Orgs. in Geneva, *UNSC Resolution on Libya Authorizes Use of Force, Including No-Fly Zone* (Mar. 18, 2011), https://geneva.usmission.gov/2011/03/18/no-fly-zone/.

[35] U.S. Dep't of State, *Remarks In an Explanation of Vote on Resolution 1970 on Libya Sanctions* (Feb. 26, 2011), https://2009-2017.state.gov/p/io/rm/2011/157390.htm.

[36] U.N. Sec. Council, 66th Sess., 6528th mtg., U.N. Doc. S/PV.6528, at p. 12 (May 4, 2011), https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/Libya%20S%20PV%206528.pdf.

[37] *Id.*

77. The United States has welcomed the opening of investigations and the issuance of arrest warrants in situations where crimes are alleged to have been committed by a non-State Party national on the territory of an ICC State Party.  These include:

78. **Ukraine**: Ukraine accepted the ICC's jurisdiction over alleged crimes occurring on its territory beginning on November 21, 2013, and subsequently ratified the Rome Statute in 2024. In March 2022, following Russia's full-scale invasion of Ukraine, 43 ICC States Parties referred the situation in Ukraine to the ICC.  The Prosecutor opened an investigation that encompasses allegations of war crimes, crimes against humanity, and genocide committed on the territory of Ukraine, which includes alleged crimes committed by Russian nationals, even though Russia is not a State Party.  The ICC has issued arrest warrants for six persons in the Ukraine situation, including Vladimir Putin, President of the Russian Federation, and Maria Lvova-Belova, Commissioner for Children's Rights in the Office of the President.  The international crimes for which arrest warrants for these individuals have been charged include the forcible transfer and deportation of children from occupied areas of Ukraine to Russia.

    a. On April 27, 2022, the U.S. Ambassador-at-Large for Global Criminal Justice stated that "[t]he United States welcomes the opening of the investigation by the ICC into atrocity crimes committed in Ukraine, and we intend to engage with all stakeholders to achieve our common objectives in ensuring justice."[38]

    b. In March 2022, the Senate unanimously passed a bipartisan resolution supporting the ICC's investigation of alleged crimes committed by Russian nationals in Ukraine.  The resolution stated that the ICC "is an international

---

[38] U.S. Mission to U.N., *Remarks at a UN Security Council Arria-Formula Meeting on Ensuring Accountability for Atrocities Committed by Russia in Ukraine* (Apr. 27, 2022), https://web.archive.org/web/20220509175804/https://usun.usmission.gov/remarks-at-a-un-security-council-arria-formula-meeting-on-ensuring-accountability-for-atrocities-committed-by-russia-in-ukraine/.

tribunal that seeks to uphold the rule of law, especially in areas where no rule of law exists, by investigating and trying individuals charged with the gravest crimes of concern to the international community: genocide, war crimes, crimes against humanity and the crime of aggression" and resolved to "encourage[] member states to petition the ICC or other appropriate international tribunal to take any appropriate steps to investigate war crimes and crimes against humanity committed by the Russian Armed Forces and their proxies and President Putin's military commanders, at the direction of President Vladimir Putin."[39]

c. In December 2022, Congress passed the FY 2023 Consolidated Appropriations Act, which expanded the authority of the United States to assist the ICC. The Act provides that the United States may "render[] assistance to the International Criminal Court to assist with investigations and prosecutions of foreign nationals related to the Situation in Ukraine, including to support victims and witnesses." H.R. 2617, 117th Cong. § 7073(b) (2023).

d. On May 31, 2023, the U.S. Ambassador-at-Large for Global Criminal Justice stated that "[w]e are grateful for the bipartisan legislation Congress has enacted to support the ICC's investigation in Ukraine."[40] The Ambassador further stated that "[h]olding Russia to account for its war crimes and other atrocities within

---

[39] S. Res. 546, 117th Cong. (2022) (enacted) (internal quotation marks omitted).

[40] *Accountability for Russian Atrocities in Ukraine: Hearing Before the S. Comm. on Foreign Rels.*, 118th Cong. 6 (2023) (statement of Beth Van Schaack, Ambassador-at-Large for Global Criminal Justice, U.S. Dep't of State).

Ukraine and against its people is foundational to the defense of U.S. values and the maintenance of a peaceful, just, and secure world."[41]

e. In 2023, then-President Joseph R. Biden, Jr. stated that the arrest warrants, including that against President Putin, were "justified."[42]   President Biden ordered the U.S. government to share evidence of alleged war crimes with the OTP to aid its investigation, a move supported by Senators of both parties.

79. **Republic of Georgia:** In January 2016, the ICC's Pre-Trial Chamber authorized the Prosecutor to investigate alleged war crimes and crimes against humanity committed in Georgia, a State Party to the Rome Statute, in the context of Russia's invasion of Georgia in 2008.

a. In June 2022, the ICC issued arrest warrants for three individuals, including two Russian nationals, for allegedly committing, *inter alia*, unlawful confinement torture and hostage taking.

b. In August 2022, the U.S. Mission to the United Nations expressed its approval of the "decisions of the International Criminal Court of June 2022 to issue arrest warrants for war crimes committed during Russia's invasion in 2008."[44]

80. **Bangladesh/Myanmar:** In November 2019, the ICC's Pre-Trial Chamber authorized the Prosecutor to investigate alleged crimes against humanity of deportation and persecution, committed against the Rohingya population, on the ground that the crimes partially occurred in Bangladesh (a State Party to the Rome Statute), even though Myanmar is not a State Party.  In

---

[41] *Id.*, at 7.

[42] Jeff Mason and Simon Lewis, *Biden says Putin committed war crimes, calls charges justified*, Reuters (March 18, 2023),   https://www.reuters.com/world/europe/us-says-no-doubt-russia-is-committing-war-crimes-ukraine-after-icc-issues-putin-2023-03-17/.

[44] U.S. Mission to the U.N., *Joint Statement by UN Security Council Members following an AOB on Georgia* (Aug. 15, 2022), https://web.archive.org/web/20220922092959/https://usun.usmission.gov/joint-statement-by-un-security-council-members-following-an-aob-on-georgia-2/.

November 2024, the ICC Prosecutor filed an application for a warrant of arrest for Senior General and Acting President Min Aung Hlaing, Commander-in-Chief of the Myanmar Defense Services, for the alleged crimes against humanity of deportation and persecution.

    a.  In March 2022, U.S. Secretary of State Antony Blinken "determined that members of the Burmese [Myanmar] military committed genocide and crimes against humanity against Rohingya."[45]   The United States has stated it is "committed to justice for victims, survivors and their families, and to accountability for those responsible for past atrocities."[46]  In September 2022, the U.S. State Department indicated it would "support a referral of the situation in Burma [Myanmar] to the [ICC]."[47]

81. There are two investigations that the United States has opposed.   These are investigations into the situations in Afghanistan and Palestine.

