**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUDGE KIMBERLY PROST; JUDGE SOLOMY BALUNGI BOSSA; and JUDGE REINE ADELAIDE SOPHIE ALAPINI-GANSOU,

          Plaintiffs,

    v.

DONALD J. TRUMP, et al.,

          Defendants.

Civil Action No. 26-cv-5305

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 4

I.    The International Criminal Court ............................................................................. 4

    A.  The ICC's Structure and Jurisdiction ................................................................5

    B.  The United States and the ICC ..........................................................................7

II.   The Sanctions Regime ........................................................................................... 14

III.  The Designations of Judges Prost, Bossa, and Alapini-Gansou ....................................... 16

    A.  Judge Kimberly Prost ........................................................................................16

    B.  Judge Solomy Balungi Bossa ..........................................................................21

    C.  Judge Reine Alapini-Gansou ...........................................................................23

ARGUMENT ..................................................................................................................... 26

I.    Plaintiffs Are Likely to Succeed on the Merits ...................................................... 26

    A.  The Sanctions Regime Is *Ultra Vires* under IEEPA ........................................27

        1.   IEEPA Does Not Authorize the Violation of International Law. ................................. 27

        2.   The Sanctions Regime Conflicts with Acts of Congress. ............................................ 38

        3.   There Is No "National Emergency." ............................................................................ 42

    B.  Plaintiffs' Designations Violate the Administrative Procedure Act. ................................47

        1.   The Designations Are Arbitrary and Capricious. ........................................................ 47

        2.   The Designations Are an Abuse of Discretion. ........................................................... 49

        3.   The Designations Are Contrary to Law. ..................................................................... 51

    C.  The Sanctions Regime Violates the Fifth Amendment as Applied to Judges Prost and Bossa. ..............................................................................................................51

II.   EO 14,203 Is Causing Irreparable Harm to Plaintiffs ........................................... 53

III.  The Balance of the Equities and Public Interest Decidedly Favor Plaintiffs. ..................... 56

CONCLUSION .................................................................................................................. 57

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullahi v. Pfizer, Inc.*,
  562 F.3d 163 (2d Cir. 2009)....................................................................................................28

*Al Haramain Islamic Foundation, Inc. v. United States Dep't of the Treasury*,
  686 F.3d 965 (9th Cir. 2012) .................................................................................................47

*Armstrong v. Manzo*,
  380 U.S. 545 (1965)................................................................................................................56

*Blanco v. United States*,
  775 F.2d 53 (2d Cir. 1985)......................................................................................................37

*Bradley v. Fisher*,
  80 U.S. 335 (1871)..................................................................................................................50

*Calero-Toledo v. Pearson Yacht Leasing Co.*,
  416 U.S. 663 (1974)................................................................................................................52

*Cheung v. United States*,
  213 F.3d 82 (2d Cir. 2000)................................................................................................27, 37

*Chubb & Son, Inc. v. Asiana Airlines*,
  214 F.3d 301 (2d Cir. 2000)....................................................................................................33

*Conn. Dep't of Env't Prot. v. OSHA*,
  356 F.3d 226 (2d Cir. 2004)....................................................................................................55

*Connecticut v. Doehr*,
  501 U.S. 1 (1991) ...................................................................................................................52

*Elrod v. Burns*,
  427 U.S. 347 (1976)................................................................................................................55

*Estate of Tov v. United Nations Relief & Works Agency*,
  807 F. Supp. 3d 208 (S.D.N.Y. 2025)....................................................................................33

*Estras v. United States*,
  606 U.S. 185 (2025).................................................................................................................40

*Evans v. Gore*,
  253 U.S. 245 (1920)................................................................................................................35

*Faiveley Transp. Malmö AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009)...............................................................................................53

*Fares v. Smith*,
   901 F.3d 315 (D.C. Cir. 2018) ...........................................................................................54

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)......................................................................................................38, 45

*Filtration Dev. Co., LLC v. United States*,
   60 Fed. Cl. 371 (2004) .......................................................................................................43

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000)..........................................................................................49

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d Cir. 2007).................................................................................................53

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006)............................................................................................................46

*Harmelin v. Michigan*,
   501 U.S. 957 (1991)............................................................................................................43

*Holy Land Foundation for Relief & Development v. Ashcroft*,
   219 F. Supp. 2d 57 (D.D.C. 2002) .....................................................................................53

*Holy Land Foundation for Relief & Development v. Ashcroft*,
   333 F.3d 156 (D.C. Cir. 2003) ...........................................................................................47

*Huminski v. Corsones*,
   386 F.3d 116 (2d Cir. 2004)...............................................................................................50

*Jifry v. FAA*,
   370 F.3d 1174 (D.C. Cir. 2004) .........................................................................................52

*Jolly v. Coughlin*,
   76 F.3d 468 (2d Cir. 1996).................................................................................................55

*Karem v. Trump*,
   960 F.3d 656 (D.C. Cir. 2020)...........................................................................................56

*Khan v. Holder*,
   584 F.3d 773 (9th Cir. 2009) .............................................................................................37

*KindHearts for Charitable Humanitarian Dev., Inc v. Geithner*,
   647 F. Supp. 2d 857 (N.D. Ohio 2009)..............................................................................53

iii

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ...................................................................................56

*Learning Res., Inc. v. Trump*,
    146 S. Ct. 628 (2026) .....................................................................................42, 43

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ...............................................................................................49

*Luokung Technology Corp. v. Department of Defense*,
    538 F. Supp. 3d 174 (D.D.C. 2021) ......................................................................55

*Ma v. Ashcroft*,
    257 F.3d 1095 (9th Cir. 2001) ...............................................................................37

*Madison Ltd. v. Ludwig*,
    82 F.3d 1085 (D.C. Cir. 1996) ..............................................................................49

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ................................................................................27

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ...................................................................................51, 52, 56

*McCahey v. L.P. Inv'rs*,
    774 F.2d 543 (2d Cir. 1985) ...................................................................................51

*McCulloch v. Sociedad Nacional De Marineros De Honduras*,
    372 U.S. 10 (1963) .................................................................................................37

*Mendaro v. World Bank*,
    717 F.2d 610 (D.C. Cir. 1983) ..............................................................................30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...........................................................................................47, 49

*Murray v. The Charming Betsy*,
    2 Cranch 64 (1804) .......................................................................................2, 27, 37

*N. Ga. Finishing v. Di-Chem, Inc.*,
    419 U.S. 601 (1975) .........................................................................................51, 52

*New York v. Noem*,
    812 F. Supp. 3d 321 (S.D.N.Y. 2025) ...................................................................56

*New York v. United States Dep't of Homeland Sec.*,
    408 F. Supp. 3d 334 (S.D.N.Y. 2019) ...................................................................51

iv

*New York v. United States Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020)..........................................................................................26, 47

*Nken v. Holder*,
    556 U.S. 418 (2009)........................................................................................................26

*Open Soc'y Justice Initiative v. Trump*,
    510 F. Supp. 3d 198 (S.D.N.Y. 2021)..................................................................26, 49, 56

*Perkins Coie LLP v. U.S. Department of Justice*,
    783 F. Supp. 3d 105 (D.D.C. 2025) ...............................................................................56

*Rona v. Trump*,
    797 F. Supp. 3d 278 (S.D.N.Y. 2025)....................................................................49, 54, 57

*Smith v. Trump*,
    791 F. Supp. 3d 90 (D. Me. 2025) .........................................................................49, 54, 57

*Soldal v. Cook County*,
    506 U.S. 56 (1992)..........................................................................................................52

*Star Fruits S.N.C. v. United States*,
    393 F.3d 1277 (Fed. Cir. 2005).......................................................................................49

*Stump v. Sparkman*
    435 U.S. 349 (1978).........................................................................................................50

*The Paquete Habana*,
    175 U.S. 677 (1900).........................................................................................................30

*U.S. v. Dhafir*,
    461 F.3d 211 (2d Cir. 2006)........................................................................................42, 43

*United States v. Ali Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011)............................................................................................43

*United States v. Clemente*,
    640 F.2d 1069 (2d Cir. 1981).........................................................................................42

*United States v. Kattar*,
    840 F.2d 118 (1st Cir. 1988)..........................................................................................42

*United States v. Lisinski*,
    728 F.2d 887 (7th Cir. 1984) .........................................................................................42

*United States v. Palestine Liberation Org.*,
    695 F. Supp. 1456 (S.D.N.Y. 1988).............................................................................27, 37

*United States v. Russo*,
   708 F.2d 209 (6th Cir. 1983) ......................................................................................42

*United States v. Sturm*,
   870 F.2d 769 (1st Cir. 1989)........................................................................................42

*United States v. Yoshida International, Inc.*,
   526 F.2d 560 (C.C.P.A, 1975) .....................................................................................44

*V.O.S. Selections, Inc. v. Trump*,
   149 F.4th 1312 (Fed. Cir. 2025) ..................................................................................43

*V.O.S. Selections, Inc. v. United States*,
   772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) ...................................................... 43, 44

*Washington v. Reno*,
   35 F.3d 1093 (6th Cir. 1994) .......................................................................................56

*Weinberger v. Rossi*,
   456 U.S. 25 (1982)........................................................................................................27

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008)...................................................................................................26, 53

*Xiaomi Corp. v. Department of Defense*,
   No. 21-cv-280 (RC), 2021 U.S. Dist. LEXIS 46496 (D.D.C. Mar. 12, 2021) ..........55

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)................................................................................................27, 43

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017)..................................................................................................56

**Statutes and Regulations**

18 U.S.C. § 112...................................................................................................................50

18 U.S.C. § 1503.................................................................................................................50

31 C.F.R. § 528 (2025) ........................................................................................................1

Administrative Procedure Act, 5 U.S.C. § 706........................................................ *passim*

American Servicemembers' Protection Act, 116 Stat. 899,
   22 U.S.C. §§ 7421 *et seq.* ...................................................................................... *passim*

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328....................................38

Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* .........................................38

Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901 *et seq.*........................................50

Foreign Operations, Export Financing, and Related Programs Appropriations Act,
Pub. L. No. 108-447...........................................................................................................38

Genocide Convention Implementation Act, 18 U.S.C. § 1091.........................................................5

Global Magnitsky Human Rights Accountability Act, Pub. L. No. 114-328.................................50

Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No.
103-236, § 506, 108 Stat. 382, 463–64 (1994) ...........................................................5

International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–1702 .......................... *passim*

National Emergencies Act, 50 U.S.C. §§ 1601 *et seq.* ...................................................................14

War Crimes Act, 18 U.S.C. § 2441..................................................................................................5

**Constitutional Authorities**

U.S. Const. Art. II ..........................................................................................................................27

U.S. Const. amend. V.......................................................................................................................51

**Legislative Authorities**

H.R. 2617, 117th Cong. § 7073(b) (2022) ......................................................................................39

H.R. Rep. No. 95-459 (1977)...............................................................................................14, 43, 44

Confirmation Hearing on the Nomination of John G. Roberts, Jr. to Be Chief
Justice of the United States: Hearing Before the S. Comm. on the Judiciary,
109th Cong. 56 (2005) .......................................................................................................48

S. Res. 546, 117th Cong. (2022)......................................................................................................39

**Treaties**

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment
or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 ..............................................................5, 31

Convention on the Prevention and Punishment of the Crime of Genocide,
Dec. 9, 1948, 78 U.N.T.S. 277.............................................................................................5

Geneva Convention (IV) Relative to the Protection of Civilian Persons
in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 ................................. *passim*

International Covenant on Civil and Political Rights,
Dec. 16, 1966, 999 U.N.T.S. 171.........................................................................................36

Negotiated Relationship Agreement between the International Criminal Court and
the United Nations, Sept. 13, 2004, 2283 U.N.T.S. 195 ..........................................................31

Rome Statute of the International Criminal Court,
July 17, 1998, 2187 U.N.T.S. 90 ................................................................................ *passim*

U.N. Charter..........................................................................................................................6, 29, 31

Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 .........................33

**Foreign and International Authorities**

*Application of the Convention on the Prevention and Punishment of the Crime of
Genocide (Bosnia and Herzegovina v. Serbia and Montenegro)*,
Judgment, I.C.J. Reports 2007 (Feb. 26, 2007) .......................................................................33

G.A. Res. 3074, U.N. Doc. A/RES/3074(XXVIII) (Dec. 3, 1973) ..............................................32

G.A. Res. 67/1, U.N. Doc. A/RES/67/1 (Nov. 30, 2012) .............................................................32

Human Rights Committee, General Comment No. 32,
UN Doc. CCPR/C/GC/32 (23 Aug. 2007).................................................................................36

International Law Commission, Draft articles on Prevention and Punishment of
Crimes Against Humanity, with Commentaries, U.N. Doc. A/74/10 (2019).........................32

*Iran–United States Claims Tribunal v. AS*, 96 ILR 321 (Neth. 1985).........................................30

*Prosecutor v. Omar Hassan Ahmad Al Bashir*, Joint Concurring Opinion of
Judges Eboe-Osuji, Morrison, Hofmański & Bossa, ICC-02/05-01/09-397-
Corr (May 6, 2019) ...................................................................................................................34

S.C. Res. 1894, U.N. Doc. S/RES/1894 (Nov. 11, 2009)............................................................32

S.C. Res. 1970, U.N. Doc. S/RES/1970 (Feb. 26, 2011)............................................................29

S.C. Res. 2419, U.N. Doc. S/RES/2419 (June 6, 2018) .............................................................32

Statute of the International Court of Justice ...............................................................................34

*ZM v. Permanent Delegation of the League of Arab States to the UN*, 116 ILR
643 (Switz. 1993)......................................................................................................................30

**Other Authorities**

*Black's Law Dictionary* (4th ed., 1968)......................................................................................43

*Emergency*, *Webster's New Collegiate Dictionary* (9th ed. 1976)..............................................45

Executive Order No. 13,224, *Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism*, 3 C.F.R. 786 (2001) .................................................................................................50

Executive Order No. 13,382, *Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters*, 3 C.F.R. 170 (2005) .......................................................50

Executive Order No. 14,203, *Imposing Sanctions on the International Criminal Court*, 90 Fed. Reg. 9369 (2025) ..................................................................... *passim*

Int'l L. Comm'n, *Second Rep. on General Principles of Law*, U.N. Doc A/CN.4/741 (Apr. 9, 2020) .............................................................................34, 35

Int'l Comm. of the Red Cross, Commentary on Geneva Convention IV (2025) ..........................32

James Crawford, *Brownlie's Principles of Public International Law* (9th ed. 2019) ......................................................................................................30

Restatement (Third) of the Foreign Relations Law of the United States (Am. L. Inst. 1987) .............................................................................................27, 37

**INTRODUCTION**

Plaintiffs Judge Kimberly Prost, Judge Solomy Balungi Bossa, and Judge Reine Adélaïde Sophie Alapini-Gansou, each a judge on the International Criminal Court ("ICC"), respectfully move for an order preliminarily enjoining their designations for sanctions under Executive Order No. 14,203, *Imposing Sanctions on the International Criminal Court,* 90 Fed. Reg. 9369 ("EO 14,203" or "Executive Order"), and its implementing regulations, 31 C.F.R. § 528 (2025), (together, the "Sanctions Regime").