82. **Afghanistan**: In 2017, the Prosecutor requested an authorization from the Pre-Trial Chamber to open an investigation into crimes allegedly committed in Afghanistan (a State Party to the Rome Statute), including those allegedly committed by the Taliban, Afghan security forces, and U.S. personnel.

    a.  In 2019, the Pre-Trial Chamber denied the request to open an investigation, finding that an investigation would not serve the interests of justice.  In 2020, following

---

[45] U.S. Dep't of State, *Secretary Antony J. Blinken on the Genocide and Crimes Against Humanity in Burma* (Mar. 21, 2022), https://2021-2025.state.gov/secretary-antony-j-blinken-at-the-united-states-holocaust-memorial-museum/.

[46] U.S. Dep't of State, *2022 Report to Congress Pursuant to Section 5 of the Elie Wiesel Genocide and Atrocities Prevention Act of 2018 (P.L. 115-441)* (July. 15, 2022), https://2021-2025.state.gov/2022-report-to-congress-pursuant-to-section-5-of-the-elie-wiesel-genocide-and-atrocities-prevention-act-of-2018/.

[47] U.S. Dep't of State, *Marking Five Years Since the Genocide in Burma* (Aug. 24, 2022), https://2021-2025.state.gov/marking-five-years-since-the-genocide-in-burma/#:~:text=Press%20Statement%0AAntony%20J.%20Blinken%2C%20Secretary%20of%20State%0AAugust%2024%2C%202022.

legal argument and a hearing, including by *amicus curiae* (including an oral intervention by former U.S. Ambassador-at-Large for War Crimes Issues, David Scheffer), the Appeals Chamber reversed that ruling and unanimously authorized the Prosecutor to proceed with the investigation. In April 2020, the Prosecutor notified the Pre-Trial Chamber of Afghanistan's request that the OTP defer its investigation.

b. In September 2021, the Prosecutor requested authorization from the Pre-Trial Chamber to resume the investigation, which the Pre-Trial Chamber granted in October 2022. In making the request, the Prosecutor expressed his decision "to focus my Office's investigations in Afghanistan on crimes allegedly committed by the Taliban and the Islamic State – Khorasan Province ('IS-K') and to deprioritise other aspects of this investigation,"[48] understood to be a reference to the investigation of alleged crimes by Afghan and U.S. forces.

c. In November 2024, six States Parties (Chile, Costa Rica, France, Luxembourg, Mexico and Spain) referred the situation in Afghanistan to the ICC, requesting an investigation into alleged crimes committed against women and girls after the Taliban takeover in 2021. The United States Mission to the United Nations had previously "condemn[ed] in the strongest terms the Taliban's continued systemic gender discrimination and oppression of women and girls in Afghanistan."[49]

---

[48] Int'l Crim. Ct., *Statement of the Prosecutor of the International Criminal Court, Karim A. A. Khan QC, following the application for an expedited order under article 18(2) seeking authorisation to resume investigations in the Situation in Afghanistan* (Sep. 27, 2021), https://www.icc-cpi.int/news/statement-prosecutor-international-criminal-court-karim-khan-qc-following-application.

[49] U.S. Dep't of State, *Joint Statement on the Human Rights Situation in Afghanistan* (Sep. 6, 2024), https://usun.usmission.gov/joint-statement-on-the-human-rights-situation-in-afghanistan/.

d. In January 2025, applications for arrest warrants were announced for senior members of the Taliban for the crime against humanity of persecution on gender grounds committed against women, girls, and members of the LGBTQI+ community since the Taliban takeover. The United States has not indicated any opposition to these arrest warrants.

e. No applications for arrest warrants have been announced for U.S. personnel. The Prosecutor has not communicated any intent to reprioritize investigations against such actors.

83. **Palestine**: In January 2015, Palestine accepted the ICC's jurisdiction and subsequently, upon becoming an ICC State Party, referred the situation to the Prosecutor in May 2018. In 2021, following confirmation by the ICC's Pre-Trial Chamber that jurisdiction was proper, the Prosecutor opened an investigation into the *Situation in Palestine*. In November 2023, five States Parties (Bangladesh, Bolivia, Comoros, Djibouti, and South Africa) submitted an additional referral, and in January 2024, two more States Parties (Mexico and Chile) submitted another referral to the Prosecutor.

a. In May 2024, the ICC Prosecutor announced that he had submitted applications for arrest warrants for three Palestinian nationals holding senior positions in Hamas, and two Israeli nationals, including Prime Minister Benjamin Netanyahu.

b. Following the announcement of the arrest warrant applications, the United Kingdom sought to challenge the ICC's jurisdiction over the *Situation in Palestine* through a Rule 103 *amicus* request, which resulted in the Pre-Trial Chamber receiving over 60 *amicus curiae* submissions, including from the United States

(consistent with its legal authorization to do so under ASPA). The United Kingdom withdrew its request before the Pre-Trial Chamber ruled on its challenge.

c. On November 21, 2024, the ICC issued an arrest warrant for Mohammed Al-Masri, the highest commander of the military wing of Hamas, for, *inter alia*, the alleged international crimes of murder, extermination, torture, rape and other forms of sexual violence, hostage-taking, and outrages upon personal dignity. The arrest warrant was terminated in February 2025, following confirmation of Mr. Al-Masri's death. The requests for arrest warrants for Ismail Haniyeh and Yahya Sinwar, two other senior leaders of Hamas, were withdrawn upon confirmation of their deaths.

d. The ICC also issued arrest warrants for Benjamin Netanyahu, Prime Minister of Israel, and Yoav Gallant, former Minister of Defense of Israel, for the alleged war crimes of starvation as a method of warfare, intentionally directing an attack against the civilian population, and the alleged crimes against humanity of murder, persecution, and other inhumane acts. As part of a jurisdictional challenge, the United States made an *amicus curiae* submission raising concerns regarding the Court's exercise of jurisdiction.

e. Israel has raised several challenges to the ICC's Palestine investigation through legal submissions to the ICC's Pre-Trial and Appeals Chambers:

    i. A jurisdictional challenge pursuant to Article 19(2) of the Rome Statute, which permits a State that has jurisdiction over a case to challenge the ICC's exercise of jurisdiction on the ground that, *inter alia*, the State is investigating or prosecuting the case or has investigated or prosecuted it.

35

The Pre-Trial Chamber denied the challenge as "premature," but the Appeals Chamber subsequently remanded to the Pre-Trial Chamber for further consideration and a ruling on the substance of Israel's jurisdictional challenge, while not setting aside the arrest warrants. This matter is pending before the Pre-Trial Chamber.

ii. A challenge seeking the Prosecutor to issue a new or revised notice under Article 18(1) of the Rome Statute, so as to re-open Israel's ability to seek a deferral, along with a request to have the arrest warrants against Israeli nationals vacated or withdrawn. The Appeals Chamber rejected Israel's appeal; two judges dissented from parts of the majority decision.

iii. A formal request to disqualify the Prosecutor, which was denied by the Appeals Chamber.