Judges Prost, Bossa, and Alapini-Gansou are distinguished jurists. They are not terrorists, narcotics traffickers, weapons proliferators, or human rights abusers—the types of international pariahs whose conduct Congress intended to address through sanctions imposed under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1702 *et seq.*, the statute under which the Sanctions Regime has been issued. Judges Prost, Bossa, and Alapini-Gansou have been sanctioned for nothing more than faithfully discharging their judicial offices by rendering decisions with which the current administration disagrees.

The sanctions that Defendants have imposed on Judges Prost, Bossa, and Alapini-Gansou are, as intended, tantamount to a financial death penalty: their bank accounts have been frozen and their credit cards rendered inoperative; they have been denied access to health insurance coverage and had their ability to conduct basic daily transactions, ranging from booking travel to using public transport, destroyed. Beyond that, the sanctions obstruct the ability of victims and witnesses of genocide, war crimes, and crimes against humanity, as well as their lawyers, from being able to present evidence or argument in the judges' courtrooms or otherwise participate in proceedings before them. U.S. persons who do so face severe civil and criminal penalties, including up to 20 years of imprisonment; non-U.S. persons risk themselves being sanctioned.

1

The sanctions' purpose is to punish Judges Prost, Bossa, and Alapini-Gansou for judicial decisions they have rendered, and to exert extra-judicial pressure on them and their colleagues on the ICC bench. Defendants hope that, by targeting the judges' financial and other personal interests, they will be coerced into rendering future decisions that are more to the administration's liking, even when the law and facts dictate otherwise. That subverts the rule of law. Put simply, the sanctions target the private interests of Judges Prost, Bossa, and Alapini-Gansou as a means of strong-arming them and other judges into disregarding their judicial oaths of office.

The effect extends far beyond the personal impact on Judges Prost, Bossa, and Alapini-Gansou. ICC judges bear the responsibility of adjudicating the guilt of those accused of the worst crimes known to humankind. They have been entrusted with that role by no fewer than 125 countries and, in some instances, by the U.N. Security Council. By obstructing the submission of evidence and argument, the Sanctions Regime threatens the integrity of those vital proceedings, as well as, more broadly, the international criminal justice system of which the ICC is the cornerstone.

For the reasons set forth below, the Sanctions Regime should be preliminarily enjoined.

*First*, Judges Prost, Bossa, and Alapini-Gansou are likely to succeed on the merits. The Sanctions Regime is *ultra vires.* As demonstrated in the Expert Declaration of Harold Hongju Koh, the former Dean of Yale Law School and its Sterling Professor of International Law—who served as Legal Adviser of the United States Department of State—the regime violates the United States' international legal obligations in multiple ways. These include violating the Charter of the United Nations; the privileges and immunities of ICC judges; obligations concerning the investigation and prosecution of suspected international crimes that are found in the Geneva Conventions as well as the Genocide and Torture Conventions, and parallel customary rules; and foundational rules concerning judicial independence and the right to fair trial. The *Charming Betsy*

doctrine requires that IEEPA, the Sanctions Regime's governing statute, be interpreted consistently with international law barring a clear congressional decision to the contrary. Congress, however, has made no such authorization.

The Sanctions Regime is further *ultra vires* because it directly conflicts with the legislative scheme that Congress enacted in the American Servicemembers' Protection Act ("ASPA"), 116 Stat. 899, 22 U.S.C. §§ 7421 *et seq*. That law codifies Congress' decision as to how the concerns that animate EO 14,203 are to be addressed. The choice Congress made was to prohibit the ICC from carrying out certain activities in the United States and to authorize the President to use enumerated legal avenues, such as providing "legal representation and other legal assistance," "exculpatory evidence," and "defense … through appearance before the [ICC]." ASPA did not authorize the President to impose sanctions. Indeed, ASPA expressly *forbids* the President from employing incentives to induce actions by ICC officials; however, as forbearance from inflicting economic harm is a classic incentive, the Sanctions Regime does precisely what Congress directed the President not to do. And the Sanctions Regime is also *ultra vires* because there is no "national emergency" within the meaning of IEEPA, which is a prerequisite for unlocking Congress' delegated sanctioning authority. The ICC's ability to exercise jurisdiction over nationals of countries that are not parties to the Rome Statute, when they are alleged to have committed crimes on the territory of States that are parties to that treaty, has existed since the court's establishment in 2002. Congress has known about this for decades and legislated accordingly. The situation is thus neither "unusual" nor "extraordinary," as IEEPA requires.

In addition, the designations of Judges Prost, Bossa, and Alapini-Gansou violate the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, because they are arbitrary,

capricious, an abuse of discretion, and contrary to law.  The freezing of the New York bank accounts of Judges Prost and Bossa also violates the Fifth Amendment's Due Process Clause.

*Second*, Judges Prost, Bossa, and Alapini-Gansou are suffering irreparable harm.  The Sanctions Regime impairs the submission of evidence and argument in international criminal proceedings over which they preside.  The threat to the integrity of those proceedings cannot later be repaired.  The mounting impact of the sanctions has also devastated the judges' ability to live normal lives in irreparable ways.  And, the freezing of Judges Prost and Bossa's bank accounts constitutes a *per se* irreparable deprivation of property without due process.

*Third*, the balance of equities and public interest decidedly favors a preliminary injunction. There is substantial public interest in ensuring government agencies abide by federal law, and no legitimate interest in maintaining unlawful sanctions or unconstitutional due process deprivations.

In short, the manifest illegality of the Sanctions Regime, the irreparable harm it is causing, and the equities and public interest, all compel this Court's intervention to enjoin the Sanctions Regime.

## BACKGROUND

### I.    The International Criminal Court

The ICC is the culmination of the post-World War II and post-Holocaust movement for international criminal justice.  The United States was a driving force behind that effort.  This was marked by the development of a body of international law criminalizing humanity's worst abuses—including genocide, war crimes, and crimes against humanity.  It also enshrined the equally important legal obligation, incumbent on all countries, to prosecute and punish those crimes.  That universal obligation is found in such seminal treaties as the Geneva Conventions and the Genocide Convention.  The U.S. ratified the former in 1955, "undertak[ing] to respect and

4

ensure respect for the [Conventions] in all circumstances."[1]  The United States ratified the latter in 1988, which likewise obligates it to prevent and punish the crime of genocide.[2]    The United States is also subject to parallel customary international law obligations to prevent and punish international crimes, including genocide, crimes against humanity, and war crimes, and to cooperate with other States to bring to an end serious violations of peremptory norms of international law.

One hundred twenty-five countries, including many of the United States' closest allies, among them 30 NATO members, have chosen to fulfill these obligations through the Rome Statute of the International Criminal Court ("Rome Statute"), July 17, 1998, 2187 U.N.T.S. 90, the treaty creating the ICC.  Though the United States has not yet ratified it, when the U.S. signed the Rome Statute in 2000, President Clinton invoked the United States' "long history of commitment to the principle of accountability, from our involvement in the Nuremberg tribunals that brought Nazi war criminals to justice, to our leadership in the effort to establish the International Criminal Tribunals for the former Yugoslavia and Rwanda."  Statement on the Rome Treaty on the International Criminal Court ("Statement on Rome Treaty"), 37 Weekly Comp. Pres. Doc. 4 (Dec. 31, 2000).

A.    The ICC's Structure and Jurisdiction

The ICC is a permanent court, based in The Hague, the Netherlands, governed by the Rome Statute.    States that ratify or accede to the Rome Statute consent to the investigation and prosecution of crimes within the ICC's jurisdiction alleged to have occurred in their territory or by

---

[1] Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War art. 1, Aug. 12, 1949, 6 U.S.T. 3516; War Crimes Act, 18 U.S.C. § 2441(c)(1).

[2] Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277 (entered into force Jan. 12, 1951; ratified by the United States Nov. 25, 1988); Genocide Convention Implementation Act, 18 U.S.C. § 1091. See also Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 1, Dec. 10, 1984, 1465 U.N.T.S. 85; Pub. L. No. 103-236, § 506, 108 Stat. 382, 463–64 (1994).

their nationals.  Rome Statute, arts. 12-13.  The ICC may also exercise jurisdiction over crimes referred to its Prosecutor by the U.N. Security Council pursuant to a resolution adopted under Chapter VII of the U.N. Charter.  *Id.* art. 13(b).  The ICC has subject matter jurisdiction over serious international crimes, including war crimes, crimes against humanity, and genocide.  The ICC is a court of last resort.  Under the principle of complementarity, the ICC may exercise jurisdiction only if the State where the alleged crimes would otherwise be investigated and prosecuted is "unwilling or unable to do so."  *Id.* arts. 5, 17(a).

The Rome Statute requires that ICC Judges demonstrate "high moral character, impartiality and integrity" and "possess the qualifications required in their respective States for appointment to the highest judicial offices."  *Id.* art. 36.  Judges must "be independent in the performance of their functions" and "shall not engage in any activity which is likely to interfere with their judicial functions or to affect confidence in their independence."  *Id.* art. 40.

The ICC's Office of the Prosecutor ("OTP") is responsible for examining situations in which international crimes are alleged to have been committed, carrying out investigations, and prosecuting individuals allegedly responsible for those crimes.  The OTP must "act independently."  *Id.* art. 42(1).  In making prosecutorial decisions, the OTP undertakes its own investigations, including taking witness statements, collecting documents, and examining crime scenes.  The OTP seeks information and assistance from States and non-State actors, including witnesses, victims, and civil society organizations, all of whom may submit evidence.  *Id.* arts. 54, 15(2).[3]

The ICC's multi-stage proceedings are characterized by robust procedural safeguards to protect the rights and interests of accused persons and States.  For example, if the Prosecutor

---

[3] *See also Office of the Prosecutor*, Int'l Criminal Court, https://www.icc-cpi.int/about/otp.

wishes to initiate a formal investigation without a State Party or Security Council referral, the Prosecutor must request authorization from the Pre-Trial Chamber. *Id.* art. 15. An accused person, a State with jurisdiction over a case (on the ground that it is investigating or prosecuting the case), or a State from which acceptance of jurisdiction is required, may challenge the ICC's exercise of jurisdiction. *Id.* art. 19. All arrest warrants requested by the Prosecutor are subject to review by the Pre-Trial Chamber. *Id.* art. 58(1). Prior to trial, there is a confirmation of charges hearing. *Id.* art. 61. Defendants are afforded fair trial rights and due process, including the presumption of innocence. *Id.* arts. 66-67. A Trial Chamber may convict an accused only if the charges are proven beyond a reasonable doubt. *Id.* arts. 64, 66, 67. To date, the ICC has issued arrest warrants and/or summonses to appear for at least 70 individuals; conducted trials resulting in the conviction of 13 defendants; and acquitted four. ECF No. 1 (Compl.) ¶ 55.

### B.      The United States and the ICC

Despite not having ratified the Rome Statute, for over two decades the United States has supported investigations and prosecutions by the ICC. For instance:

- **Ukraine** accepted the ICC's jurisdiction and subsequently became a party to the Rome Statute. Following a referral by 43 ICC States Parties, the ICC opened an investigation of alleged war crimes, crimes against humanity, and genocide committed on the territory of Ukraine, including crimes allegedly committed by Russian nationals, even though the Russian Federation is not a State Party to the Rome Statute. Compl. ¶ 78. The U.S. Ambassador-at-Large for Global Criminal Justice stated that "[t]he United States welcomes the opening of the investigation by the ICC into atrocity crimes committed in Ukraine, and we intend to engage with all stakeholders to achieve our common objectives in ensuring justice." *Id.* ¶ 78(a).

7

- o Pursuant to this investigation, the ICC issued arrest warrants for Vladimir Putin and Maria Lvova-Belova, both nationals of the Russian Federation, for allegedly committing, among other war crimes, the deportation of children from occupied areas of Ukraine to Russia.  The U.S. Mission to the U.N. stated: "[a]s President Biden noted, we believe the warrants are justified.  The United States supports that investigation, as well as a range of other situations before the Court."[4]

- o Congress enacted bipartisan legislation supporting U.S. involvement in and cooperation with the ICC's investigation in Ukraine.  The State Department welcomed the legislation, noting that "[h]olding Russia to account for its war crimes and other atrocities within Ukraine and against its people is foundational to the defense of U.S. values and the maintenance of a peaceful, just, and secure world."  *Id.* ¶ 78(d).

- **Uganda**, a State Party to the Rome Statute, referred the situation on its territory to the ICC, which included the alleged forced enlistment of children, sexual enslavement, and rape.  *Id.* ¶ 68.  The U.S. played a leading role in facilitating the transfer to the ICC of Dominic Ongwen, a top commander of the Lord's Resistance Army, an armed group active in Uganda.  *Id.* ¶ 68(a).  The State Department praised the ICC's prosecution and welcomed Mr. Ongwen's transfer and conviction, stating it hopes the ICC's "judgment demonstrates that justice must and will be done" for "the thousands of abducted young women and girls subjected to horrific sexual violence, torture, and forced labor in the Lord's Resistance Army."  *Id.* ¶ 68(c).