## II. Executive Order 14,203 and the Statutory Authority It Invokes

84. On February 6, 2025, President Trump issued EO 14,203. The Executive Order invokes authority Congress delegated to the President in, *inter alia*, the National Emergencies Act ("NEA"), 50 U.S.C. §§ 1601 *et seq.*, and IEEPA, 50 U.S.C. §§ 1701 *et seq*. EO 14,203, Preamble. These statutes were designed to limit presidential abuses of emergency authorities, not to authorize their unbounded use.

### *The National Emergencies Act*

85. The NEA provides the framework for declarations of national emergencies. It "establish[es] clear procedures and safeguards for the exercise by the President of emergency powers conferred upon him by other statutes." *United States v. Frade*, 709 F.2d 1387, 1400 (11th Cir. 1983) (quoting Report of the Committee on Government Operations: National Emergencies Act, S. Rep. No. 94-1168 at 3(Aug. 26, 1976)).

36

86. The NEA was enacted in 1976 to address "[r]evelations of how [emergency] power has been abused by high government officials" and "concern about the potential exercise, unchecked by the Congress or the American people, of this extraordinary power." Final Report of the Special Committee on National Emergencies and Delegated Emergency Powers, S. Rep. 94-922 at 18 (May 28, 1976). Prior open-ended grants of emergency power "often … led to a situation in which the use of an Act belie[d] the purposes for which it was enacted." *Id*. at 12.

87. In the face of such abuses, Congress intended the NEA to "make it possible for our Government to function in accordance with regular and normal provisions of law rather than through special exceptions and procedures which were intended to be in effect for limited periods during specific emergency conditions." H.R. Rep. No. 94-238, at 2 (1975). The NEA thus aims to prevent the President from "rul[ing] the country without reference to normal constitutional process" and to ensure that emergency powers "will be utilized only in time of genuine emergency." S. Rep. 94-922 at 18.

88. The NEA was "not intended to enlarge or add to Executive power." S. Rep. No. 94-1168 at 3 (1976). It explicitly disclaims granting the President any substantive authority that can be exercised to address a national emergency, instead requiring that "[w]hen the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631.

### *The International Emergency Economic Powers Act*

89. One of the statutes through which Congress has authorized the President to exercise emergency power is IEEPA, enacted in 1977. Under IEEPA, "the President may "block … regulate … void, prevent or prohibit, any acquisition, holding, withholding, use, transfer,

37

withdrawal, … dealing in, or exercising any right, power or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States."  50 U.S.C. § 1702(a)(1)(B).

90. The circumstances when the President may wield the authority Congress delegated through IEEPA are limited. The powers delegated to the President thereunder "*may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose*."  *Id.* § 1701(b) (emphasis added).

91. The national emergency in relation to which IEEPA powers may be exercised must concern an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."  *Id.* § 1701(a).

92. The "purpose" of IEEPA was to "revise and delimit the President's authority to regulate international economic transactions during wars or national emergencies."  S. Rep. No. 95-466, at 2 (1977), reprinted in 1977 U.S.C.C.A.N. 4540, 4541.  In enacting IEEPA, Congress chiefly sought to limit the non-wartime powers that the President had been delegated under the Trading with the Enemy Act of 1917 ("TWEA").  H.R. Rep. No. 95-459, at 3-9 (1977); *see id.* at 9 (quoting congressional testimony by Assistant Secretary of the Treasury C. Fred Bergsten) ("[T]he authority of … section [5(b) of TWEA] is so broad that this administration strongly believes that the powers should only be used on a truly emergency basis.").

93. In enacting IEEPA, Congress underscored that Presidential "authority for *routine, nonemergency regulation* of international economic transactions which has heretofore been

38

conducted under [TWEA] should be transferred to other legislation," and that nonemergency regulation is *not* permitted under IEEPA. *Id*. at 11 (emphasis added).

94. Congress intended the requirement of a national emergency to be a meaningful constraint on the President's IEEPA power. The "main … substantive restriction[]" on the exercise of IEEPA authority "stems from a recognition that emergencies are by their nature rare and brief, and are not to be equated with normal ongoing problems." *Id*. at 10. Congress explained that "[a] national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute *a real emergency, and for no other purpose*." *Id*. (emphasis added). "A state of national emergency should not be a normal state of affairs." *Id.*

### *Executive Order 14,203*

95. EO 14,203 declares a national emergency with respect to "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons," defined as "any United States person, unless the United States provides formal consent to ICC jurisdiction over that person or becomes a state party to the Rome Statute" and "any foreign person that is a citizen or lawful resident of an ally of the United States that has not consented to ICC jurisdiction over that person or is not a state party to the Rome Statute." EO 14,203, Preamble & § 8(d).

96. The Executive Order asserts that the ICC has "engaged in illegitimate and baseless actions" because it has "without a legitimate basis, asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel, and has further abused its power by issuing baseless arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and Former Minister of Defense Yoav Gallant." *Id*., Preamble. The Executive Order further asserts that the "ICC has no jurisdiction over the United States or Israel, as neither country is party to the Rome Statute or a member of the ICC." *Id*.

39

97.  The Executive Order declares this putative national emergency despite the fact that the Rome Statute authorizes the ICC to exercise territorial jurisdiction where crimes are committed by non-State Party nationals on the territory of an ICC State Party, an authorization about which the United States has long been aware.  *See supra* ¶¶ 31-32.  And, the Executive Order does so notwithstanding the fact that the United States has, in numerous cases, supported ICC investigations into and prosecutions of crimes allegedly committed by nationals of States that are not party to the Rome Statute or members of the ICC.  *See supra* ¶¶ 77-80.  The Executive Order also does so despite the fact that Congress has prescribed limited *legal processes* for the Executive to address situations in which the ICC seeks to investigate or prosecute a covered U.S. or allied person.

98. Pursuant to Section 1(a)(ii) of EO 14,203, the Secretary of State is authorized to designate any foreign person whom the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, determines to meet the criteria provided in the Executive Order.[50]  Designation results in the designated person's inclusion on the SDN List maintained by OFAC.

99. It is unlawful to violate an Executive Order issued under IEEPA that prohibits dealing in a designated person's property or interests in property.  50 U.S.C. § 1705(a).  Those who violate

---

[50] Section 1(a)(ii) authorizes the Secretary of State to designate any additional foreign person whom the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, determines:

(A)     to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality;

(B)     to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity in subsection (a)(ii)(A) of this section or any person whose property or interests in property are blocked pursuant to this order; or

(C)     to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property or interests in property are blocked pursuant to this order.

EO 14,203 § 1(a)(ii).

such orders are subject to a civil penalty of the greater of $377,700 or twice the value of the blocked transaction. *See id.*; 31 C.F.R. § 501, App. A; 90 Fed. Reg. 3687 (2025). They are also subject to criminal fines up to $1,000,000 and if a natural person, up to 20 years of imprisonment.

**III. Plaintiffs' Designations Under Executive Order 14,203**

100. Each of the Plaintiffs has been designed for sanctions under EO 14,203 and included on OFAC's SDN List.

### *Judge Kimberly Prost*

101. Judge Prost is a Canadian national who has served as a judge of the ICC since March 2018. Her election as a Judge of the ICC is the culmination of a decades-long career in criminal law and counterterrorism.