---

[4] Calvin Smyre, U.S. Mission to the U.N., United States Statement on Agenda Item 74: Report of the International Criminal Court, U.N. G.A.O.R., 78th Sess., at 2 (Oct. 30, 2023), https://estatements.un.org/estatements/10.0010/20231030150000000/9pqKoEEGe5ct/u0JIQkuQxAWb_en.pdf.

- The **Democratic Republic of the Congo**, a State Party to the Rome Statute, referred the situation on its territory to the ICC, where some 5.4 million people are reported to have died from war-related causes.[5]  *Id.* ¶ 69.  The U.S. facilitated the transfer to the ICC of a defendant, charged with war crimes and crimes against humanity, including murder, rape, sexual slavery, attacking civilians, pillaging, and recruiting child soldiers. *Id.* ¶ 69.  The State Department "welcome[d] the removal of one of the most notorious and brutal rebels ... to the International Criminal Court" and praised the U.S.' "key role in the surrender" of that accused war criminal "to the ICC."  *Id.*  ¶ 69(a).

- The **Central African Republic**, a State Party to the Rome Statute, referred to the ICC the situation on its territory, which included mass rapes and killings.  The State Department expressed support for "the ICC's investigations in the Central African Republic" and "commend[ed]" its "commitment to ensuring accountability for serious crimes, including through its cooperation with the ICC."  *Id.* ¶ 70(a).

- The U.N. Security Council, of which the U.S. is a permanent member, referred the situation in the **Darfur region of Sudan**, which is not a State Party to the Rome Statute, to the ICC.  At the time, atrocities committed in Darfur had resulted in "the loss of hundreds of thousands of civilian lives and the displacement of millions more from their homes in a campaign marked by ethnic cleansing."[6]  *Id.* ¶ 74.  The State Department announced it "fully support[ed] bringing to justice those responsible for

---

[5]    *Democratic    Republic    of    the    Congo*,    Trust    Fund    for    Victims, https://www.trustfundforvictims.org/en/locations/democratic-republic-congo (last visited June 30, 2026).

[6] *World confronts an 'ugly and inescapable truth' in Darfur, says ICC Prosecutor*, U.N. News (Jan. 29, 2024), https://news.un.org/en/story/2024/01/1146012.

crimes and atrocities" and "call[ed] upon the Sudanese Government to cooperate fully with the ICC."  *Id.* ¶ 74(a).

> o   The National Security Council, upon the ICC's issuance of a second arrest warrant for then-Sudanese President Omar al-Bashir on charges of genocide, extermination, torture, and rape, among other crimes, stated the U.S. "strongly supports international efforts to bring those responsible for genocide and war crimes in Darfur to justice and believes that there cannot be a lasting peace in Darfur without accountability."[7]  *Id.* ¶ 75(b).  The United States has also supported accountability efforts by the ICC following the recent resumption of the conflict.  *Id.* ¶ 75(a).

- The U.N. Security Council unanimously referred the situation in **Libya**, which is not a State Party to the Rome Statute, to the ICC, "condemning the violence and use of force against civilians" and "deploring the gross and systematic violation of human rights."[8]  *Id.* ¶ 76(a).  The U.S. stated that the referral "reflected the importance that the international community attaches to ensuring that those responsible for the widespread and systematic attacks against the Libyan people are held accountable" and "welcome[d] the swift and thorough work of the Prosecutor."  *Id.* ¶ 76(b).

- **Mali**, which is a State Party to the Rome Statute, referred the situation regarding alleged international crimes in its territory to the ICC.  Those alleged crimes included murder, mutilation, torture, intentionally directing attacks against protected objects, and rape.  The State Department stated that "[t]he United States supports efforts by the

---

[7]  *US urges Sudan cooperation on Bashir arrest warrant*, Reuters (Jul. 13, 2010), https://www.reuters.com/article/world/africa/us-urges-sudan-cooperation-on-bashir-arrest-warrant-idUSN13260228/.

[8] International Criminal Court, *Situation in Libya*, https://www.icc-cpi.int/situations/libya (last visited June, 30, 2026).

ICC and Malian authorities to provide justice for these serious crimes" and "commend[ed] Mali for its cooperation with the ICC." *Id.* ¶ 71(b).

- The **Republic of Georgia** is a State Party to the Rome Statute. The ICC authorized the Prosecutor to investigate alleged war crimes perpetrated during Russia's invasion of Georgia's territory. The U.S. Mission to the United Nations praised the subsequent "decisions of the International Criminal Court" to issue arrest warrants for nationals of the Russian Federation notwithstanding the fact that it is not a party to the Rome Statute. *Id.* ¶ 79(b).

- **Venezuela**, which is a State Party to the Rome Statute, referred to the ICC alleged crimes against humanity occurring in its territory, including systematic torture and extrajudicial killings. The U.S. Mission to the United Nations "welcomed … the Court's reauthorization of the Prosecutor's investigation in Venezuela. Victims of these atrocities continue to demand justice." *Id*. ¶ 72(b).

- **Bangladesh** is a State Party to the Rome Statute. The ICC authorized the Prosecutor to investigate alleged crimes against humanity of deportation and persecution, committed against the Rohingya population, on the ground that the crimes partially occurred in Bangladesh, even though **Myanmar** is not a State Party. The U.S. State Department indicated it would "support a referral of the situation in Burma [Myanmar] to the [ICC]." *Id.* ¶ 80(a).

In December 2023, the U.S., in a speech to the ICC's Assembly of States Parties, confirmed its role in "providing practical assistance to the OTP across a range of its investigations," including "helping the [ICC] track fugitives across several situations" by means of, *inter alia*, "offering

11

rewards for their arrest" and "providing input and commentary on the OTP's policy papers."[9]  The U.S. also "conven[ed] meetings with experts from the U.S. government, the private sector, the [ICC], and other accountability mechanisms to identify practical solutions to some of the most difficult challenges facing international justice actors, including with respect to witness protection, insider witnesses, and cybersecurity."[10]  In October 2024, the U.S., in a statement to the U.N. General Assembly, "reiterate[d] its support for the ICC's efforts to deliver justice in situations where atrocities have been committed," including "in Ukraine, Darfur, and the Central African Republic."[11]

The United States has opposed only two ICC investigations. In 2020, the ICC's Appeals Chamber authorized an investigation into crimes allegedly committed in Afghanistan, including those allegedly committed by the Taliban, Afghan security forces, and U.S. personnel.  In September 2021, the Prosecutor expressed his decision to focus the investigation on crimes allegedly committed by the Taliban and the Islamic State-Khorasan Province and to "deprioritise other aspects of this investigation"—understood to refer to the investigation of alleged crimes by U.S. forces.  Compl. ¶ 82(b).  In January 2025, applications for arrest warrants were announced for senior members of the Taliban for the crime against humanity of persecution on gender grounds.  No applications for arrest warrants have been announced for U.S. personnel.

In 2021, following authorization by the Pre-Trial Chamber, the OTP opened an investigation into the situation in Palestine (at the request of Palestine, a State Party to the Rome

---

[9] U.S. Amb.-at-Large for Glob. Crim. Just., *Statement of the United States at the 22nd Session of the Assembly of States Parties of the International Criminal Court* (Dec. 8, 2023), https://2021-2025.state.gov/statement-of-the-united-states-at-the-22nd-session-of-the-assembly-of-states-parties-of-the-international-criminal-court.

[10] *Id*.

[11] U.S. Mission to the U.N., *Remarks at a U.N. General Assembly Meeting on a Report of the International Criminal Court*, (Oct. 28, 2024), https://web.archive.org/web/20250623003742/https://usun.usmission.gov/remarks-at-a-un-general-assembly-meeting-on-a-report-of-the-international-criminal-court-2/.

Statute).  On November 21, 2024, the ICC issued an arrest warrant for Mohammed Al-Masri, the highest commander of the military wing of Hamas, for alleged crimes, including murder, extermination, torture, rape and other forms of sexual violence, hostage-taking, and outrages upon personal dignity.  The OTP also requested arrest warrants for other senior Hamas leaders, Ismail Haniyeh and Yahya Sinwar.  All three proceedings were terminated upon confirmation of their deaths.  Arrest warrants were also issued for Benjamin Netanyahu, Prime Minister of Israel, and Yoav Gallant, former Minister of Defense of Israel, for the alleged war crimes of starvation as a method of warfare and intentionally directing an attack against the civilian population, and the alleged crimes against humanity of murder, persecution, and other inhumane acts.  Israel is participating in the proceeding and has raised challenges to the investigation, including a jurisdictional challenge and an effort to seek the Prosecutor's disqualification.  These challenges have been denied or are pending.  As part of a jurisdictional challenge, the United States made an *amicus curiae* submission raising concerns regarding the Court's exercise of jurisdiction.

The United States' opposition to these investigations is based on its long-standing objection to the prospect of the ICC exercising jurisdiction over nationals of non-State Parties.  When the U.S. signed the Rome Statute, President Clinton expressed concern "that when the [ICC] comes into existence, it will not only exercise authority over personnel of states that have ratified the Treaty, but also claim jurisdiction over personnel of states that have not." Statement on the Rome Treaty.

To address this concern, in 2002, Congress enacted ASPA.  In this respect, Congress elected to impose certain restrictions on the ICC's activities in the United States and authorized the President to undertake a limited set of actions to assist U.S. persons or allied persons who are subject to ICC proceedings, such as providing legal representation, participating in legal

13

proceedings (as the United States already has), or presenting exculpatory evidence.  22 U.S.C. § 7427.  The imposition of sanctions however, is *not* an authorized action.  Indeed, ASPA expressly *prohibits* the type of coercive inducements that the Sanctions Regime employs, even in circumstances of a U.S. person being detained.  *Id.* § 7427(d).  Further, Congress included provisions in ASPA to permit support for ICC investigations under certain circumstances, including with respect to "foreign nationals accused of genocide, war crimes or crimes against humanity" and "investigations and prosecutions of foreign nationals related to the Situation in Ukraine."  *Id.* § 7433(a).

## II.    The Sanctions Regime

On February 6, 2025, President Trump issued EO 14,203.  The Order invokes authority Congress delegated to the President in IEEPA that permits the President to exercise certain powers once he has declared a national emergency under the National Emergencies Act, 50 U.S.C. §§ 1601 *et seq.*, with respect to "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."  50 U.S.C. § 1701(a).  IEEPA's powers "*may not be exercised for any other purpose.*"  *Id.* § 1701(b) (emphasis added).

Congress intended the national emergency requirement to be a meaningful constraint on the President's powers: "A national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose."  H.R. Rep. No. 95-459, at 10 (1977).  Subject to this statutory constraint, IEEPA permits the President to:

> block … regulate ... void, prevent or prohibit, any acquisition, holding, withholding, use transfer, withdrawal, ... dealing in, or exercising any right, power or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

14

50 U.S.C. § 1702(a)(1)(B).

EO 14,203 declares a national emergency with respect to "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons," defined as any U.S. person or "any foreign person that is a citizen or lawful resident of an ally of the United States" that has not consented to ICC jurisdiction. EO 14,203, Preamble & § 8(d). The Order asserts that the ICC has "engaged in illegitimate and baseless actions" and has "without a legitimate basis, asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel," and specifically references the arrest warrants issued for Israeli Prime Minister Benjamin Netanyahu and former Minister of Defense Yoav Gallant for war crimes and crimes against humanity. *Id.*, Preamble.

EO 14,203 declares this putative national emergency notwithstanding that: (1) the Rome Statute authorizes the ICC to exercise territorial jurisdiction where crimes are committed by non-State Party nationals on the territory of an ICC State Party; (2) for a quarter-century, Congress has been aware of, and in fact enacted legislation, to address the prospect of the ICC exercising such territorial jurisdiction; and (3) the United States has, in numerous cases, supported ICC investigations into and prosecutions of crimes allegedly committed by nationals of States that are not party to the Rome Statute, including crimes allegedly committed by Russian nationals in Ukraine and Georgia.

Section 1 of the EO "block[s]" the "property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, of" the Prosecutor of the ICC, Mr. Karim Khan KC, and "any foreign person determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General," *inter alia*, "to have directly engaged in any

15

effort by the ICC to investigate, arrest, detain, or prosecute a protected person." *Id*. § 1(a).  Those whose property is blocked are included on the Specially Designated Nationals List ("SDN List") maintained by the Department of the Treasury's Office of Foreign Assets Control ("OFAC").

In addition to Judges Prost, Bossa, and Alapini-Gansou, the administration has designated for sanctions under EO 14,203 five additional ICC judges; the Prosecutor of the ICC and its two Deputy Prosecutors; the U.N. Special Rapporteur on situation of human rights in the Palestinian territories occupied since 1967; and three Palestinian human rights organizations.

## III.    The Designations of Judges Prost, Bossa, and Alapini-Gansou

### A.    Judge Kimberly Prost

Judge Prost is a Canadian national who has served as a Judge of the ICC since March 2018. Her election to that position is the culmination of a decades-long career in criminal law and counterterrorism.

Prior to her international judicial service, Judge Prost had a distinguished career as a senior federal prosecutor in Canada.  Among other things, she served as Senior Counsel in the Criminal Law Branch of the Department of Justice, representing the Government of Canada in criminal, extradition, and constitutional law cases, including before the Supreme Court of Canada, and as Director of the International Assistance Group in the Department of Justice, where she was responsible for developing Canada's processes for extradition and international cooperation in criminal matters.  She also represented Canada in the negotiation of the U.N. Convention against Transnational Organized Crime, the U.N. Convention against Corruption, and the Rome Statute. *See* Declaration of Judge Kimberly Prost ¶¶ 3-8 ("Prost Decl.").

In recognition of her close cooperation with colleagues in the United States Government, Judge Prost received from the United States Department of Justice the plaque below:

16



*Id.*, Ex. A.