102. Prior to her international judicial service, Judge Prost had a distinguished career as a federal prosecutor in Canada.

    a. In May 1981, Judge Prost graduated with a Bachelor of Law (L.L.B.) degree from the University of Manitoba Faculty of Law as a gold medalist, the award given to the top graduating student in the program. She was admitted to the Bar of Manitoba, Canada in June 1982 and to the Bar of Ontario, Canada in April 1991.

    b. In June 1982, Judge Prost began working as a domestic federal prosecutor in a regional office of Canada's Department of Justice in Winnipeg, Manitoba, serving in that role for five years conducting trials, including jury trials, in relation to a range of alleged criminal offenses.

    c. In June 1987, Judge Prost transitioned to Counsel in Canada's newly-formed Crimes Against Humanity and War Crimes Section in the Department of Justice in Ottawa, Ontario, where she was responsible for preparing case assessments for the

41

Minister of Justice regarding possible prosecutions of Nazi and other war criminals living in Canada.

d. From January 1990 to June 1994, Judge Prost served as Senior Counsel in the Criminal Law Branch of the Department of Justice, representing the Government of Canada in criminal, extradition, and constitutional law cases, including before the Supreme Court of Canada.

e. From June 1994 to July 2000, Judge Prost served as Director of the International Assistance Group in the Department of Justice, where she was responsible for developing Canada's processes for extradition and international cooperation in criminal matters.  She also represented Canada in over 40 bilateral and multilateral treaty negotiations, including the U.N. Convention against Transnational Organized Crime and the U.N. Convention against Corruption.

f. In 1998, Judge Prost was a member of the Canadian delegation for the negotiation of the Rome Statute and subsequently worked on the Crimes Against Humanity and War Crimes Act that incorporated the Rome Statute into Canadian domestic law. Throughout her tenure with the Department of Justice, she worked closely with counterparts in the U.S. Department of Justice.

103. Upon leaving the Government of Canada, Judge Prost held senior positions with intergovernmental agencies/organizations focused on, *inter alia*, implementing the Rome Statute; enhancing domestic capacity to prosecute genocide, crimes against humanity, and war crimes; and combatting terrorism and other transnational criminal activities.

a. In July 2000, Judge Prost joined the Commonwealth Secretariat as Head of Criminal Law and Deputy Director of the Legal and Constitutional Affairs

Division.  In the wake of the September 11, 2001 terrorist attacks on the United

States, she assisted Member States in implementing U.N. Security Council

Resolution 1373, which obliged States to implement counterterrorism measures,

including freezing the funds and assets of persons who participate in or facilitate

terrorist acts.

b.  In April 2005, Judge Prost became Chief of the Legal Advisory Section, Treaty and

Legal Affairs Branch at the U.N. Office of Drugs and Crime, the U.N. agency

responsible for combatting organized crime, corruption, and terrorism.

104.  In July 2006, after being nominated by the Government of Canada, Judge Prost was

elected by the U.N. General Assembly to serve as an *ad litem* judge of the International Criminal

Tribunal for the former Yugoslavia ("ICTY"), the ad-hoc court established by U.N. Security

Council Resolution 827 to prosecute individuals accused of committing grave breaches of the

Geneva Conventions, violations of the laws or customs of war, genocide, and crimes against

humanity on the territory of the former Yugoslavia.

a.  At the ICTY, Judge Prost adjudicated, *inter alia*, *Prosecutor v. Popovic et al.*, a

joint trial of seven individuals accused of committing atrocities at Srebrenica.  The

trial spanned 425 sitting days and resulted in the conviction of two defendants of

genocide, one defendant for aiding and abetting genocide, and all seven defendants

of crimes against humanity.

105.  From July 2010 to July 2015, Judge Prost served as the first Ombudsperson for the

U.N. Security Council Al-Qaida Sanctions Committee at the U.N. headquarters in New York.  She

was selected and appointed by the U.N. Secretary-General as "an eminent individual of high moral

character, impartiality and integrity."  To the best of her knowledge, her appointment received the

43

support of all five Permanent Members of the Security Council, including the United States. As Ombudsperson, she reviewed delisting requests from individuals sanctioned for associations with Al-Qaida and ISIL, ensuring those listed received due process.

106. In February 2016, Judge Prost returned to The Hague to serve as the *Chef de Cabinet* for the President of the ICC.

107. Following her nomination by the Government of Canada, Judge Prost was elected as an ICC judge in December 2017 by the Assembly of States Parties.

108. After taking her judicial oath of office in March 2018, Judge Prost was assigned to the Trial Division by the Presidency.

    a. In her capacity as a Trial Division Judge, Judge Prost presides over *The Prosecutor v. Abdallah Banda Abakaer Nourain*, arising from the *Situation in Darfur, Sudan*, involving the alleged war crimes of violence to life, intentionally directing attacks against peacekeeping operations, and pillaging.

    b. Judge Prost also presides over *The Prosecutor v. Al Hassan Ag Abdoul Aziz Ag Mohamed Ag Mahmoud*, arising from the *Situation in the Republic of Mali* and crimes allegedly committed during the occupation of Timbuktu by Ansar Eddine and Al-Qaida in the Islamic Maghreb. In June 2024, the accused was convicted of multiple counts of crimes against humanity and war crimes, including torture, persecution, and outrages upon personal dignity, but was acquitted as to the war crimes and crimes against humanity of rape and sexual slavery, and the war crime of attacking protected objects. Judge Prost filed a separate and partly dissenting opinion expressing her disagreement with the majority's acquittals in relation to crimes of gender-based persecution and sexual violence.

c. Judge Prost oversees the implementation of reparations orders for victims in multiple cases, including *The Prosecutor v. Germain Katanga* (reparations for 297 victims), *The Prosecutor v. Bosco Ntaganda* (reparations for over 10,000 victims), and *The Prosecutor v. Dominic Ongwen* (reparations for approximately 49,772 victims).

109. Judge Prost has served temporarily on the Appeals Chamber on four occasions, including her now-completed assignment to the *Situation in the Islamic Republic of Afghanistan* ("*Situation in Afghanistan*") and her current assignment to *The Prosecutor v. Alfred Yekatom and Patrice-Édouard Ngaïssona*, a case arising out of the *Situation in the Central African Republic II*. The latter panel is deliberating appeals filed by both the defense and the Prosecutor against the Trial Chamber's July 2025 judgment convicting defendants of the war crimes of attacks against the civilian population, murder, displacement, directing an attack against a building dedicated to religion, and torture, in addition to the crimes against humanity of murder, forcible transfer, imprisonment, torture, and persecution.

a. In the *Situation in Afghanistan*, the ICC Prosecutor had requested authorization, in 2017, to initiate an investigation into alleged war crimes and crimes against humanity on the territory of Afghanistan, including those allegedly committed by the Taliban, Afghan security forces, and U.S. personnel.

b. In April 2019, Pre-Trial Chamber II rejected the request, finding that although the requirements of jurisdiction and admissibility had been met, the investigation would not serve the "interest of justice" because of the political circumstances in Afghanistan. The Prosecutor appealed.