Judge Prost also held senior positions with intergovernmental agencies and organizations focused on, *inter alia*, implementing the Rome Statute; enhancing domestic capacity to prosecute genocide, crimes against humanity, and war crimes; and combatting terrorism and other transnational criminal activities. *See id.* ¶¶ 9-11. Among other things, she was Head of Criminal Law and Deputy Director of the Legal and Constitutional Affairs Division of the Commonwealth Secretariat. In that capacity, in the wake of the September 11, 2001 terrorist attacks on the United States, she assisted Member States in implementing U.N. Security Council Resolution 1373, which obliged States to implement counterterrorism measures, including freezing the funds and assets of persons who participate in or facilitate terrorist acts.

17

In July 2006, Judge Prost was elected by the U.N. General Assembly to serve as an *ad litem* judge of the International Criminal Tribunal for the former Yugoslavia ("ICTY"), the *ad hoc* court established by U.N. Security Council to prosecute individuals accused of committing international crimes on the territory of the former Yugoslavia. *See id.* ¶ 12.

From July 2010 to July 2015, Judge Prost served as the first Ombudsperson for the U.N. Security Council Al-Qaida Sanctions Committee at the U.N. headquarters in New York. She was selected and appointed by the U.N. Secretary-General as "an eminent individual of high moral character, impartiality and integrity." *Id.* ¶ 14. As Ombudsperson, she reviewed delisting requests from individuals sanctioned for associations with Al-Qaida and ISIL, ensuring those listed received due process. *See id.* ¶¶ 14-16. In February 2016, Judge Prost returned to The Hague to serve as the *Chef de Cabinet* for the President of the ICC.

In December 2017, following her nomination by the Government of Canada, Judge Prost was elected as an ICC Judge by the Assembly of States Parties. *See id.* ¶¶ 18-20. After taking her judicial oath of office in March 2018, she was assigned to the Trial Division by the Presidency. As a Trial Division Judge at the ICC, Judge Prost presides over cases arising from the situations in Darfur and Mali and oversees the implementation of reparations orders benefiting over 60,000 victims of international crimes across multiple cases. *See id.* ¶¶ 20, 25, 27-28.

On four occasions, Judge Prost served temporarily as one of the five judges on the Appeals Chamber. From October 25, 2019 to March 5, 2020, she was assigned to the appellate panel in the *Situation in Afghanistan*. She joined the Chamber's March 2020 unanimous decision authorizing the ICC Prosecutor's investigation of crimes allegedly committed in Afghanistan, which reversed a decision of the Pre-Trial Chamber that had denied the Prosecutor's request to open that investigation. The Appeals Chamber held that the Pre-Trial Chamber had erred in

18

conducting an "interests of justice" assessment, which was not within its purview under Article 15(4) of the Rome Statute. Judge Prost has had no involvement in any Afghanistan-related matters since March 2020. *See id.* ¶¶ 29, 33-34.

Over five years later, on August 20, 2025, Secretary of State Marco Rubio designated Judge Prost for sanctions pursuant to Section 1(a)(ii)(A) of EO 14,203. The State Department contemporaneously stated that Judge Prost was "designated for ruling to authorize the ICC's investigation into U.S. personnel in Afghanistan." *See id.* ¶¶ 36. The State Department has not presented, nor does it possess, substantial evidence that Judge Prost has "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality," within the meaning of Section 1(a)(ii)(A) of EO 14,203.

The imposition of sanctions against Judge Prost has caused her significant harm. Among other things:

    a. Her bank account at HSBC Bank USA, N.A. at the Grand Central branch in Midtown Manhattan has been frozen;

    b. She is no longer able to use credit cards, including cards issued by both U.S. and non-U.S. banks;

    c. She has very limited access to banking services, which only function in parts of Europe and Canada;

    d. She cannot effect simple transfers of funds entirely within Europe to pay bills;

    e. She is unable to purchase U.S. dollars or other currencies if the transactions pass through the U.S. financial system, and when travelling outside the European Union or Canada, she is confined to cash transactions;

f. Her accounts with U.S. companies such as Amazon, Google, and Expedia have been limited or cancelled entirely;

g. Carrying out basic daily tasks—such as using public transport, booking hotels, ordering online, or calling a taxi—have become difficult or impossible;

h. She has, in effect, lost access to health insurance due to her provider's refusal to pay out her medical claims, despite payment of her dues, and has been unable to secure health insurance from other providers;

i. She has been unable to attend speaking engagements in the United States, despite having previously and frequently spoken in the United States, including at Columbia University, Case Western Reserve University, Harvard University, and New York University;

j. She was unable to present a keynote address at the American Branch of International Law Association's annual International Law Weekend in October 2025, hosted at Fordham School of Law in New York, and was barred from participating virtually in the event;

k. She indefinitely postponed a planned visit to Vanderbilt University and abandoned plans to attend the Annual Meeting of the American Society for International Law, held in April 2026 in Washington, D.C.;

l. She was deprived of the opportunity to exchange with members of prominent U.S.-based human rights non-governmental organizations, which appear to have been instructed to limit their interactions with her at the December 2025 meeting of the Assembly of States Parties; and

m. Her family members in Canada worry about traveling to the United States.

*Id.* ¶¶ 38-41.

### B.    Judge Solomy Balungi Bossa

Judge Bossa is a national of the Republic of Uganda who has served as a Judge of the ICC since March 2018.  Judge Bossa's judicial service on the ICC is the culmination of a lengthy career focused on human rights and international judicial service.

Prior to becoming an international judge, Judge Bossa had a distinguished career in private practice and academia.  She served as a legal academic, the managing partner of one of only two women-owned law firms in Uganda, and the first female President of the Uganda Law Society, while also co-founding several regional legal organizations focused on human rights, constitutionalism, and the rule of law.  Her leadership roles included serving as Vice-Chairperson of the International Bar Association's Human Rights Institute and as founding president of the East African Law Society.  *See* Declaration of Judge Solomy Balungi Bossa ¶¶ 6-9 ("Bossa Decl.").  Judge Bossa was appointed to the Ugandan High Court in 1997.  She subsequently served on Uganda's Court of Appeal, which also functions as the country's Constitutional Court, from 2013 to 2018.  *See id.* ¶¶ 10, 13.

Judge Bossa has served on numerous international and regional courts.  She became the first woman appointed to the East African Court of Justice in 2002.  From 2003 to 2013, she served as a Judge on the International Criminal Tribunal for Rwanda, a U.N. Security Council-established *ad hoc* tribunal supported by the United States, where she adjudicated cases involving genocide and crimes against humanity over a nine-and-a-half-year tenure.  She also served as a part-time Judge on the U.N. Residual Mechanism for International Criminal Tribunals and was elected to the African Court on Human and Peoples' Rights in 2014.  *See id.* ¶¶ 11-15.

Judge Bossa was elected an ICC Judge in December 2017 and assigned to the Appeals Chamber.  During her tenure, Judge Bossa has heard appeals in major cases arising from situations

21

in the Democratic Republic of the Congo, Uganda, Côte d'Ivoire, and Mali, including appeals resulting in the confirmation of convictions and lengthy sentences for war crimes and crimes against humanity, as well as the confirmation of an acquittal. *See id.* ¶¶ 19, 23-24.

In the *Situation in Afghanistan*, Judge Bossa joined her four other colleagues in the Appeals Chambers' March 5, 2020 decision authorizing the Prosecutor to investigate potential crimes committed in Afghanistan. *See id.* ¶¶ 23, 25-28.

Over five years later, on June 5, 2025, Secretary of State Rubio designated Judge Bossa pursuant to Section 1(a)(ii)(A) of EO 14,203. The State Department contemporaneously stated that Judge Bossa was designated because she "ruled to authorize the ICC's investigation against U.S. personnel in Afghanistan." *Id.* ¶ 31.

The State Department has not presented, and does not possess, substantial evidence that Judge Bossa has "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality," within the meaning of Section 1(a)(ii)(A) of EO 14,203.

The imposition of sanctions against Judge Bossa has caused her significant harm. Among other things:

    a. Her bank account at the United Nations Federal Credit Union in New York was blocked, cutting her off from funds she had maintained there since 2003;

    b. She is no longer able to use credit cards;

    c. She is unable to purchase U.S. dollars or other currencies if the transactions pass through the U.S. financial system;

    d. Booking international transport and accommodation has become difficult or impossible;

22

e.  She is unable to pay bills in U.S. dollars or transfer funds between accounts that are held in U.S. dollars;

f.  She is hindered from accessing technological services based in the U.S., including her personal Google email account;

g.  She is unable to attend speaking engagements within the U.S. or exchange with members of prominent U.S.-based human rights non-governmental organizations.

*Id.* ¶¶ 34-37.

### C.    Judge Reine Adelaide Sophie Alapini-Gansou

Judge Reine Adelaide Sophie Alapini-Gansou is a national of the Republic of Benin who has served as a Judge of the ICC since March 2018. She currently serves as the Second Vice-President of the Court.

Judge Alapini-Gansou had a distinguished domestic and international career prior to her election to the ICC.  As a member of the Benin bar, she litigated seminal women's rights cases in Benin, including a successful constitutional challenge to the criminalization of female adultery, and participated in legal reform initiatives regarding female genital mutilation, sexual harassment, and gender-based violence.  *See* Declaration of Judge Reine Alapini-Gansou ¶ 8 ("Alapini-Gansou Decl.").

In 2005, Judge Alapini-Gansou was elected as one of 11 Commissioners of the African Commission on Human and Peoples' Rights, a quasi-judicial body under the auspices of the African Union.  During the 12 years she spent on the African Commission, she participated in the adjudication of approximately 700 human rights complaints.  In 2009, she was appointed Chair of the African Commission, a position she held until 2012.  Judge Alapini-Gansou also served as the Commission's Special Rapporteur on the Situation of Human Rights Defenders in Africa from 2005 to 2009, and from 2012 to 2017.  *See id.* ¶¶ 11-13.

Judge Alapini-Gansou was appointed to serve on international investigative and monitoring missions, including as member of the U.N. International Commission of Inquiry on Côte d'Ivoire and the U.N. Commission of Inquiry on human rights violations in Burundi, and as head of the Human Rights Component of the International African Support Mission in Mali and the African Union Mission for Mali and the Sahel. *See id.* ¶¶ 14, 16-17.

Judge Alapini-Gansou was elected an ICC Judge in December 2017. She was assigned to serve as one of the three judges in Pre-Trial Chamber I. At the time of her assignment, her chamber oversaw situations involving Comoros, Greece and Cambodia, the Democratic Republic of the Congo, Gabon, Georgia, Libya, and Mali. *See id.* ¶¶ 19, 25.

On May 22, 2018, Palestine referred the *Situation in the State of Palestine* to the ICC Prosecutor. On May 24, 2018, the ICC Presidency assigned the situation to Pre-Trial Chamber I, based on workload considerations. Judge Alapini-Gansou had no grounds to recuse herself, as she had never been involved in the case in any capacity before joining the ICC. *See id.* ¶¶ 32-34.

On February 5, 2021, Pre-Trial Chamber I ruled that the ICC's territorial jurisdiction extends to Gaza and the West Bank, including East Jerusalem. On November 21, 2024, Pre-Trial Chamber I issued warrants of arrest for senior Hamas officials, as well as warrants for Benjamin Netanyahu and Yoav Gallant, for crimes against humanity and war crimes. *See id.* ¶¶ 36-38. Israel has brought several jurisdictional challenges, one of which is pending before the Pre-Trial Chamber on which Judge Alapini-Gansou sits.

On June 5, 2025, Secretary of State Rubio designated Judge Alapini-Gansou pursuant to Section 1(a)(ii)(A) of EO 14,203. The State Department contemporaneously stated that Judge Alapini-Gansou was designated because she "ruled to authorize the ICC's issuance of arrest

24

warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Minister of Defense Yoav Gallant."[12]

The State Department has not presented, and does not possess, substantial evidence that Judge Alapini-Gansou has "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality," within the meaning of Section 1(a)(ii)(A) of EO 14,203.

The imposition of sanctions against Judge Alapini-Gansou has caused her significant harm. Among other things:

    a. She is no longer able to use her credit card from her French bank;

    b. She is unable to purchase U.S. dollars or other currencies if the transactions pass through the U.S. financial system;

    c. Booking international transport and accommodation has become difficult or impossible;

    d. She is hindered from accessing technological services based in the U.S.;

    e. She has, in effect, lost access to health insurance, due to her provider's refusal to pay out medical claims;

    f. She feels her security has been threatened, leading her to:

        i. Arrange to be driven to the ICC from her home in The Hague;

        ii. Choose not to walk to the ICC or around The Hague;

        iii. Reduce the frequency of her visits to her home in Benin;

        iv. Reduce work-related travel within Europe;

---

[12] U.S. Dep't of State, *Imposing Sanctions in Response to the ICC's Illegitimate Actions Targeting the United States and Israel* (June 5, 2025), https://www.state.gov/imposing-sanctions-in-response-to-the-iccs-illegitimate-actions-targeting-the-united-states-and-israel.

g. She has ceased organizing seminars and workshops for non-governmental organizations in Africa, and in some cases she has been specifically asked not to participate in events or activities;

h. She is unable to engage with members of prominent U.S.-based human rights non-governmental organizations; and

i. Her son has abandoned plans to attend law school in the United States, and one of her daughters, who works for an international NGO, has cancelled trips to the United States.

*Id.* ¶¶ 41-50.

## ARGUMENT

A plaintiff seeking a preliminary injunction must establish that: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [the plaintiff's] favor"; and (4) "that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *see also Open Soc'y Justice Initiative v. Trump*, 510 F. Supp. 3d 198, 207 (S.D.N.Y. 2021). When the government is a party to the suit, "the final two factors merge." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020) ("*New York II*") (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). All criteria are satisfied here.

## I.    Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to prevail on the merits. First, the Sanctions Regime is *ultra vires* under IEEPA because it conflicts with international law as well as acts of Congress, and there is no "national emergency" within the meaning of IEEPA. Second, Plaintiffs' designations violate the APA because they are arbitrary and capricious, an abuse of discretion, and contrary to law. Third, as applied to Judges Prost and Bossa, the Sanctions Regime violates the Fifth Amendment's Due

Process Clause because the blocking of their New York bank accounts constitutes a deprivation of property without any of the procedural safeguards the Constitution demands.