45

c. Judge Prost was appointed to the appellate panel on October 25, 2019, because the then-President of the Court was unable to sit.  On March 5, 2020, the panel unanimously found that the Pre-Trial Chamber had erred in considering the "interests of justice" factor, which was not within its purview under Article 15(4) of the Rome Statute.  The decision authorized the Prosecutor to initiate the investigation.

d. Judge Prost participated in the *Situation in Afghanistan* for only one decision and for less than five months: from October 25, 2019 to March 5, 2020.  At the time of her designation for sanctions, she was no longer assigned to any appeals or other matters related to the *Situation in Afghanistan*.  That continues to be the case.

110. Over five years later, on August 20, 2025, Secretary of State Rubio designated Judge Prost for sanctions pursuant to Section 1(a)(ii)(A) of EO 14,203.  The State Department contemporaneously stated that Judge Prost was "designated for ruling to authorize the ICC's investigation into U.S. personnel in Afghanistan."

111. The State Department has not presented, and upon information and belief does not possess, substantial evidence that Judge Prost has "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality," within the meaning of Section 1(a)(ii)(A) of the Executive Order.

### *Judge Solomy Balungi Bossa*

112. Judge Bossa is a national of the Republic of Uganda who has served as a judge of the ICC since March 2018.  Her judicial service on the ICC is the culmination of a lengthy career focused on human rights and international adjudication.

46

113.    Prior to becoming an international judge, Judge Bossa had a distinguished career in private practice.

a.  Judge Bossa received her Bachelor of Laws (LL.B.) degree with honors from Makerere University in Uganda and qualified as a lawyer in 1979.  In 1980, she earned a Post-Graduate Diploma in Legal Practice from Uganda's Law Development Centre.

b.  She began her career as a lecturer at the Law Development Centre, teaching family law, land transactions, and administrative law from 1980 to 1997.  In 1987, she became the managing partner of the law firm Bossa and Company Advocates. Between 1988 and 1994, she was one of only two women to own a law practice in Uganda.

c.  While in private practice, Judge Bossa served as the President of the Uganda Law Society from 1993 to 1995—the first woman to hold that position.  In 1995, she helped establish and served as the founding president of the East African Law Society.  From 1993 to 1999, she served as Vice-Chairperson of the International Bar Association's Human Rights Institute.

d.  In 1995, Judge Bossa helped found the Uganda Network on Law, Ethics and HIV/AIDS.  In 1997, she became the founding chairperson of the Kituo Cha Katiba (Eastern Africa Centre for Constitutional Development), a regional organization promoting constitutionalism, human rights, and the rule of law.

114.    In 1997, Judge Bossa was appointed as a judge of the High Court of Uganda.  She subsequently served as a judge for numerous regional and international courts, including as the first woman appointed to the East African Court of Justice in 2002.

47

a. From 2003 to 2013, Judge Bossa served as a judge for the International Criminal Tribunal for Rwanda ("ICTR"), a tribunal established by U.N. Security Council Resolution 955, with the support of the United States, for the purpose of prosecuting individuals responsible for the 1994 Rwandan genocide. During her nine-and-a-half-year tenure as judge on the ICTR, Judge Bossa adjudicated numerous cases involving genocide and crimes against humanity.

115. Following her tenure at the ICTR, Judge Bossa returned to Uganda's domestic judiciary and was appointed to the Court of Appeal, which also serves as Uganda's Constitutional Court, where she served from 2013 to 2018. She also served as a part-time judge on the U.N. Residual Mechanism for International Criminal Tribunals and was elected to the African Court on Human and Peoples' Rights in 2014.

116. Judge Bossa was elected as an ICC judge in December 2017 and sworn in on March 8, 2018. The Presidency assigned her to the Appeals Chamber.

a. During her tenure on the Appeals Chamber, Judge Bossa has heard appeals in major cases, including *The Prosecutor v. Bosco Ntaganda* (confirming the conviction and thirty-year sentence for eighteen counts of war crimes and crimes against humanity), *The Prosecutor v. Dominic Ongwen* (confirming the conviction for sixty-one counts), *The Prosecutor v. Laurent Gbagbo and Charles Blé Goudé* (confirming the acquittal), and *The Prosecutor v. Ahmad Al Faqi Al Mahdi*.

117. In the *Situation in Afghanistan*, Judge Bossa participated as a member of the Appeals Chamber panel that heard the Prosecutor's appeal of the Pre-Trial Chamber's decision rejecting the investigation. On March 5, 2020, the Appeals Chamber unanimously held that the

48

Pre-Trial Chamber had erred by conducting an "interests of justice" assessment not within its purview, and authorized the Prosecutor to investigate.

118.    Over five years later, on June 5, 2025, Secretary of State Rubio designated Judge Bossa pursuant to Section 1(a)(ii)(A) of EO 14,203.  The State Department contemporaneously stated that Judge Bossa was designated because she "ruled to authorize the ICC's investigation against U.S. personnel in Afghanistan."

119.    The State Department has not presented, and upon information and belief does not possess, substantial evidence that Judge Bossa has "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality," within the meaning of Section 1(a)(ii(A) of the Executive Order.

### *Judge Reine Adelaide Sophie Alapini-Gansou*

120.    Judge Reine Adelaide Sophie Alapini-Gansou is a national of the Republic of Benin who has served as a judge of the ICC since March 2018.  She currently serves as the Second Vice-President of the Court.

121.    Judge Alapini-Gansou had a distinguished domestic and international career prior to her election to the ICC.

   a.    Judge Alapini-Gansou completed her legal studies at the National University of Benin, graduating with a master's degree in Business Law and Judicial Careers in 1983.  She also holds advanced diplomas in Environmental Law and Policy from the Universities of Maastricht and Lomé, and a Diploma in Common Law for Business from the University of Lyon 3, as well as diplomas in international human rights law from the African Institute of Human Rights, the René Cassin Institute, and the International Development Law Organization.

49

b. Judge Alapini-Gansou began her career as a lawyer in 1986 upon her admission to the Benin Bar, initially specializing in business law and later developing a criminal law practice. She litigated seminal women's rights cases in Benin, including a successful constitutional challenge to the criminalization of female adultery, and participated in legal reform initiatives regarding female genital mutilation, sexual harassment, and gender-based violence.

c. In 2005, Judge Alapini-Gansou was elected as one of eleven Commissioners of the African Commission on Human and Peoples' Rights, a quasi-judicial body under the auspices of the African Union. During the twelve years she spent on the African Commission, she participated in the adjudication of approximately 700 human rights complaints. In 2009, she was appointed Chair of the African Commission, a position she held until 2012. Judge Alapini-Gansou also served as the Commission's Special Rapporteur on the Situation of Human Rights Defenders in Africa from 2005 to 2009, and from 2012 to 2017.

d. Judge Alapini-Gansou was appointed to serve on international investigative and monitoring missions, including as member of the U.N. International Commission of Inquiry on Côte d'Ivoire and the U.N. Commission of Inquiry on human rights violations in Burundi, and as head of the Human Rights Component of the International African Support Mission in Mali and the African Union Mission for Mali and the Sahel.