### A. The Sanctions Regime Is *Ultra Vires* under IEEPA.

The President wields executive, not legislative, power; he is entrusted with enforcing, not making, law. *See* U.S. Const. Art. II, § 1; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 633 (1952). For an exercise of Presidential authority to be lawful, it must be made pursuant to the President's express constitutional powers under Article II, the President's independent constitutional authority, or by express or implicit Congressional delegation of power. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Here, the Sanctions Regime exceeds Congress' delegation of authority under IEEPA in three respects: (1) the regime violates international law, which Congress has not authorized the President to do; (2) it conflicts with acts of Congress; and (3) there is no "national emergency" within the meaning of IEEPA.

#### 1. IEEPA Does Not Authorize the Violation of International Law.

The Sanctions Regime is *ultra vires* under IEEPA because it violates international law and Congress did not authorize any such violations. Under the *Charming Betsy* doctrine, "an act of [C]ongress ought never to be construed to violate the law of nations, if any other possible construction remains." *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982) (quoting *Murray v. The Charming Betsy*, 2 Cranch 64, 118 (1804)). This "unbroken line of authority," *United States v. Palestine Liberation Org.*, 695 F. Supp. 1456, 1465 (S.D.N.Y. 1988), compels the conclusion that the Sanctions Regime is outside the bounds of Congress' delegated authority under IEEPA. *Cheung v. United States*, 213 F.3d 82, 92 (2d Cir. 2000) (applying *Charming Betsy* doctrine and reconciling the interpretation of "country" to both American law and the U.S.-Hong Kong extradition treaty). *See also* Restatement (Third) of the Foreign Relations Law of the United States

§ 114 (Am. L. Inst. 1987) ("[W]here fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States.").

The Sanctions Regime violates international law in multiple ways. *See* Compl. ¶¶ 135-148. This is shown in the Expert Declaration of Professor Koh, who has served as the Legal Adviser of the U.S. Department of State, the Government's principal legal adviser on international law and the law of foreign relations. Professor Koh is widely regarded as the American legal academy's leading expert on international law. His evaluation of the Sanctions Regime is categorical: it is not only contrary to the United States' historical role as "a central architect and supporter of the international criminal justice system," the regime "places the United States in direct violation of many of its international law obligations." Expert Declaration of Harold Hongju Koh in Support of Plaintiffs ¶¶ 8-10, 12 ("Koh Decl.").

Professor Koh identifies four categories of international legal obligations, all binding on the United States, which the Sanctions Regime breaches. *Id*. ¶ 10. These obligations arise from commitments undertaken by the United States in treaties and conventions ratified with the advice and consent of the Senate, as well as from equally binding customary international law. *Id.* ¶ 42; *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 180 (2d Cir. 2009) (customary international law is legally binding on States).

*First*, the Sanctions Regime "violate[s] the United States' obligation, under the duly ratified UN Charter, to cooperate with the United Nations by abiding by binding Security Council resolutions." Koh Decl. ¶ 43. This is because "[t]he ICC is not just a stand-alone international organization: its *raison d'être* is intrinsically related to the work and mission of the UN, with whom it has entered into a 'relationship agreement,' providing for close cooperation between the two organizations." *Id.* ¶ 44.

28

The inextricably linked role of the U.N. and the ICC is underscored by the Security Council's prerogative, enshrined in the Rome Statute, to refer situations to the ICC when crimes have been committed that represent a threat to international peace and security. Rome Statute, art. 13(b); *see also* U.N. Charter, chapter VII. As Professor Koh underscores, this is "a mechanism that the United States has itself invoked, voting in favor of the Security Council's referral to the ICC in the situation in Libya." Koh Decl. ¶ 43; *see also* S.C. Res. 1970, ¶ 4, U.N. Doc. S/RES/1970 (Feb. 26, 2011).

U.N. Member States have "agree[d] to accept and carry out the decisions of the Security Council in accordance with the present Charter." U.N. Charter, art. 25. Resolutions adopted to maintain international peace and security pursuant to the Council's powers under Chapter VII of the U.N. Charter, such as those referring situations to the ICC, are binding. Koh Decl. ¶ 43. Further, "Members of the United Nations shall join in affording mutual assistance in carrying out the measures decided upon by the Security Council." U.N. Charter, art. 49. The United States, as a Member of the United Nations, is also obligated to "fulfill in good faith the obligations assumed by [it] in accordance with the [U.N.] Charter" and to "give the United Nations every assistance in any action it takes in accordance with the … Charter." *Id.* art. 2 §§ 2, 5.

By targeting ICC judges and prosecutors, the Sanctions Regime "do[es] not assist, but rather impede[s], the ICC's investigation of situations that were specifically referred to the court by the UN Security Council." Koh Decl. ¶ 43. In doing so, the United States is "directly interfer[ing] with the implementation of the Security Council's binding resolutions to maintain international peace and security," thus breaching the United States' most fundamental obligations under the U.N. Charter. *Id.*

29

*Second*, the United States has an "obligation, even as a non-party to the Rome Statute, to respect the privileges and immunities of the ICC and its officials, as provided under customary international law." *Id.* ¶ 44; *cf. The Paquete Habana*, 175 U.S. 677, 700 (1900) (holding that customary international law is binding). "It is well established under international law that an international organization is entitled to such privileges and such immunity from the jurisdiction of a member state as are necessary for the fulfillment of the purposes of the organization." *Mendaro v. World Bank*, 717 F.2d 610, 615 (D.C. Cir. 1983) (internal quotation omitted). While the United States is not a party to the Rome Statute, international organizations, particularly those of a universal character, enjoy privileges and immunities under customary international law that must be respected by all States, even those that are not members of such organizations. *See, e.g.*, James Crawford, *Brownlie's Principles of Public International Law* 174 (9th ed. 2019) ("[I]f the personality of international organizations stems from an objective assessment of their functions and non-parties are required to accept their separate identity, then this personality must be populated with the attributes necessary for the organization to carry out its mandate, including as necessary the immunity of the institution and its personnel.").

In fulfillment of this obligation, foreign courts routinely respect the privileges and immunities of international organizations even in circumstances where that State is not a member of the organization. *See, e.g.*, *Iran–United States Claims Tribunal v. AS*, 94 ILR 321, 329 (Neth. 1985) (Dutch Supreme Court holding that international organizations, such as the Iran-United States Claims Tribunal, to which the Netherlands is not party, enjoy immunity from jurisdiction in respect of disputes related to the fulfilment of their tasks); *ZM v. Permanent Delegation of the League of Arab States to the U.N.*, 116 ILR 643, 647-649 (Switz. 1993) (Labour Court of Geneva recognizing that Switzerland was required to grant the privileges and immunities normally owed

30

to international organizations to the League of Arab States, despite Switzerland not being a member).

The ICC is an international organization of universal character. Its membership is open to all States, and it already counts 125 States Parties (*i.e.*, almost two-thirds of U.N. Member States). Koh Decl. ¶¶ 44, 51. Moreover, as noted above, the ICC has entered into a relationship agreement with the United Nations, which provides for close cooperation between the two organizations. *See* Rome Statute, art. 2; Negotiated Relationship Agreement between the International Criminal Court and the United Nations art. 3, Sept. 13, 2004, 2283 U.N.T.S. 195. Accordingly, by virtue of its universal character in relationship with the United Nations, the United States is under an obligation, even as a non-party, to respect the privileges and immunities of the ICC and its officials. Koh Decl. ¶ 44.

The core privileges and immunities of international organizations and their officials are those that permit them to exercise their functions, such as immunity for words spoken or acts performed in the furtherance of official duties. Thus, as Professor Koh explains,

> [b]y targeting and threatening ICC judges, officials, and other entities that may assist its work, the Executive Order and designations constitute an illegal interference with the ICC's functions. They directly obstruct the ICC's core functions by seeking to influence its judges through coercion, not reason, and by sanctioning members of the Office of the Prosecutor to keep them from assisting the ICC in conducting full and fair independent investigations and prosecutions as their professional judgment directs.

*Id.* ¶ 45.

*Third*, the Sanctions Regime "impair[s] the United States' obligations under international law to prevent and punish international crimes." *Id.* ¶ 46. These obligations arise not only from customary international law, but from treaties and conventions ratified by the United States, including the U.N. Charter, 1949 Geneva Conventions, the 1948 Genocide Convention, and the 1984 Convention Against Torture. *Id.* ¶¶ 46-47.

31

For example, as a party to the 1949 Geneva Conventions, the United States has "undertake[n] to respect and ensure respect for the [Conventions] in all circumstances." Geneva Convention (IV) art. 1, Aug. 12, 1949, 6 U.S.T. 3516.  As explained by the International Committee of the Red Cross, which enjoys a privileged position regarding the Geneva Conventions' interpretation, the duty to ensure respect for the Conventions entails an obligation to prevent violations and stop ongoing violations by other High Contracting Parties.[13] Measures to ensure respect by other States include supporting international efforts to bring suspected perpetrators of serious violations of the Conventions to justice, including through the ICC.[14]

Likewise, under customary international law, all States have a duty to prevent and punish all international crimes, including genocide, crimes against humanity, and war crimes. *See, e.g.*, S.C. Res. 2419, ¶ 6, U.N. Doc. S/RES/2419 (June 6, 2018); G.A. Res. 67/1, ¶ 22, U.N. Doc. A/RES/67/1 (Nov. 30, 2012); S.C. Res. 1894, ¶ 10, U.N. Doc. S/RES/1894 (Nov. 11, 2009); Principles of International Cooperation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes and Crimes against Humanity, G.A. Res. 3074 (XXVIII), annex, U.N. Doc. A/RES/3074(XXVIII) (Dec. 3, 1973).  This entails a positive duty to cooperate with other States to prevent and punish international crimes and ensure accountability. *See* International Law Commission, Draft articles on Prevention and Punishment of Crimes Against Humanity, with Commentaries at 61, ¶ 13, U.N. Doc. A/74/10 (2019); Principles of International Cooperation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes and Crimes against Humanity, G.A. Res. 3074 (XXVIII), annex, ¶ 3, U.N. Doc. A/RES/3074(XXVIII) (Dec. 3, 1973).

---

[13] Int'l Comm. of the Red Cross, Commentary on Geneva Convention IV art. 1 (2025), https://ihl-databases.icrc.org/en/ihl-treaties/gciv-1949/article-1/commentary/2025, ¶ 189.

[14] *Id.* ¶ 251.

Professor Koh emphasizes that, "[l]ike all states, the United States thus has a legal duty to cooperate with other States to bring to an end serious violations of such peremptory norms of international law (or *jus cogens* norms) such as the prohibitions against genocide, crimes against humanity, and serious violations of international humanitarian law."  Koh Decl. ¶ 49; *Estate of Tov v. United Nations Relief & Works Agency*, 807 F. Supp. 3d 208, 224 (S.D.N.Y. 2025) (listing the prohibition of genocide, torture, and gross violations of international human rights as *jus cogens* norms).  The ICC investigates and prosecutes numerous situations that all involve violations of international humanitarian law, war crimes, and/or crimes against humanity.  This includes, but is not limited to, the situations expressly mentioned in the Executive Order.  The United States is thus under an obligation both under treaty law and customary international law to support international efforts and cooperate with other States to prosecute and punish these crimes and violations.

The obligations to investigate and punish international crimes, including through cooperation with other States, must be performed in good faith.  *See* Vienna Convention on the Law of Treaties arts. 26, 31(1), May 23, 1969, 1155 U.N.T.S. 331; *Chubb & Son, Inc. v. Asiana Airlines*, 214 F.3d 301, 309 & n.5 (2d Cir. 2000) (recognizing the Vienna Convention as an "authoritative guide to the customary international law of treaties").  The "United States' positive obligation to prevent and punish international crimes carries with it a negative obligation not to interfere with or hinder ongoing international efforts to investigate and punish those crimes."  Koh Decl. ¶ 50; *cf. Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro)*, Judgment, I.C.J. Reports 2007, ¶ 166 (Feb. 26, 2007) (finding that the obligation to prevent genocide in Article I of the Genocide

Convention "necessarily implies" the corresponding negative obligation for a State *not to commit genocide* itself despite this obligation not being made express in the text of the convention).

At a minimum, the obligation to prevent and punish international crimes implies the negative duty not to interfere with States' efforts to cooperate to punish such international crimes. "Because 125 States have chosen to fulfill their right and duty to investigate and punish international crimes by supporting the work of the ICC, by its institutional actions, the Court thus 'exercises the jurisdiction of all the concerned sovereigns *inter se*, for their overall benefit.'" Koh Decl. ¶ 51; *Prosecutor v. Omar Hassan Ahmad Al Bashir*, Joint Concurring Opinion of Judges Eboe-Osuji, Morrison, Hofmański & Bossa, ICC-02/05-01/09-397- Anx1-Corr, ¶ 59 (May 6, 2019). Since "[t]he Executive Order and its underlying designations are expressly designed to constrain the ICC's ability to pursue certain investigations, and to prevent States from supporting it in doing so," the Sanctions Regime directly thwarts the collective efforts of 125 States to fulfil their most fundamental obligations under international law. Koh Decl. ¶ 51. The Sanctions Regime thus violates the United States' own legal obligations. *Id*.

*Fourth*, "[b]ecause these sanctions are designed to impede or unduly influence the judicial functions of the ICC and its judges in the administration of those cases, they offend the general principle of law guaranteeing the independence of the judiciary" and are thus "incompatible with the fundamental human right to a fair trial" free from political interference. *Id.* ¶¶ 56-57.

General principles of law, which are recognized by the principal legal systems of the world, are binding rules of international law. *See* Statute of the International Court of Justice art. 38(c) (enshrining general principles of law recognized by nations as a source of international law); Int'l L. Comm'n, *Second Rep. on General Principles of Law*, U.N. Doc A/CN.4/741, ¶¶ 17, 26 (Apr. 9, 2020). As Professor Koh notes, "[t]he principle of the independence of the judiciary is enshrined

in the vast majority of States' domestic legal systems and is at the heart of the general principle of the rule of law." Koh Decl. ¶ 53. In the United States, this "constitutional principle" is "so widely esteemed and so vital to our system of government." *Evans v. Gore*, 253 U.S. 245, 259 (1920).