122. Judge Alapini-Gansou was elected as an ICC judge in December 2017 and sworn in on March 9, 2018. Upon her election, the Presidency assigned her to Pre-Trial Chamber I. At

50

the time of her assignment, Pre-Trial Chamber I was assigned situations involving Cambodia, the Comoros, the Democratic Republic of the Congo, Gabon, Georgia, Greece, Libya, and Mali.

123.    On May 22, 2018—after Judge Alapini-Gansou's election and assignment to Pre-Trial Chamber I—the State of Palestine referred the *Situation in the State of Palestine* to the Prosecutor of the ICC.  On May 24, 2018, the Presidency assigned the situation to Pre-Trial Chamber I, based on workload considerations.  Judge Alapini-Gansou had no grounds to recuse herself, as she had never been involved in the situation in any capacity before joining the ICC.

124.    On February 5, 2021, Pre-Trial Chamber I ruled that the Court's jurisdiction extends to Gaza and the West Bank, including East Jerusalem.  On November 21, 2024, Pre-Trial Chamber I issued warrants of arrest for senior Hamas officials, as well as warrants for Benjamin Netanyahu and Yoav Gallant, for crimes against humanity and war crimes.  Challenges that have been filed in that situation are *sub judice*.

125.    On June 5, 2025, Secretary of State Rubio designated Judge Alapini-Gansou pursuant to Section 1(a)(ii)(A) of EO 14,203.  The State Department contemporaneously stated that Judge Alapini-Gansou was designated because she "ruled to authorize the ICC's issuance of arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Minister of Defense Yoav Gallant."

126.    The State Department has not presented, and upon information and belief does not possess, substantial evidence that Judge Alapini-Gansou has "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality," within the meaning of Section 1(a)(ii)(A) of the Executive Order.

127.    Upon information and belief, the designations of Judge Prost, Judge Bossa, and Judge Alapini-Gansou were intended to punish them for decisions made in discharge of their judicial obligations.

128.    Upon information and belief, the threat of designations under Section 1(a) of the Executive Order, and the designations of Judge Prost, Judge Bossa, and Judge Alapinia-Gansou, was and is intended to influence the decisions of the judges of the ICC.

129.    Upon information and belief, the designations under Section 1(a) of the Executive Order of Judge Prost, Judge Bossa and Judge Alapini-Gansou were and are intended to influence and/or punish them for their judicial decisions and those of other judges of the ICC.

### *Other Designations Under Executive Order 14,203*

130.    In addition to Plaintiffs, the Administration has designated for sanctions under EO 14,203 five additional ICC judges and included them on the SDN List: Judge Luz del Carmen Ibáñez Carranza; Judge Beti Hohler; Judge Nicolas Yann Guillou; Judge Gocha Lordkipanidze; and Judge Erdenebalsuren Damdin.

131.    The Administration has also designated for sanctions under EO 14,203 and included on the SDN List:

    a.    The ICC's Prosecutor;

    b.    The ICC's two Deputy Prosecutors;

    c.    The United Nations Special Rapporteur on situation of human rights in the Palestinian territories occupied since 1967;

    d.    The organizations Al-Haq: Law in the Service of Mankind, Al Mezan Center for Human Rights, and the Palestinian Centre for Human Rights.

## IV. The Impact of the Executive Order and Subsequent Designations on Plaintiffs

### *Judge Kimberly Prost*

132.    The imposition of sanctions against Judge Prost has caused her significant harm. Among other things:

a.    Her bank account at HSBC Bank USA, N.A. at the Grand Central branch in Midtown Manhattan has been frozen;

b.    She is no longer able to use credit cards, including cards issued by both U.S. and non-U.S. banks;

c.    She has very limited access to banking services, which only function in parts of Europe and Canada; simple transfers to pay bills entirely within Europe have resulted in funds being rejected or blocked;

d.    She is unable to purchase U.S. dollars or other currencies if the transactions pass through the U.S. financial system, and when travelling outside the European Union or Canada, she is confined to cash transactions;

e.    Her accounts with U.S. service companies such as Amazon, Google, and Expedia have been limited or cancelled entirely;

f.    As a result, basic tasks—such as using public transport, booking hotels, ordering online, or calling a taxi—have become difficult or impossible;

g.    She has, in effect, lost access to health insurance due to her provider's refusal to pay out her medical claims, despite payment of her dues, and has been unable to secure health insurance from other providers;

h.    She has been unable to attend speaking engagements in the United States, despite having previously and frequently spoken in the United States, including at

Columbia University, Case Western Reserve University, Harvard University, and New York University;

i.  She was unable to present a keynote address at Fordham University in October 2025 and was further barred from participating virtually in the event, part of the American Branch of International Law Association's annual International Law Weekend;

j.  She has had to indefinitely postpone a planned visit to Vanderbilt University and abandon plans to attend the annual conference of the American Society for International Law, held in April 2026 in Washington, D.C.;

k.  She was deprived of the opportunity to exchange with members of U.S.-based human rights non-governmental organizations, who appear to have been instructed to limit their interactions with her at the December 2025 meeting of the Assembly of States Parties; and

l.  Her family members in Canada worry about traveling to the United States.

### *Judge Solomy Balungi Bossa*

133.  The imposition of sanctions against Judge Bossa has caused her significant harm. Among other things:

a.  Her bank account at the United Nations Federal Credit Union in New York has been frozen, cutting her off from funds she had maintained there since 2003;

b.  She is no longer able to use credit cards;

c.  She is unable to purchase U.S. dollars or other currencies if the transactions pass through the U.S. financial system;

54

d. Booking international transport and accommodation has become difficult or impossible;

e. She is unable to pay bills in U.S. dollars or transfer funds between accounts that are held in U.S. dollars;

f. She is hindered from accessing technological services based in the U.S., including her personal Google email account;

g. She is unable to attend speaking engagements within the U.S. or exchange with members of U.S.-based human rights non-governmental organizations.

*Judge Reine Adelaide Sophie Alapini-Gansou*

134.   The imposition of sanctions against Judge Alapini-Gansou has caused her significant harm. Among other things:

a. Her bank account in France has been affected, and she is no longer able to use her credit card from her French bank, limiting her ability to cover basic expenses;

b. She is unable to purchase U.S. dollars or other currencies if the transactions pass through the U.S. financial system;

c. Booking international transport and accommodation has become difficult or impossible;

d. She is hindered from accessing technological services based in the U.S.;

e. She has lost health insurance and been unable to obtain health insurance from another provider;

f. She can no longer walk to the Court due to security concerns, she must be driven by a driver as a safety measure, and she no longer feels free to walk around at will, as she fears she may be attacked;

g. She had to reduce the frequency of her visits to her home in Benin for her own safety, and had to reduce work-related travel within Europe because it has become burdensome, as she must report her presence to local authorities for security protection wherever she goes;

h. She has ceased organizing seminars and workshops for non-governmental organizations in Africa for fear of exposing them to legal consequences, and in some cases she has been specifically asked not to participate in events or activities;

i. She is unable to engage with members of U.S.-based human rights non-governmental organizations; and

j. Her son has abandoned plans to attend law school in the United States, and one of her daughters, who works for an international non-governmental organization, has cancelled trips to the United States.