The independence of the judiciary is also "reflected in many treaties and UN resolutions," which is evidence that the principle has been transposed into the international legal system. Koh Decl. ¶ 53; *see* Int'l L. Comm'n, *Second Rep. on General Principles of Law*, U.N. Doc A/CN.4/741, ¶ 97 (Apr. 9, 2020) ("[T]reaties[] can be considered as evidence confirming that a principle common to the principal legal systems of the world is transposed to the international legal system."). For its part, the Rome Statute specifically criminalizes "[i]mpeding, intimidating or corruptly influencing an official of the Court for the purpose of forcing or persuading the official not to perform, or to perform improperly, his or her duties." Rome Statute, art. 70(1)(d).

However, contrary to this rule of international law, the "stated purpose of E.O. 14,203 and the designations of senior ICC officials made thereunder is to sanction the designated individuals solely for doing their lawful jobs … Their apparent goal is to influence these individuals to make their decisions based on their personal interests, rather than on the objective facts and law of the cases before them." Koh Decl. ¶ 56. Indeed, "[u]nlike counterterrorism sanctions, which are directed against financiers for whom there is probable cause to believe they are supporters of terrorism, many of the targets of the E.O. 14,203 sanctions are innocent judges and prosecutors being punished for the 'offense' of acting as impartial court officials, without any proffered proof that they are in any way biased, not independent, corrupted, or otherwise unfit to serve." *Id.* ¶ 54. The Sanctions Regime is thus an affront to the general principle of judicial independence and is simply incompatible with the rule of law.

35

As such, the Sanctions Regime further "violate[s] the U.S. standing obligation to ensure the right to a fair international trial by interfering with the ICC's judicial independence and capacity to provide a fair process in the situations referred to it, and to the individuals accused and prosecuted by it." *Id.* ¶ 56. The International Covenant on Civil and Political Rights, to which the United States is party, guarantees in its Article 14(1) "a fair and public hearing by a competent, independent and impartial tribunal established by law." International Covenant on Civil and Political Rights art. 14(1), Dec. 16, 1966, 999 U.N.T.S. 171. Interpreting this provision, the U.N. Human Rights Committee has explained that States must ensure "the actual independence of the judiciary from political interference." Human Rights Committee, General Comment No. 32, U.N. Doc. CCPR/C/GC/32 (23 Aug. 2007), ¶ 19. This "principle does not just apply to domestic courts," but to those appearing before international courts as well. Koh Decl. ¶ 56. A court whose judges and prosecutors are subject to coercion cannot ensure a fair trial for those appearing before it.

Indeed, the impact of the Sanctions Regime extends far beyond the targeted individuals, and undermines the rights of large groups of stakeholders. As Professor Koh underscores,

> The judges and prosecutors sanctioned under the order are responsible for adjudicating cases on behalf of victims of war crimes, crimes against humanity, and genocide. By subjecting ICC officials to measures that impair their ability to carry out their judicial and prosecutorial functions, the sanctions deprive victims of the legal advocates and adjudicators who give their claims voice. By undercutting the work of the ICC as a whole, the E.O. and its related designations extend beyond their immediate targets to punish victims' advocates and survivors whose cases these sanctions make more difficult to conclude.

*Id.* ¶ 57.

For all of these reasons, whether taken individually or collectively, the Sanctions Regime violates the United States' binding obligations under treaty and custom alike.

36

In the absence of a "clear[] and unequivocal[]" congressional statement to the contrary, courts are "under a duty to interpret statutes in a manner consonant with" international law. *Palestine Liberation Org.*, 695 F. Supp. at 1465; *see also* Restatement (Third) of the Foreign Relations Law § 114; *id.* § 115, cmt. a (observing courts "require clear indication that Congress … intended to supersede … [an] international obligation"). Courts thus routinely construe statutes so as not to conflict with international law. *See, e.g.*, *McCulloch v. Sociedad Nacional De Marineros De Honduras*, 372 U.S. 10, 21 (1963) (construing National Labor Relations Act in harmony with the "well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship"); *Cheung*, 213 F.3d at 92 (construing extradition statute "in such a way 'so as to give effect to both' the [Immigration and Nationality Act] and the [Hong Kong Extradition] Agreement") (quoting *Blanco v. United States*, 775 F.2d 53, 61 (2d Cir. 1985)); *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009) ("Under *Charming Betsy*, we should interpret the INA in such a way as to avoid any conflict with the [Refugee] Protocol, if possible."); *Ma v. Ashcroft*, 257 F.3d 1095, 1114 (9th Cir. 2001) (applying *Charming Betsy* to avoid a violation of the International Covenant on Civil and Political Rights).

IEEPA must therefore be interpreted so as not to contravene the United States' international legal obligations, absent a congressional indication to the contrary. Neither the text nor the legislative history of IEEPA contains a "clearl[] and unequivocal[]" authorization to violate international law or in any way suggests that Congress bestowed the President with authority to "abrogate[] prior treaties or international obligations entered into by the United States." *Palestine Liberation Org.*, 695 F. Supp. at 1465. IEEPA's delegation of authority must accordingly be construed "in a manner consonant with" international law. *Id.* As the Sanctions Regime is plainly violative of multiple international legal rules, it is necessarily *ultra vires*.

37

### 2.    The Sanctions Regime Conflicts with Acts of Congress.

The Sanctions Regime is *ultra vires* for another reason: it conflicts with how Congress decided to address concerns relating to the ICC.  In *FDA v. Brown & Williamson Tobacco Corp.*, the Supreme Court held that the FDA was precluded from regulating tobacco products under the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*, because, through legislation, Congress had "create[ed] a distinct regulatory scheme to address the problem of tobacco and health," thereby "directly sp[eaking] to the issue."  529 U.S. 120, 143-44, 133, 155 (2000). As with tobacco, Congress has created a scheme that balances protecting against the risk of the ICC exercising jurisdiction over U.S. and allied persons with U.S. support for ICC investigations and prosecutions.

Congress codified that scheme in ASPA, which it enacted in 2002 to address this precise concern.  22 U.S.C. § 7423.  The Findings section of ASPA makes clear that Congress sought to address the risk of the ICC exercising jurisdiction over U.S. nationals.  *See id*. § 7421(5).  *See also id.* § 7421(8) (declaring a policy that "Members of the Armed Forces … should be free from the risk of prosecution by the [ICC], especially when they are stationed or deployed around the world to protect the [U.S.] national interests").

However, despite enacting ASPA, and amending the statute multiple times,[15] Congress never saw fit to adopt or authorize a sanctions regime for the ICC.  That is not surprising; doing so would undermine the very ICC investigations and prosecutions that Congress (and the Executive Branch) has repeatedly praised and sought to support.  *See* Compl. ¶¶ 59-83.

Indeed, Section 7433 of ASPA expressly states that "nothing in this title shall prohibit the United States from rendering assistance to international efforts to bring to justice … foreign

---

[15] *See* Foreign Operations, Export Financing, and Related Programs Appropriations Act, 2005, Pub. L. No. 108-447, div. D, § 574, 118 Stat. 2809, 3027 (2004); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. K, tit. VII, § 7073(b), 136 Stat. 4459, 5092 (2022).

nationals accused of genocide, war crimes or crimes against humanity, or from rendering assistance to the International Criminal Court to assist with investigations and prosecutions of foreign nationals related to the Situation in Ukraine, including to support victims and witnesses." 22 U.S.C. § 7433(a). Section 7433, and its recent expansion to cover the Russia-Ukraine conflict, reinforces Congress' decision that the ICC should continue to be used to advance international criminal justice, even when it involves the investigation and prosecution of nationals of a country that has not consented to ICC jurisdiction. Put simply, Congress has made clear that the U.S. has an ongoing interest in not crippling the ICC, as the Sanctions Regime seeks to do, but in maintaining support for its investigations and prosecutions.[16]

ASPA's text confirms that Congress was not only aware of the concerns the Sanctions Regime purportedly seeks to address, but chose to address them through a narrow, enumerated set of restrictions related to the ICC's operations in the United States and a narrow grant of specific authorities to the President. Crucially, Congress did not provide the President sanctions authority to mitigate the risk that it had identified. Instead, it imposed specific restrictions on cooperation with the ICC and declined to go further absent an actual detention of a U.S. person, and even then, Congress did not permit coercive sanctions. Every restriction and Presidential authority in the statute is tied to a defined trigger and a corresponding defined response; the statute nowhere authorizes or contemplates the use of economic sanctions against the Court, its personnel, or those cooperating with the Court.

In fact, the statute explicitly provides the President legal avenues to assist protected persons "arrested, detained, investigated, prosecuted, or imprisoned by" the ICC, including providing

---

[16] In 2022, Congress passed legislation to facilitate the United States's assistance to the ICC's investigation of crimes in Ukraine, H.R. 2617, 117th Cong. § 7073(b) (2022), and the Senate unanimously passed a resolution expressing support for the ICC, S. Res. 546, 117th Cong. (2022). Further, as explained above, in 2024, Congress appropriated funds to support the ICC directly. *See supra* at 14. *See also* Compl. ¶ 64.

39

"legal representation and other legal assistance," "exculpatory evidence," and "defense … through appearance before the [ICC]." 22 U.S.C. § 7427(c).  That deliberate restraint reflects a legislative judgment about the outer limits of an appropriate U.S. response to the ICC in the very circumstances which purport to form the basis for the Executive Order here.  To the extent that the President wants to protect U.S. interests or support U.S. allies before the ICC, Congress has specified the avenues the President may use.  Sanctions are not included in this catalogue of authorized responses.  Under the canon *expressio unius est exclusio alterius,* that omission must be given effect.  *See Estras v. United States*, 606 U.S. 185, 186 (2025) (stating that "*expressio unius est exclusio alterius*" is a "well-established canon of statutory interpretation" which means "expressing one item of an associated group excludes another item not mentioned").

Section 7423 further illustrates the narrowness of Congress' chosen response.  Entitled "Prohibition on investigative activities of agents," it provides only that "[n]o agent of the International Criminal Court may conduct, in the United States or any territory subject to the jurisdiction of the United States, any investigative activity relating to a preliminary inquiry, investigation, prosecution, or other proceeding at the International Criminal Court." 22 U.S.C. § 7423(h)(1).[17]  That is the *entirety* of the operative restraint Congress imposed on ICC investigative conduct: a territorial bar on the physical entry of ICC investigators into the United States.  Despite Congress' full awareness of the ICC's potential reach over U.S. personnel, Section 7423 nowhere identifies economic sanctions as a permissible or contemplated tool.  Its silence is telling.

The specificity of ASPA's restrictions on the ICC and directions to the President makes that omission conspicuous.  Congress legislated with granular precision.  It barred U.S. courts and

---

[17] *See also* 22 U.S.C. § 7433(a) (2024) (amending ASPA to include a carve-out for Ukraine: "Nothing in this [subchapter] shall prohibit the United States from … rendering assistance to the International Criminal Court to assist with investigations and prosecutions of foreign nationals related to the Situation in Ukraine, including to support victims and witnesses[.]").

40

state and local agencies from "cooperat[ing] with the International Criminal Court in response to a request for cooperation," *id.* § 7423(b); prohibited the "transfer" of any U.S. citizen or permanent resident alien to the Court, *id.* § 7423(d); forbade the obligation of appropriated funds for "assisting the investigation, arrest, detention, extradition, or prosecution" of such persons, *id.* § 7423(f); required the President to invoke treaty provisions "to prevent the transfer to, or other use by, the International Criminal Court" of U.S. mutual-legal-assistance materials, *id.* § 7423(g); and directed the establishment of "appropriate procedures" to prevent the "direct or indirect transfer" of "classified national security information and law enforcement information" to the ICC, *id.* § 7425(a)-(b). Congress' decision not to include sanctions as an authorized response to precisely the situation here is thus dispositive: the use of such power is not allowed.

Even in the circumstance of an actual detention of a national of the U.S. or certain allied nations by the ICC—which is not the case here—Congress *prohibited* the type of sanction that EO 14,203 imposes. While Congress authorized the President "to use all means necessary and appropriate to bring about the release of [a protected person] who is being detained or imprisoned by, on behalf of, or at the request of the [ICC]," *id.* § 7427(a), it provided that the otherwise all-encompassing all-necessary-means language "does *not* authorize the payment of bribes or the provision of other such *incentives to induce* the release of a [protected person]," *id.* § 7427(d) (emphasis added).

This carveout reinforces the point. Even in the most extreme circumstance contemplated by ASPA—detention of a protected person by the ICC—Congress' considered decision is that incentives to induce behavior are categorically prohibited. Congress expressly withheld authority to use inducements to influence ICC-related action. Yet, the use of incentives to induce decisions by ICC judges and prosecutors—specifically the threat to their personal, including financial,

41

interests—is precisely what EO 14,203 seeks to effect: offer forbearance of imposing personal economic and other harm as an incentive to induce them to render decisions to the administration's liking.  This is a classic form of improper inducement.  *See United States v. Sturm*, 870 F.2d 769, 773 (1st Cir. 1989) (holding defendant can be found guilty of wrongfully obtaining property through use of legitimate economic threat); *United States v. Kattar*, 840 F.2d 118 (1st Cir. 1988) (affirming conviction for extortion induced by wrongful use of economic fear); *United States v. Russo*, 708 F.2d 209, 215 (6th Cir. 1983), *cert. denied*, 464 U.S. 993 (1983) (same); *United States v. Clemente*, 640 F.2d 1069 (2d Cir. 1981) (same); *United States v. Lisinski*, 728 F.2d 887, 891-92 (7th Cir. 1984) (holding "[t]he wrongful use of fear does not require a threat – although, in the victim's mind, the threat – usually implied – will be present" and "the wrongful use of fear is satisfied if the extortioner exploits the victim's fear of economic loss").  Here, sanctioning ICC judges (and prosecutors), freezing their assets, and cutting off their access to the international financial system in order to coerce favorable official action is plainly an attempt to influence the ICC's judicial and prosecutorial authorities. In other words, precisely the type of conduct that ASPA bars.