## V. The Sanctions Regime Violates the United States' Obligations under International Law

135. The Sanctions Regime violates international law. As such, it is *ultra vires* under IEEPA, which did not delegate to the President the authority to violate international law.

136. *First*, the Sanctions Regime violates the United States' obligations to cooperate with the United Nations and to abide by Security Council decisions under, *inter alia*, Articles 2(5) and 25 of the U.N. Charter. The U.N. Security Council has referred the situations in Sudan and Libya to the ICC pursuant to the Council's powers under Chapter VII of the U.N. Charter to adopt binding measures to maintain international peace and security. *See* S.C. Res. 1593, ¶ 1, U.N. Doc. S/RES/1593 (Mar. 31, 2005); S.C. Res. 1970, ¶ 4, U.N. Doc. S/RES/1970 (Feb. 26, 2011). However, the Sanctions Regime impedes the work of the ICC, including with respect to the investigation and prosecution of the Sudan and Libya situations. In doing so, the Sanctions Regime directly interferes with the implementation of the Security Council's binding resolutions. It thus

violates the United States' obligation to cooperate with the United Nations and abide by Security Council resolutions.

137.    *Second*, the Sanctions Regime violates the United States' obligation to respect privileges and immunities to which ICC officials are entitled.  The United States must respect the ICC's privileges and immunities and those of its officials, even as a non-party, because the ICC is an international organization of universal character that enjoys privileges and immunities under customary international law that must be respected by all States.  By targeting and threatening the ICC's judges, the Sanctions Regime impermissibly interferes with the ICC's functions.  As such, it violates the privileges and immunities that are owed to the ICC and its personnel.

138.    *Third,* the Sanctions Regime violates the United States' international legal obligations with respect to the investigation, prevention, and punishment of international crimes because it is intended to, and in fact does, interfere with efforts by other States to investigate, prosecute, and punish those crimes.

139.    The United States' obligation not to interfere with efforts by other States to investigate, prosecute, and punish international crimes derives from its obligations to investigate and punish international crimes and to cooperate with other States to bring to an end serious violations of peremptory norms of international law.  Those obligations are based on, *inter alia*:

      a. The 1949 Geneva Conventions, pursuant to which the United States has "undertake[n] to respect and ensure respect for the [Conventions] in all circumstances." *E.g.*, Fourth Geneva Convention art. 1.  This duty to ensure respect for the Geneva Conventions entails an obligation to prevent violations thereof and stop ongoing violations by other High Contracting Parties to the Conventions.  Measures to ensure respect for the Geneva Conventions by other States include

supporting international efforts to bring suspected perpetrators of serious violations of the Conventions to justice, including through the ICC.

b.  The 1948 Genocide Convention, pursuant to which the United States is obligated "to prevent and to punish" the crime of genocide, *e.g.*, acts of killing, causing serious harm, and preventing births, that are committed with the intent to destroy a national, ethnical, racial, or religious group in whole or in part. Genocide Convention, art. I.

c.  The customary international law obligation of all States to prevent and punish international crimes, including genocide, crimes against humanity, and war crimes. That obligation entails a duty to cooperate with other States to prevent and punish international crimes and ensure accountability, derived notably from the U.N. Charter.

d.  The customary international law obligation on all States to cooperate with other States to bring to an end serious violations of peremptory norms of international law, *i.e.*, violations of a *jus cogens* nature.  The prohibition of genocide, torture, crimes against humanity, and serious violations of human rights and international humanitarian law are all peremptory norms of international law, prohibitions that are reinforced by the Genocide Convention and the Convention Against Torture, which require their States Parties to prosecute or extradite suspected perpetrators of such crimes. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 5, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85; Genocide Convention, arts. V-VII.

140.    These obligations include the obligation not to interfere with efforts by other States to investigate and punish those crimes because, under customary international law, international obligations must be performed in good faith.  The obligations to prevent and punish international crimes and to cooperate in good faith include the obligation not to take measures that hinder efforts by other States to investigate, prosecute, and punish such crimes.

141.    The States Parties to the Rome Statute, in exercise of their sovereign prerogative, have chosen to implement their obligation to investigate, prosecute, and punish international crimes through the work of the ICC, which exercises the criminal jurisdiction of its States Parties.

142.    However, EO 14,203, by its express terms, seeks to prevent the ICC from being able to "investigate, arrest, detain, or prosecute" persons alleged to have committed international crimes. EO 14,203, Preamble.  And, by designating judges and prosecutorial staff, and continuing to threaten to do so, the Executive Order, and the Sanctions Regime more broadly, hinders these efforts not just in respect of the two investigations singled out by the Order, but also *all* other ICC investigations and prosecutions currently underway as well as any that might be commenced in the future.  As such, the Sanctions Regime breaches the United States' obligations with respect to the prevention and punishment of international crimes.

143.    *Fourth*, the Sanctions Regime violates international law because it targets the personal—including financial—interests of judges to try to influence through improper means their judicial decision-making.  This contravenes a foundational general principle of law that forms part of the *corpus* of international law: respect for judicial, prosecutorial, and expert independence. Article 38(c) of the Statute of the International Court of Justice establishes that general principles of law recognized by nations are a source of international law.

144.    The requirement that the independence of judges be respected, including the prohibition on seeking to improperly influence their judicial decision-making, is a general principle of law.  It is enshrined in the vast majority of domestic legal systems. It unquestionably applies in the United States.  In the words of the Supreme Court, this "constitutional principle" is "widely esteemed and … vital to our system of government." *Evans v. Gore*, 253 U.S. 245, 259 (1920).

145.    The principle is also reflected in numerous treaties and international instruments, including the International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171 ("ICCPR"), to which the United States is a party. Article 14(1) of the ICCPR provides that "everyone shall be entitled to a fair and public hearing by a competent, *independent and impartial tribunal*" (emphasis added).  Similarly, Article 10 of the Universal Declaration of Human Rights, G.A. Res. 217 A (III), U.N. Doc. A/810 (Dec. 10, 1948) provides that "[e]veryone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal."

146.    The obligation to respect judicial, prosecutorial, and expert independence, and not seek to improperly influence official decision-making, applies with full force to international courts and tribunals, including the ICC.  Article 40 of the Rome Statute codifies that "judges shall be independent in the performance of their functions" and Article 70 criminalizes "[i]mpeding, intimidating or corruptly influencing an official of the … Court for the purpose of forcing or persuading the official not to perform, or to perform improperly, his or her duties."  Rome Statute, arts., 40, 70.

147.    The Sanctions Regime violates this bedrock principle of law.  The purpose of the Sanctions Regime is to punish and exert pressure on judges to influence their judicial decision-

making and to cause them to make judicial decisions based on their personal interests, not on the basis of the law and facts.