        3.        There Is No "National Emergency."

The Sanctions Regime is *ultra vires* for still another reason: the absence of an underlying "national emergency," which is a required predicate for the imposition of sanctions under IEEPA. In that connection, IEEPA does not contain a "sweeping delegation[]" of power.  *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 630-631 (2026).  Rather, Congress' delegation of authority is "defined and limited."  *U.S. v. Dhafir*, 461 F.3d 211, 217 (2d Cir. 2006).  The President's sanctions authority under IEEPA "may not be exercised for any … purpose" other than "deal[ing] with an unusual and extraordinary threat" to the foreign policy interests of the United States "with respect to which a national emergency has been declared."  50 U.S.C. § 1701(b).

42

This is a "'meaningful[] constrain[t] [on] the President's discretion.'" *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1379 (Ct. Int'l Trade 2025) (quoting *Dhafir*, 461 F.3d at 216), *aff'd V.O.S. Selections, Inc., v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025); *see also United States v. Ali Amirnazmi*, 645 F.3d 564, 576 (3d Cir. 2011) (same). Congress has underscored that the "main … substantive restriction[]" on the exercise of IEEPA authority "stems from a recognition that emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems." H.R. Rep. No. 95-459, at 10 (1977). Congress explained that "[a] national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose"; put simply, "a national emergency should not be a normal state of affairs*." Id.* These limits are critical; "as the Framers understood, emergencies can 'afford a ready pretext for usurpation' of congressional power." *Learning Res., Inc.*, 146 S. Ct. at 641 (quoting *Youngstown Sheet & Tube Co.*, 343 U. S. at 650 (1952) (Jackson, J., concurring)).

Here, the Sanctions Regime is *ultra vires* under IEEPA because the ICC's exercise of jurisdiction over alleged international crimes, including with respect to nationals of non-States Parties to the Rome Statute, is neither "unusual" nor "extraordinary."

The term "unusual" means rare and different from ordinary practice. *Black's Law Dictionary* (4th ed., 1968) (defining "unusual" as "[u]ncommon; not usual, rare"). *See also, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 976 (1991) (defining "unusual" as "such as [does not] occur in ordinary practice"). Further, "unusual" exigencies must be temporary. *See Filtration Dev. Co., LLC v. United States*, 60 Fed. Cl. 371, 383 (2004) ("[T]he court is unwilling to condone an indefinite extension of the unusual and compelling urgency … exception."). This accords with

43

Congress' admonition that IEEPA powers are only unlocked by threats that are "rare and brief." H.R. Rep. No. 95-459, at 10 (1977).

There is nothing "unusual" about the ICC's ability to exercise jurisdiction over alleged international crimes occurring on the territories of Afghanistan and Palestine, both of which have acceded to the Rome Statute. Since the Rome Statute's entry into force more than two decades ago, the ICC has been authorized to exercise jurisdiction where "[t]he State on the territory of which the conduct in question occurred" is a party thereto or has accepted jurisdiction of the ICC. *See* Rome Statute, art. 12(2)(a). The ICC has always been able to do so regardless of whether the "[s]tate of which the person accused of the crime is a national" of a State that is a party to the Rome Statute or has otherwise accepted ICC jurisdiction. *Id*. art. 12(2)(b).

The ICC has routinely exercised such territorial jurisdiction since its inception. It has done so, for instance, in regard to crimes that are alleged to have been committed on the territories of Ukraine, Georgia, Bangladesh, and the Democratic Republic of Congo, all parties to the Rome Statute, by nationals of States that are not parties to the Rome Statute, such as Russia, Myanmar, and Rwanda. *See* Compl. ¶¶ 68-69, 78-80. Indeed, the United States supported *all* of these exercises of territorial jurisdiction. *See id.* There is thus nothing "unusual" about the manner in which the ICC has exercised jurisdiction in regard to persons alleged to have committed crimes on the territories of Afghanistan and Palestine.

Nor is the ICC's exercise of jurisdiction in this way "extraordinary." Whether a threat is "extraordinary" turns on whether Congress anticipated the relevant circumstance. *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 578 (C.C.P.A. 1975) (Congress "has said what may be done with respect to *unforeseeable* events in the TWEA"—the predecessor to IEEPA) (emphasis added); *V.O.S. Selections*, 772 F. Supp. 3d at 1375 (quoting *Yoshida Int'l, Inc.*, 526 F.2d at 578);

44

*see also Emergency*, *Webster's New Collegiate Dictionary* 372 (9th ed. 1976) (defining

emergency" as "an *unforeseen* combination of circumstances or the resulting state that calls for

immediate action") (emphasis added).    A circumstance expressly foreseen and specifically

addressed by Congress cannot be characterized as the kind of extraordinary emergency for which

IEEPA was reserved.

From the time the ICC began operations a quarter-century ago, Congress understood that

the ICC could exercise jurisdiction over nationals of non-States Parties to the Rome Statute who

are accused of committing international crimes on the territory of States Parties.  *See, e.g.*, U.S.

Dep't of State, Bureau of Political-Military Affs., Fact Sheet: U.S. State Department Fact Sheet

on   the   International   Criminal   Court   (Aug.   2,   2002),   https://2001-

2009.state.gov/t/pm/rls/fs/23426.htm (noting that "[t]he ICC purports to have jurisdiction over

certain crimes committed in the territory of a state party, including by nationals of a non-party");

Cong. Research Serv., The International Court of Justice and the International Criminal Court: A

Primer 13–15 (R48004, Apr. 4, 2024) (stating that "[t]he court may exercise jurisdiction over

crimes committed by the nationals of or on the territory of Rome Statute states parties or of states

that have accepted the court's jurisdiction for that purpose").  As the U.S. Mission to the United

Nations put it in January 2026: "*None of these concerns are new; indeed, the United States has*

*been making the same point for nearly three decades…*"[18]

Based on that awareness, Congress "crafted a specific legislative response," *FDA*, 529 U.S.

at 157, in the form of ASPA, 22 U.S.C. §§ 7421 *et seq.*, to address its specific concern that "United

States armed forces operating overseas could be conceivably prosecuted by the international court

---

[18] U.S. Mission to U.N., Remarks at a U.N. Security Council Briefing on the International Criminal Court's Investigation of the Situation in Darfur, Sudan (Jan. 19, 2026), https://usun.usmission.gov/remarks-at-a-un-security-council-briefing-on-the-international-criminal-courts-investigation-of-the-situation-in-darfur-sudan/?repeat=w3tc (emphasis added).

even if the United States has not agreed to be bound by the treaty," *id*. § 7421(5). Congress has created this scheme as the means for balancing protecting against the risk of the ICC exercising jurisdiction over U.S. and allied persons with U.S. support for ICC investigations and prosecutions.

Indeed, Congress legislated against the backdrop of contemporaneous U.S. military engagements that potentially exposed U.S. personnel to the very ICC jurisdiction it sought to address. ASPA was enacted on August 2, 2002, less than a year after the commencement of U.S. and allied military operations in Afghanistan, and a month after the Rome Statute entered into force. Congress took care to invoke the risks to "[m]embers of the Armed Forces" who are "stationed or deployed around the world," *id*. § 7421(8), in connection with their participation "in multinational operations" abroad as the predicate for its legislation, *id*. § 7421(5).

The Supreme Court's decision in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), is instructive. The Supreme Court held that the President's military commission lacked authority to proceed because its structure and procedures were inconsistent with both the Uniform Code of Military Justice ("UCMJ") and Common Article 3 of the Geneva Conventions. The Court emphasized that, even though it constituted Congress' response to the greatest terrorist attack against the United States, the Authorization for the Use of Military Force ("AUMF") did not expand or alter the preexisting constraints of UCMJ Article 21, which conditions the President's use of military commissions on compliance with the law of war, including the Geneva Conventions, or of UCMJ Article 36, which requires procedural uniformity with courts-martial absent demonstrated impracticability. *Id.* at 593-95, 613-25.

So too here. Even assuming the Executive has foreign policy concerns regarding the ICC's exercise of jurisdiction, those concerns do not permit the President to disregard the limits Congress placed on the exercise of delegated authority. Congress specifically addressed the risk that the

46

ICC could exercise jurisdiction over the very persons defined as "protected persons" in EO 14,203, years ago, and did not characterize it as an emergency. The putative "threat" identified in the Executive Order thus cannot be characterized as "extraordinary."

### B.     Plaintiffs' Designations Violate the Administrative Procedure Act.

The APA requires "hold[ing] unlawful and set[ting] aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See also New York II*, 969 F.3d at 63. Here, the designations must be set aside for each reason.

#### 1.     The Designations Are Arbitrary and Capricious.

Agency action is arbitrary and capricious if the agency "relied on factors which Congress" did "not intend[] it to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, the designations rest on factors that have no basis in IEEPA. Through ASPA, Congress created a legislative scheme to deal with the very issue that the designations purport to address, authorizing specific measures, 22 U.S.C. § 7427, and preserving the ability to render assistance to ICC investigations and prosecutions in specified circumstances, *id*. § 7433, while prohibiting "bribes" and "such other incentives to induce," *id*. § 7427(d). Despite amending ASPA multiple times, Congress never authorized sanctions against ICC personnel or those who support the court's work. By issuing designations to respond to circumstances that Congress chose to address exclusively through ASPA, the designations rely on factors which Congress has not intended it to consider, rendering the designations arbitrary and capricious.

The designations are also arbitrary and capricious because they are not based on "[s]ubstantial evidence." *Al Haramain Islamic Foundation, Inc. v. United States Dep't of the Treasury*, 686 F.3d 965, 976 (9th Cir. 2012); *Holy Land Foundation for Relief & Development v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003). There is no evidence that Judges Prost, Bossa, or Alapini-Gansou "directly engaged in any effort by the ICC to investigate, arrest, detain, or

47

prosecute a protected person without consent of that person's country of nationality," as required for designation under Section 1(a)(ii)(A) of EO 14,203.   None of the State Department's announcements refers to any actual evidence that any of them has, in fact, "directly engaged in" such efforts to investigate, arrest, detain, or prosecute any "protected persons."  *See* Compl. ¶¶ 95, 111, 119, 126.

The lacunae are unsurprising.  ICC Judges do not "directly engage[]" in "efforts to investigate, arrest, detain, or prosecute" persons accused of international crimes.  Rather, they act as neutral arbiters, adjudicating matters of law and fact that are placed before them by the OTP, defense counsel, and others with standing to present evidence and argument to the Court.  Chief Justice Roberts could have been describing the ICC Judges when he observed:

> Judges and Justices are servants of the law, not the other way around. Judges are like umpires. Umpires don't make the rules, they apply them. The role of an umpire and a judge is critical. They make sure everybody plays by the rules, but it is a limited role. Nobody ever went to a ball game to see the umpire.

Confirmation Hearing on the Nomination of John G. Roberts, Jr. to Be Chief Justice of the United States: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 56 (2005) (statement of Hon. John G. Roberts, Jr.).

The designations are further arbitrary and capricious because they are based on agency action that "entirely failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  In particular, Defendants entirely failed to consider the impact that the designations would inevitably have on the international regime for accountability for international crimes.  The effect of the designations of Judges Prost, Bossa, and Alapini-Gansou, among other things, is to prevent U.S. persons from providing evidence or other services to them in light of

IEEPA's civil and criminal penalties for violating the Executive Order,[19] and to chill non-U.S. persons from doing so, lest they also become designated. This obstructs the submission of evidence and argument in any proceeding in which Judges Prost, Bossa, or Alapini-Gansou preside. The designations thus impede the effective investigation and prosecution even of crimes concerning which the United States has supported ICC engagement, including in Ukraine, Sudan, Uganda, and the Central African Republic. The failure to consider these consequences renders the designations arbitrary and capricious.

### 2.    The Designations Are an Abuse of Discretion.

Agency action that constitutes an abuse of discretion must be set aside under 5 U.S.C. § 706(2)(A). "An abuse of discretion occurs when a… decision represents an unreasonable judgment in weighing relevant factors." *In re Gartside*, 203 F.3d 1305, 1315-16 (Fed. Cir. 2000); *see also Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005) (same); *Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1098 (D.C. Cir. 1996) (holding judicial review of agency action under the APA "must go beyond the agency's procedures to include the substantive reasonableness of its decision."). As the Supreme Court recently underscored, Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386-87, 391 (2024).

Here, the designations are a textbook abuse of discretion. Their purpose is to target the personal, including financial interests of judges as a means of pressuring them into disregarding their oaths of office. That is the antithesis of the rule of law. It is irreconcilable with the Supreme

---

[19] *See Rona v. Trump*, 797 F. Supp. 3d 278, 284 (S.D.N.Y. 2025) (finding that plaintiffs wishing to, *inter alia*, submit an *amicus brief* and contribute to the OTP's policy were chilled from doing so, given the Prosecutor's designation); *Smith v. Trump,* 791 F. Supp. 3d 90, 97-98 (D. Me. 2025) (holding that Section 3(a)'s prohibition of providing services that benefit sanctioned ICC officials restricts more speech than necessary to further the government's stated interest); *see also Open Soc'y Just. Initiative*, 510 F. Supp. 3d at 216 (explaining "[t]he prospect of enforcement under IEPPA [sic] has caused Plaintiffs not to speak, and hence forgo exercising their First Amendment rights").

Court's repeated admonition, over more than a century-and-a-half, that it is a "'a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions without apprehension of personal consequences to himself.'" *Stump v. Sparkman* 435 U.S. 349, 355 (1978) (quoting *Bradley v. Fisher*, 80 U.S. 335, 347 (1871)). *See also Huminski v. Corsones*, 386 F.3d 116, 136 (2d Cir. 2004) ("judges should be at liberty to exercise their functions with independence and without fear of consequences"). And it is inconsistent with the principles that underpin numerous federal statutes. *See, e.g.*, 18 U.S.C. § 1503 (prohibiting efforts to "influence, intimidate, or impede any … officer in or of any court of the United States"); *id*. § 112 (prohibiting coercion of foreign officials, including "chief executive officer[s] of international organizations").