148.     This coercive interference further infringes the human rights of all participants in the judicial process, including the rights of victims to access justice and of defendants to a fair trial. As noted above, the ICCPR, to which the United States is party, guarantees in its Article 14(1) "a fair and public hearing by a competent, independent and impartial tribunal established by law."  Interpreting this provision, the U.N. Human Rights Committee has explained that States must ensure "the actual independence of the judiciary from political interference."  U.N. Human Rights Comm., General Comment No. 32: Article 14, Right to Equality Before Courts and Tribunals and to a Fair Trial, ¶ 19, U.N. Doc. CCPR/C/GC/32 (Aug. 23, 2007).

## CAUSES OF ACTION
## COUNT I
### *Ultra Vires* Action under IEEPA, 50 U.S.C. §§ 1701 *et seq*.

(All Plaintiffs Against All Defendants)

149.     Plaintiffs repeat the allegations set forth above as if fully set forth herein.

150.     Congress delegated to the President a limited grant of authority to regulate foreign commerce under IEEPA.

151.     Congress did not vest the President with authority to violate international law in exercising authority under IEEPA.

152.     In the absence of a clear and unequivocal Congressional statement to the contrary, courts are under a duty to interpret statutes in a manner consonant with international law.  There is no such statement in IEEPA.

153. The Sanctions Regime is *ultra vires* under IEEPA and violates the separation of powers because it conflicts with international law and the obligations of the United States thereunder.

## COUNT II

### *Ultra Vires* Action under IEEPA, 50 U.S.C. §§ 1701 *et seq*.

(All Plaintiffs Against All Defendants)

154. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

155. The purported exercise of IEEPA authority in the Sanctions Regime, including in EO 14,203, is *ultra vires* because it conflicts with other acts of Congress, to wit, *inter alia*, the American Service-Members' Protection Act, as amended, 22 U.S.C. §§ 7421 *et seq*.

## COUNT III

### *Ultra Vires* Action under IEEPA, 50 U.S.C. §§ 1701 *et seq*.

(All Plaintiffs Against All Defendants)

156. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

157. Congress enacted IEEPA to limit presidential abuses of emergency authorities.

158. The President's authority under IEEPA "may only be exercised" to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. §§ 1701 (a), (b).

159. The President's authority under IEEPA "may not be exercised for any other purpose." *Id*. § 1701 (b).

160. The exercise of IEEPA authority in EO 14,203 and the Sanctions Regime is *ultra vires* because the Executive Order is not based on a national emergency, as required by IEEPA.

161.    The exercise of IEEPA authority in EO 14,203 and the Sanctions Regime is *ultra vires* because the Executive Order is not based on an unusual and extraordinary threat, as required by IEEPA.

## COUNT IV

**Violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution**
(Plaintiffs Prost and Bossa Against All Defendants)

162.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

163.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides: "No person shall be … deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.  It requires that parties deprived of their property receive adequate notice and an opportunity to be heard.  *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

164.    The blockings of Plaintiffs Prost and Bossa's bank accounts in New York constitute deprivations of property.

165.    The Fifth Amendment's Due Process Clause required Defendants to provide Plaintiffs Prost and Bossa with notice reasonably calculated under the circumstances to apprise them of the allegations against them so that they have the opportunity to make a meaningful response.

166.    Defendants' failure to provide Plaintiffs Prost and Bossa with prompt, adequate, and fair notice of the basis, conclusions, and reasons relied upon to sanction them violated their right to due process under the Fifth Amendment.

## COUNT V

**Violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution**
(Plaintiffs Prost and Bossa Against All Defendants)

167.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

168. The Takings Clause of the Fifth Amendment to the U.S. Constitution provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V.

169. The blockings of Plaintiffs Prost and Bossa's bank accounts in New York constitute the takings of the private property of Plaintiffs Prost and Bossa without just compensation.

## COUNT VI

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

(All Plaintiffs Against Defendants United States Department of State, Marco A. Rubio, United States Department of the Treasury, Scott K. H. Bessent, United States Department of Justice, Todd W. Blanche, Office of Foreign Assets Control, Bradley T. Smith)

170. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

171. The designations of Plaintiffs administrated by the State Department and OFAC pursuant to EO 14,203 violate the Administrative Procedure Act, because the designations were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## COUNT VII

### Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*.

(All Plaintiffs Against All Defendants)

172. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

173. Under 28 U.S.C. § 2201, this Court "may declare the rights and other legal relations of any interested party seeking such declaration." As set forth above, the Sanctions Regime comprises exercises of authority that are *ultra vires* under IEEPA; violates the Administrative Procedure Act; and violates Plaintiffs' Fifth Amendment rights, on their face and as applied.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Declare that the Sanctions Regime, including Executive Order 14,203, is *ultra vires* under IEEPA;

B.      Declare that the Sanctions Regime, including Executive Order 14,203, violates the Fifth Amendment to the United States Constitution as applied to Plaintiffs Prost and Bossa;

C.      Declare that the designations issued pursuant to Executive Order 14,203 are arbitrary and capricious, an abuse of discretion, and contrary to law under the Administrative Procedure Act;

D.      Enter a judgment setting aside Plaintiffs' designations and ordering Defendants to remove Plaintiffs from designation as SDNs and to unblock their property in the United States;

E.      Preliminarily and permanently enjoin Defendants from enforcing the designations issued pursuant to Executive Order 14,203;

F.      Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

G.      Grant such other relief as the Court may deem just and proper.

Dated: June 24, 2026                          Respectfully submitted,

**JUDGE KIMBERLY PROST;
JUDGE SOLOMY BALUNGI BOSSA; and
JUDGE REINE ADELAIDE SOPHIE ALAPINI-
GANSOU**

By their attorneys,

/s/ Nicholas M. Renzler
Andrew B. Loewenstein (*pro hac vice* to be
    submitted)
Amir A. Farhadi (*pro hac vice* to be submitted)

FOLEY HOAG LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
617-832-1000
aloewenstein@foleyhoag.com
afarhadi@foleyhoag.com

Nicholas M. Renzler (NR1608)
Hannah E. Sweeney (6202584)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
212-812-0400
nrenzler@foleyhoag.com
hsweeney@foleyhoag.com

Rawda Fawaz (*pro hac vice* to be submitted)
FOLEY HOAG LLP
1717 K Street N.W
Washington, DC 20006
202-223-1200
rfawaz@foleyhoag.com

*Counsel for All Plaintiffs*

James A. Goldston (2327435)
Esti T. Tambay (ET2721)
Genevieve B. Quinn (GQ9239)
Natasha N. Arnpriester (5673678)
OPEN SOCIETY FOUNDATIONS
Open Society Justice Initiative
224 West 57th Street
New York, NY 10019, United States
212-548-0600
james.goldston@opensocietyfoundations.org
esti.tambay@opensocietyfoundations.org
genevieve.quinn@opensocietyfoundations.org
natasha.arnpriester@opensocietyfoundations.org

*Counsel for Plaintiff Judge Kimberly Prost*