Indeed, the designations of Judges Prost, Bossa, and Alapini-Gansou are a gross abuse of any sanctioning power. Prior to the designations under EO 14,203 (and its predecessor under the first Trump administration), sanctions had targeted terrorists (Executive Order No. 13,224, *Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism,* 3 C.F.R. 786 (2001)), narcotics traffickers (Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901 *et seq.*), weapons proliferators (Executive Order 13,382, *Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters*, 3 C.F.R. 170 (2005)), and corrupt actors and human rights abusers (Global Magnitsky Human Rights Accountability Act, Pub. L. No. 114-328, Subtitle F). The individuals designated under these instruments bear no resemblance to the distinguished jurists who now find themselves subject to the same types of restrictions. And, the fact that the effect of the designations is to obstruct the investigation and prosecution of the worst international crimes, including where the United States has encouraged the ICC to investigate and prosecute, makes the abuse of discretion undeniable.

50

3.      The Designations Are Contrary to Law.

Finally, the designations violate the APA because they are contrary to law.  They are *ultra vires* exercises of authority under IEEPA, violate the Fifth Amendment, and violate numerous treaties and rules of customary international law.  As such, the designations must be set aside.  *New York v. United States Dep't of Homeland Sec.*, 408 F. Supp. 3d 334, 345 (S.D.N.Y. 2019) (finding violation of APA when the agency action "exceed[ed] DHS's delegated authority under the INA and [was] contrary to law").

**C.      The Sanctions Regime Violates the Fifth Amendment as Applied to Judges Prost and Bossa.**

Defendants have blocked Judges Prost and Bossa's New York bank accounts at HSBC Bank USA, N.A. and the U.N. Federal Credit Union Bank, respectively, rendering Judges Prost and Bossa unable to use or transfer any funds held in those accounts.  Bossa Decl. ¶¶ 34-37; Prost Decl. ¶ 38.  The blockings constitute deprivations of property without due process of law.

The Fifth Amendment to the U.S. Constitution provides, *inter alia*: "No person shall be … deprived of … property, without due process of law…."  U.S. Const. amend. V.  It requires that individuals deprived of their property receive adequate notice and an opportunity to be heard.  *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

"A bank account" is "surely a form of property."  *N. Ga. Finishing v. Di-Chem, Inc.*, 419 U.S. 601, 606 (1975).  *See also McCahey v. L.P. Inv'rs*, 774 F.2d 543, 547 (2d Cir. 1985) ("assum[ing] [that] … bank account[s] [are] … property interest of which [one] [can]not be deprived, even temporarily, without due process").  Blocking an account is a deprivation of property within the meaning of the Fifth Amendment because it strips the account holder of the present use, control, and enjoyment of their funds.  *See N. Ga. Finishing*, 419 U.S. at 606-07 (finding that *ex parte* freezing of a company's bank account "deprived" the company "of the use

51

of the property" without adequate due process); *Connecticut v. Doehr*, 501 U.S. 1, 27 (1991) (Rehnquist, J., concurring) (observing "seizure" of a "bank deposit" amounts to a "depriv[ation]" cognizable under the Fifth Amendment because it "deprive[s] [its owner] of the use and possession of the property"). Accordingly, the freezing of Judges Prost and Bossa's New York bank accounts cannot lawfully be accomplished without affording Judges Prost and Bossa due process.

The "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner" prior to being deprived of property. *Jifry v. FAA*, 370 F.3d 1174, 1183 (D.C. Cir. 2004) (quoting *Mathews*, 424 U.S. at 333) (cleaned up). Yet, prior to the deprivation of their property, neither Judge Prost nor Judge Bossa was given notice of the blocking, nor afforded any opportunity to be heard to challenge it. Bossa Decl. ¶ 33; Prost Decl. ¶ 36.

The failure to provide Judges Prost and Bossa with notice and opportunity to be heard violates the Due Process clause because there was no extraordinary situation permitting such notice and hearing to be "postponed until after seizure," *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 677-78 (1974).[20] Indeed, the deprivation was not "directly necessary to secure an important governmental or general public interest," nor was there "a special need for very prompt action," as there must to qualify as a "extraordinary situation," *id*. at 677.

There can be no justification for the *ex parte*, pre-notice deprivations of Judges Prost and Bossa's New York bank accounts. Those actions were plainly not necessary to prevent the imminent illicit use of that property or to protect the general public. There is no evidence that there was a risk that either judge would contribute her assets to an illegal or illicit entity that threatens harm the public welfare. Neither judge has ever been suspected of, charged with, or

---

[20] "A seizure of property" amounts to a deprivation because it "occurs where 'there is some meaningful interference with an individual's possessory interests in that property.'" *Soldal v. Cook County*, 506 U.S. 56, 61 (1992). *See also N. Ga. Finishing*, 419 U.S. at 606 (using the terms "deprivation" and "seizure" interchangeably).

convicted of a crime in any country.  And unlike the "extraordinary situation[s]" described above, there are no pending investigations or proceedings, criminal or otherwise, against either judge.

The upshot is that Judges Bossa and Prost remain subject to an indefinite deprivation of their property interests with no stated justification or foreseeable endpoint.[21]  In *Al Haramain Islamic Found., Inc.*, the Court held that the government had violated due process by "refus[ing] to disclose its reasons for investigating and designating [the plaintiff], leaving [it] unable to respond adequately to the agency's unknown suspicions."  686 F.3d at 984-85 (9th Cir. 2012); *see also KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857, 904 (N.D. Ohio 2009) (reaching the same conclusion because the plaintiff "remain[ed] largely uninformed about the basis for the government's actions").  Here, likewise, Defendants have not disclosed to Judges Bossa and Prost any evidence or information explaining the decision to designate them.  Prost Decl. ¶ 36; Bossa Decl. ¶ 32.

## II.    EO 14,203 Is Causing Irreparable Harm to Plaintiffs.

Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  Irreparable harm exists where the injury is "actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Faiveley Transp. Malmö AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).

The harm that Judges Prost, Bossa, and Alapini-Gansou are suffering is irreparable.  They are judges on the court that 125 countries have entrusted with the prosecution of the most serious international crimes.  The sanctions imposed on them irreparably impede their ability to carry out

---

[21] Because the blocking of their bank accounts is indefinite in duration, it also amounts to a taking of property without compensation in violation of the Fifth Amendment. *See Holy Land Foundation for Relief & Development v. Ashcroft*, 219 F. Supp. 2d 57, 78 (D.D.C. 2002) (observing that a "long-term blocking order" can "ripen[] into a vesting of property in the United States … so as to constitute a taking").

their judicial functions by threatening the integrity of the proceedings over which they preside. The Sanctions Regime imposes severe civil and criminal penalties, including up to 20 years of imprisonment, on U.S. persons who provide "services" to or for the "benefit" of designated persons like Judges Prost, Bossa, and Alapini-Gansou. *See* EO 14,203, § 3(a). It also subjects any foreign person who "materially assist[s]" or provides "services to or in support of" these judges to themselves being designated. *Id*. § 1(a)(ii)(B). The effect is to obstruct lawyers, witnesses, victims and their legal representatives, civil society organizations, and service providers from engaging with Judges Prost, Bossa, and Alapini-Gansou in any capacity connected to their judicial work— on pain of designation or criminal penalties. This is not a theoretical risk: U.S. human rights advocates have already "halted all work with the ICC" because of the Sanctions Regime's chilling effect. *Smith*, 791 F. Supp. 3d at 93; *Rona v. Trump* 797 F. Supp. 3d 278, 293.

These onerous restrictions apply to *every* case over which Judges Prost, Bossa, or Alapini-Gansou preside—including proceedings that have no connection to the "protected persons" whose alleged investigation is cited as justification for the purported national emergency. No monetary award at the conclusion of litigation could restore judicial proceedings conducted without the benefit of full participation.

Beyond these irreparable harms, the Sanctions Regime severely impedes Plaintiffs' ability to live normal lives. Undeniably, "[t]he effect of an OFAC designation on the designee's private interests is 'dire.'" *Fares v. Smith*, 901 F.3d 315, 323 (D.C. Cir. 2018). Judge Prost can no longer use credit cards; her accounts with U.S. companies such as Amazon, Google, and Expedia have been limited or cancelled entirely; and basic tasks—using public transport, booking hotels, ordering online, or calling a taxi—have become difficult or impossible. Prost Decl. ¶ 38. She has effectively lost access to health insurance. *id.* ¶ 39. Judge Bossa cannot use credit cards or book

54

international travel. Bossa Decl. ¶¶ 33-34, 37.  Judge Alapini-Gansou's bank in France cancelled her credit card, limiting her ability to cover basic expenses; she has lost health insurance; and her salary payments have been disrupted, leaving her in constant financial insecurity.  Alapini-Gansou Decl. ¶¶ 48-49.

These harms are compounded by the reputational harm that Judges Prost, Bossa, and Alapini-Gansou are suffering, which is likewise irreparable.  Their names now appear on the SDN List alongside terrorists and violators of human rights—a fact Judge Prost describes as "especially painful" and "ironic," Prost Decl. ¶ 37.  As Judge Alapini-Gansou attests, she now fears to walk to her court.  Alapini-Gansou Decl. ¶ 43.  Such stigma cannot be undone retroactively.  *See Luokung Technology Corp. v. Department of Defense*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021) (finding plaintiff suffered "reputational damage along with various forms of unrecoverable monetary loss," which "together constitute precisely the type of irreparable harm preliminary injunctive relief is designed to address"); *Xiaomi Corp. v. Department of Defense*, No. 21-cv-280 (RC), 2021 U.S. Dist. LEXIS 46496, at \*26 (D.D.C. Mar. 12, 2021) (finding irreparable harm because "[i]t is almost unquestionable" that the designation "damaged [the plaintiff's] reputational standing with corporate customers and business partners").

Further, the ongoing constitutional violation that Judges Prost and Bossa are suffering due to the blocking of their New York bank accounts—deprivation of property without due process in violation of the Fifth Amendment, *see supra* Section I.C—is *per se* irreparable.  It has long been established that the loss of constitutional freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (a "presumption of irreparable injury [] flows from a violation of constitutional rights"); *Conn. Dep't of Env't Prot. v. OSHA*, 356 F.3d 226, 231

(2d Cir. 2004) ("violations of constitutional rights are presumed irreparable").  Moreover, Plaintiffs' constitutional injury cannot be remedied later, as the right at stake is the right to be heard *before* the government acts to deprive Plaintiffs of property, *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  Each day the designations remain in force, Judges Prost and Bossa remain subject to an indefinite deprivation of their property interests.

## III.    The Balance of the Equities and Public Interest Decidedly Favor Plaintiffs.

The balance of equities and public interest favor an injunction.  There is "a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *New York v. Noem*, 812 F. Supp. 3d 321, 337 (S.D.N.Y. 2025) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994).  Because the Sanctions Regime "violates statutes enacted by Congress, including the APA," and is *ultra vires* under IEEPA, the public interest favors an injunction.  *Noem*, 812 F. Supp. 3d at 337.  Further, there is no public interest in maintaining an unconstitutional deprivation of due process.  *See Perkins Coie LLP v. U.S. Department of Justice*, 783 F. Supp. 3d 105, 178-180 (D.D.C. 2025) (finding irreparable harm when plaintiffs demonstrated that EO 14,230 violated, *inter alia*, the firms' rights under the Fifth Amendment); *see also Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("[A] violation of Fifth Amendment due process rights . . . support[s] injunctive relief.").

Any appeal to national security is unavailing.  As Judge Failla stated in preliminarily enjoining enforcement of EO 14,203's materially identical predecessor executive order during the first Trump administration, "national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" *Open Soc'y Just. Initiative*, 510 F. Supp. at 211 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017) (internal quotes

56

omitted).  *See also Smith,* 791 F. Supp. 3d at 99; *Rona,* 797 F. Supp. 3d at 207.  The equities and public interest thus decisively favor the injunction.

## CONCLUSION

The Court should preliminarily enjoin the Sanctions Regime.

Dated: July 2, 2026

Respectfully submitted,

**JUDGE KIMBERLY PROST, JUDGE SOLOMY BALUNGI BOSSA, AND JUDGE REINE ADELAIDE SOPHIE ALAPINI-GANSOU,**

By their attorneys,
/s/ *Andrew B. Loewenstein*
Andrew B. Loewenstein (*pro hac vice*)
Amir Farhadi (*pro hac vice*)
FOLEY HOAG LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
617-832-1000
aloewenstein@foleyhoag.com
afarhadi@foleyhoag.com

Nicholas M. Renzler (NR1608)
Hannah E. Sweeney (6202584)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
212-812-0400
nrenzler@foleyhoag.com
hsweeney@foleyhoag.com

Rawda Fawaz (*pro hac vice*)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
202-223-1200
rfawaz@foleyhoag.com

*Counsel for All Plaintiffs*

57

James A. Goldston (2327435)
Esti T. Tambay (ET2721)
Genevieve B. Quinn (GQ9239)
Natasha N. Arnpriester (5673678)
OPEN SOCIETY FOUNDATIONS
Open Society Justice Initiative
224 West 57th Street
New York, NY 10019, United States
212-548-0600
james.goldston@opensocietyfoundations.org
esti.tambay@opensocietyfoundations.org
genevieve.quinn@opensocietyfoundations.org
natasha.arnpriester @opensocietyfoundations.org

*Counsel for Plaintiff Judge Kimberly Prost*

<u>**CERTIFICATE OF COMPLIANCE WITH THE COURT'S JULY 2, 2026 ORDER**</u>

<u>**GRANTING LEAVE TO EXCEED LOCAL RULE 7.1(c) WORD COUNT LIMITATION**</u>

I, Andrew B. Loewenstein, counsel for Plaintiffs, hereby certify that the foregoing memorandum of law complies with the word count limitation set forth in the Court's July 2, 2026 Order, ECF No. 35. This document contains 17, 371 words, excluding the caption, table of contents, table of authorities, signature block, and required certificates, as permitted by Local Rule 7.1(c).

*/s/ Andrew B. Loewenstein*

59