**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JUDGE KIMBERLY PROST, JUDGE SOLOMY BALUNGI BOSSA, and JUDGE REINE ADELAIDE SOPHIE ALAPINI-GANSOU,

      Plaintiffs,

      -v-

DONALD J. TRUMP, in his official capacity as President of the United States, UNITED STATES DEPARTMENT OF STATE, MARCO A. RUBIO, in his official capacity as Secretary of State, UNITED STATES DEPARTMENT OF THE TREASURY, SCOTT K. H. BESSENT, in his official capacity as Secretary of the Treasury, UNITED STATES DEPARTMENT OF JUSTICE, and TODD BLANCHE, in his official capacity as Acting United States Attorney General,

      Defendants.

No. 26 Civ. 5305 (JMF)

---

**COMBINED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2689/2713
Email: danielle.marryshow@usdoj.gov
      mark.osmond@usdoj.gov

DANIELLE J. MARRYSHOW
MARK OSMOND
Assistant United States Attorneys
– Of Counsel –

**TABLE OF CONTENTS**

**PAGE(S)**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 3

    I.    Statutory and Regulatory Background ................................................................... 3

    II.    Factual Background ............................................................................................... 4

LEGAL STANDARD ............................................................................................................. 7

    I.    Legal Standard Governing Motion to Dismiss .................................................... 7

    II.    Legal Standard Governing Preliminary Injunctions ........................................... 7

ARGUMENT ........................................................................................................................ 8

    I.    Plaintiffs Fail to State IEEPA Statutory Claims ................................................. 8

        A.    The *Charming Betsy* Canon, Non-Self-Executing Treaties, and Customary International Law Are Not Relevant for Judicial Review of these IEEPA Designations ...................................................................................................... 8

        B.    The Designations Do Not Conflict With ASPA ........................................... 12

        C.    Executive Order 14203 Falls Within the President's Delegated Authority Under 50 U.S.C. § 1701 ................................................................................... 13

    II.    Plaintiffs Fail to State a Plausible Fifth Amendment Due Process Claim ......... 15

    III.    Plaintiffs Fail to State a Plausible Takings Claim .............................................. 20

    IV.    Plaintiffs Fail to State a Plausible APA Claim ................................................... 20

        A.    "Extremely Deferential" Standard of Review ............................................. 21

        B.    The Designations Were Reasonable and Easily Withstand APA Review ...... 22

        C.    Plaintiffs' Contrary Arguments Lack Merit ................................................. 23

    V.    Plaintiffs' Long Delay in Seeking Relief Negates Any Asserted Irreparable Harm ........ 26

    VI.    The Balance of the Equities and the Public Interest Do Not Favor Issuing a Preliminary Injunction ....................................................................................... 28

CONCLUSION .................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  591 U.S. 430 (2020) ............................................................................................................... 16

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*,
  686 F.3d 965 (9th Cir. 2012) ................................................................................................ 17

*Al-Bihani v. Obama*,
  590 F.3d 866 (D.C. Cir. 2010) .............................................................................................. 12

*Al-Bihani v. Obama*,
  619 F.3d 1 (D.C. Cir. 2010) ............................................................................................ 10, 21

*ARC Ecology v. U.S. Dep't of Air Force*,
  411 F.3d 1092 (9th Cir. 2005) ............................................................................................ 9, 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................................. 7

*Bazzi v. Gacki*,
  468 F. Supp. 3d 70 (D.D.C. 2020) ........................................................................................ 19

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................................. 7

*Blue Trees Hotel Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
  369 F.3d 212 (2d Cir. 2004) .................................................................................................... 7

*Calero-Toledo v. Pearson Yacht Leasing Co.*,
  416 U.S. 663 (1974) ............................................................................................................... 18

*Cali v. Trump*,
  No. 26-5172, 2026 WL 1765953 (D.C. Cir. Jun. 15, 2026) .................................................. 16

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) .................................................................................................... 7

*Christopher Norman Chocolates, Ltd. v. Schokinag Chocolates N. Am., Inc.*,
  270 F. Supp. 2d 432 (S.D.N.Y. 2003) ................................................................................... 28

*Chunn v. Amtrak*,
  916 F.3d 204 (2d Cir. 2019) ............................................................................................ 16, 17

*Cisco Systems, Inc. v. Doe I*,
  146 S. Ct. 1882 (2026) ................................................................................................... 11

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985) ..................................................................................... 26, 28

*Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*,
  146 F.4th 1144 (D.C. Cir. 2025) ................................................................................... 24

*Davis v. Pension Benefit Guarantee Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) .................................................................................... 28

*Dickson v. Sec'y of Def.*,
  68 F.3d 1396 (D.C. Cir. 1995) ...................................................................................... 22

*Environmental Defense v. EPA*,
  369 F.3d 193 (2d Cir. 2004) .......................................................................................... 21

*Fares v. Smith*,
  249 F. Supp. 3d 115 (D.D.C. 2017) ............................................................................... 20

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ........................................................................................................ 22

*Food & Drug Administration v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ................................................................................................. 12, 13

*Friends of Animals v. Romero*,
  948 F.3d 579 (2d Cir. 2020) .......................................................................................... 21

*Fulmen Co. v. OFAC*,
  547 F. Supp. 3d 13 (D.D.C. 2020) ................................................................................ 22

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007) .............................................................................................. 7

*Guevera v. Village of Freeport*,
  No. 25 Civ. 4061 (SJB) (JMW), 2025 WL 3484935 (E.D.N.Y. Dec. 4, 2025) ...................... 28

*Hessel v. Christie's Inc.*,
  399 F. Supp. 2d 506 (S.D.N.Y. 2005) ............................................................................ 27

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
  953 F. Supp. 2d 495 (S.D.N.Y. 2013) .............................................................................. 7

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ............................................................................................................ 29

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    219 F. Supp. 2d 57 (D.D.C. 2002) ................................................................... 17, 20, 30

*In re 650 Fifth Ave.*,
    No. 08 Civ. 10934 (KBF), 2013 WL 2451067 (S.D.N.Y. June 6, 2013) ................................. 20

*IPT Co. v. U.S. Dep't of Treasury*,
    No. 92 Civ. 5542 (JFK), 1994 WL 613371 (S.D.N.Y. Nov. 4, 1994) ...................................... 20

*Islamic Am. Relief Agency v. Gonzales*,
    477 F.3d 728 (D.C. Cir. 2007) ................................................................ 15, 22, 23, 30

*Islander E. Pipeline Co., LLC v. McCarthy*,
    525 F.3d 141 (2d Cir. 2008) ................................................................................ 23, 24

*Karadzic v. Gacki*,
    602 F. Supp. 3d 103 (D.D.C. 2022) ...................................................................... 23, 24

*Karpova v. Snow*,
    402 F. Supp. 2d 459 (S.D.N.Y. 2005) ............................................................. 15, 29, 30

*Lab. Council for Latin Am. Advancement v. EPA*,
    12 F.4th 234 (2d Cir. 2021) ........................................................................................ 24

*Le Sportsac, Inc. v. Dockside Research, Inc.*,
    478 F. Supp. 602 (S.D.N.Y. 1979) ............................................................................. 27

*Life Techs. Corp. v. AB Sciex Pte. Ltd.*,
    No. 11 Civ. 325 (RJH), 2011 WL 1419612 (S.D.N.Y. Apr. 11, 2011) .................................... 27

*Livery Round Table, Inc. v. New York City FHV & Limousine Comm'n*,
    No. 18 Civ. 2349 (JGK), 2018 WL 1890520 (S.D.N.Y. Apr. 18, 2018) .................................. 27

*Lopez Bello v. Smith*,
    651 F. Supp. 3d 20 (D.D.C. 2022) ..................................................................... 17, 19

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ................................................................................................... 16

*Medellín v. Texas*,
    552 U.S. 491 (2008) ............................................................................................ 10, 11

*Monowise Ltd. Corp. v. Ozy Media, Inc.*,
17 Civ. 8028 (JMF), 2018 WL 2089342 (S.D.N.Y. May 3, 2018)...........................................27

*Nat'l Org. for Women-New York City v. United States Dep't of Def.*,
755 F. Supp. 3d 350 (S.D.N.Y. 2024)................................................................................21

*Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*,
821 F. Supp. 3d 62 (D.D.C. 2026).....................................................................................21

*Nattah v. Bush*,
770 F. Supp. 2d 193 (D.D.C. 2011)...................................................................................11

*Nken v. Holder*,
556 U.S. 418 (2009)...........................................................................................................29

*Olenga v. Gacki*,
507 F. Supp. 3d 260 (D.D.C. 2020)...................................................................................26

*Omar v. McHugh*,
646 F.3d 13 (D.C. Cir. 2011)........................................................................................ 10, 14

*The Paquete Habana*,
175 U.S. 677 (1900)...........................................................................................................11

*Regan v. Wald*,
468 U.S. 222 (1984)..................................................................................................... passim

*Renkel v. United States,*
456 F.3d 640 (6th Cir. 2006) .............................................................................................11

*Rottier v. Paz*,
No. 12 Civ. 1324 (PAE), 2013 WL 30686 (S.D.N.Y. Jan. 3, 2013)..................................... 7

*Rusaviainvest, OOO v. Yellen*,
No. 18 Civ. 5676 (PGG), 2023 WL 6198256 (S.D.N.Y. Sept. 21, 2023) .............. 15, 21, 29, 30

*Russian Volunteer Fleet v. United States*,
282 U.S. 481 (1931)...........................................................................................................16

*Serra v. Lappin*,
600 F.3d. 1191 (9th Cir. 2010) ............................................................................................9

*Serv. Emps. Int'l Union Loc. 200 United v. Trump*,
420 F. Supp. 3d 65 (W.D.N.Y. 2019).................................................................................21

*Spinelli v. City of New York*,
   579 F.3d 160 (2d Cir. 2009)..................................................................... 17

*State v. Dep't of Just.*,
   951 F.3d 84 (2d Cir. 2020)....................................................................... 25

*Students for Fair Admissions v. U.S. Mil. Acad. at West Point*,
   709 F. Supp. 3d 118 (S.D.N.Y. 2024)........................................................ 7

*Tel-Oren v. Libyan Arab Republic*,
   726 F.2d 774 (D.C. Cir. 1984) ................................................................. 11

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
   60 F.3d 27 (2d Cir. 1995).......................................................................... 28

*Tough Traveler, Ltd. v. Outbound Prods.*,
   60 F.3d 964 (2d Cir. 1995)........................................................................ 28

*Udall v. Tallman*,
   380 U.S. 1 (1965)...................................................................................... 23

*United States v. Ahmed*,
   94 F. Supp. 3d 394 (E.D.N.Y. 2015) .......................................................... 9

*United States v. Oseguera Gonzalez*,
   507 F. Supp. 3d 137 (D.D.C. 2020) .......................................................... 19

*United States v. Premises & Real Prop. at 4492 S. Livonia Rd., Livonia, N.Y.*,
   889 F.2d 1258 (2d Cir. 1989)..................................................................... 18

*United States v. Taleb-Jedi*,
   566 F. Supp. 2d 157 (E.D.N.Y. 2008) ................................................. 15, 29

*United States v. Yunis*,
   924 F.2d 1086 (D.C. Cir. 1991).................................................................. 10

*Vassiliades v. Rubio*,
   792 F. Supp. 3d 1 (D.D.C. 2025)........................................................ 25, 26

*We The Patriots USA, Inc. v. Hochul*,
   17 F.4th 266 (2d Cir. 2021) ........................................................................ 8

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)......................................................................................... 7

vi

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
    750 F. Supp. 2d 150 (D.D.C. 2010) ......................................................................... 20, 22, 23, 30

*Zevallos v. Obama*,
    10 F. Supp. 3d 111 (D.D.C. 2014) ......................................................................... 17

*Zevallos v. Obama*,
    793 F.3d 106 (D.C. Cir. 2015) ......................................................................... 17, 19

**Statutes**

22 U.S.C. § 7421(8) ......................................................................... 12

22 U.S.C. § 7421(9) ......................................................................... 12, 4

22 U.S.C. § 7421(11) ......................................................................... 4, 9

22 U.S.C. §§ 7423–7425 ......................................................................... 4

50 U.S.C. § 1701 ......................................................................... 3, 8, 13, 14

50 U.S.C. § 1701(a) ......................................................................... 14

50 U.S.C. § 1701(b) ......................................................................... 13

50 U.S.C. § 1702(a)(1)(B) ......................................................................... 3

Pub. L. No. 107-206 ......................................................................... 4

Defendants President Donald J. Trump, United States Department of State, Secretary of State Marco A. Rubio, United States Department of the Treasury, Secretary of the Treasury Scott K. H. Bessent, United States Department of Justice, and Acting Attorney General Todd Blanche (collectively, the "Government" or "Defendants") submit this memorandum of law in support of their motion to dismiss the Complaint (Dkt. No. 1) filed by plaintiffs International Criminal Court Judges Kimberly Prost ("Prost"), Solomy Balungi Bossa ("Bossa"), and Reine Adelaide Sophie Alapini-Gansou ("Alapini-Gansou") (collectively, "Plaintiffs") pursuant to Federal Rule of Civil Procedure 12(b)(6), and in opposition to Plaintiffs' motion for a preliminary injunction, Dkt. No. 37 ("Pl. Br.").

## PRELIMINARY STATEMENT

Plaintiffs are three foreign nationals serving as judges of the International Criminal Court ("ICC"), an international tribunal created by a treaty to which the United States is not a party and whose jurisdiction this country has consistently refused to accept. Exercising broad authority that Congress conferred through the International Emergency Economic Powers Act ("IEEPA"), the President determined that efforts by the ICC to investigate, arrest, detain, or prosecute U.S. personnel and the officials of allies that have also not consented to the ICC's jurisdiction constitute an unusual and extraordinary threat to the national security and foreign policy of the United States, and he declared a national emergency to address that threat by issuing Executive Order 14203. Pursuant to that order, the Secretary of State designated Bossa and Prost because they took actions to authorize the ICC's investigation of U.S. personnel in Afghanistan. The Secretary of State designated Alapini-Gansou because she took actions to authorize the ICC's issuance of arrest warrants against senior Israeli officials. Plaintiffs now ask this Court to enjoin those designations and to hold that the President and the Secretary of State exceeded their authority to make those

designations under IEEPA. The Court should decline that invitation, deny the motion for a preliminary injunction, and dismiss the Complaint.

Plaintiffs cannot establish a likelihood of success on the merits because each of their claims fails as a matter of law. First, their IEEPA statutory claims lack merit. The non-self-executing treaties and customary international law principles on which Plaintiffs rely have not been incorporated into domestic law and cannot be invoked, through the Charming Betsy canon or otherwise, to constrain the President's exercise of congressionally delegated authority. And despite their arguments to the contrary, the American Servicemembers' Protection Act ("ASPA") addresses a narrower concern and imposes no limit on the President's separate authority to impose economic sanctions under IEEPA. Finally, Executive Order 14203 falls squarely within the broad powers Congress granted the President to address foreign threats to national security and to the foreign-policy interests of the United States—a determination owed substantial deference.

Second, Plaintiffs' constitutional and Administrative Procedure Act ("APA") claims fare no better. Their due process claim fails because the settled law of IEEPA blocking orders does not require pre-deprivation notice, given the compelling governmental interest in the immediate blocking of assets, and Plaintiffs have access to ample post-deprivation process that they apparently never pursued. Their takings claim fails as a matter of law, because blocking orders are temporary deprivations that do not vest assets in the Government and, thus, do not constitute takings. And their APA claim fails under the extremely deferential standard governing review of sanctions decisions because the designations were reasonable.

Finally, even setting aside these fatal deficiencies on the merits, Plaintiffs cannot satisfy the remaining preliminary-injunction factors. Their unexplained delay of roughly a year after their designations—and a year and a half after Executive Order 14203 was issued—before seeking

2

emergency relief belies any claim of irreparable harm. And the balance of equities and the public interest weigh decisively against enjoining economic measures that the political branches have adopted in response to a declared threat to the Nation's national security and foreign policy. For these reasons, and as set forth more fully below, the Court should deny the motion for a preliminary injunction and dismiss the Complaint.

## BACKGROUND

### I.  Statutory and Regulatory Background

For nearly its entire history, the United States has used economic sanctions as a means to protect national security and achieve foreign-policy goals. Through IEEPA, Congress gave the President broad authority to impose sanctions in response to "any unusual and extraordinary threat" arising from outside the United States. 50 U.S.C. § 1701(a). Upon declaring a national emergency with respect to such a threat, the President may "regulate . . . or prohibit" any "transactions involving[] any property" in which any foreign national "has any interest by any person . . . subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B).

Presidents have invoked IEEPA to block the property of designated persons under a variety of sanctions programs responding to declared national emergencies. *See, e.g.*, Exec. Order 13694, 80 Fed. Reg. 18,077 (Apr. 1, 2015) (blocking property of persons responsible for malicious cyber activities); Exec. Order 13382, 70 Fed. Reg. 38,567 (June 28, 2005) (blocking property of persons who contributed to the proliferation of weapons of mass destruction). In general, persons designated under an IEEPA-based sanctions program are added to the List of Specially Designated Nationals and Blocked Persons ("SDN List"), which is administered by the Department of Treasury's Office of Foreign Assets Control ("OFAC"). Persons placed on the SDN List generally have their property within U.S. jurisdiction "block[ed]" (i.e., frozen), and U.S. persons are generally prohibited from transacting with them absent authorization from OFAC. *See* 50 U.S.C.

3

§ 1702(a)(1)(B). OFAC's regulations permit any interested person, including a designated person, to apply for a specific license authorizing an otherwise-prohibited transaction. *See* 31 C.F.R. § 501.801. Designated persons may also seek administrative reconsideration of their designation. 31 C.F.R. § 501.807.

The Rome Statute established the ICC in 2002. *See* Jennifer Elsea, Cong. Rsch. Serv., RL 31437, *ICC: Overview and Selected Legal Issues* 1 (2002). The United States is not a party to the Rome Statute and has consistently declined to accept the ICC's jurisdiction over U.S. nationals. As Congress found in the American Servicemembers' Protection Act ("ASPA"), Pub. L. No. 107-206, tit. II, 116 Stat. 820, 899–909 (2002), the Rome Statute exposes members of the U.S. Armed Forces and senior government officials, including the President, to the "risk of criminal prosecution for national security decisions involving such matters as responding to acts of terrorism, preventing the proliferation of weapons of mass destruction, and deterring aggression," 22 U.S.C. § 7421(9).

Congress recognized the danger that, although "[t]he United States is not a party to the Rome Statute," 22 U.S.C. § 7421(11), the ICC would nonetheless assert jurisdiction over American servicemembers and officials. Motivated by that specific concern, it therefore prohibited certain forms of cooperation with the ICC and restricted U.S. participation in certain United Nations ("U.N.") operations that could expose U.S. personnel to prosecution before the ICC. 22 U.S.C. §§ 7423–7425.

## II.     Factual Background

On February 6, 2025, President Trump issued Executive Order 14203, finding that the ICC has "engaged in illegitimate and baseless actions targeting America and our close ally Israel." 90 Fed. Reg. 9369, 9369 (Feb. 6, 2025). Neither the United States nor Israel is a party to the Rome Statute, nor has either country recognized the ICC's jurisdiction. *Id.* The ICC nonetheless asserted

4

jurisdiction over and opened investigations into U.S. and Israeli personnel and issued arrest warrants against Israeli Prime Minister Benjamin Netanyahu and former Israeli Defense Minister Yoav Gallant. *Id.* President Trump found that these actions "set a dangerous precedent, directly endangering current and former United States personnel, including active service members of the Armed Forces, by exposing them to harassment, abuse, and possible arrest"; "threaten[] to infringe upon the sovereignty of the United States"; and "undermine[]" U.S. "national security and foreign policy." *Id.*

President Trump determined that "any effort by the ICC to investigate, arrest, detain, or prosecute" protected persons—defined as U.S. persons or foreign citizens of a U.S. ally that has not consented to ICC jurisdiction—"constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States," and declared a national emergency to address that threat. *Id.* at 9370–9371. The executive order blocks the property of, and prohibits certain transactions with, *inter alia*, any foreign person determined by the Secretary of State to have "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality." *Id.* at 9370. Absent an applicable exemption or OFAC authorization, U.S. persons may not provide funds, goods, or services to, or for the benefit of, a designated person. *Id.* The order also suspends the entry into the United States of designated persons. *Id.*

Plaintiffs are three sitting judges of the ICC who reside in The Hague. Compl. ¶¶ 13–15. Prost is a citizen of Canada; Bossa is a citizen of Uganda; and Alapini-Gansou is a citizen of Benin. *Id.* Each has served as an ICC judge since March 2018. *Id.*

On June 5, 2025, Secretary of State Marco Rubio designated Bossa and Alapini-Gansou under Executive Order 14203, and on August 20, 2025, Secretary Rubio designated Prost under

5

the same executive order. *Id.* ¶¶ 110, 118, 125. Bossa was designated because she "ruled to authorize the ICC's investigation against U.S. personnel in Afghanistan." *Id.* ¶ 118. Alapini-Gansou was designated because she "ruled to authorize the ICC's issuance of arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Minister of Defense Yoav Gallant." *Id.* ¶ 125. Like Bossa, Prost was "designated for ruling to authorize the ICC's investigation into U.S. personnel in Afghanistan." *Id.* ¶ 110.

On the day the sanctions were imposed, the State Department issued fact sheets and press releases explaining the rationale for each designation, indicating that each ICC judge was designated under Executive Order 14203 for having directly engaged in an effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality.[1] A notice in the Federal Register was published more recently. 91 Fed. Reg. 11,117, 11,117–18 (Mar. 6, 2026).

Plaintiffs allege that, as a consequence of their designations, their property within the United States has been blocked, including bank accounts that Prost and Bossa maintain in New York. Compl. ¶¶ 132(a), 133(a). Plaintiffs further allege that the designations have disrupted aspects of their personal and professional lives—including, for example, their ability to use certain credit cards and banking services and obtain services from U.S.-based companies. *Id.* ¶¶ 132–34.

---

[1] Imposing Sanctions in Response to the ICC's Illegitimate Actions Targeting the United States and Israel, U.S. Dep't of State (June 5, 2025) (press release for Judges Bossa and Alapini-Gansou); *Imposing Sanctions in Response to the ICC's Illegitimate Actions Targeting the United States and Israel*, U.S. Dep't of State (June 5, 2025) (fact sheet for Judges Bossa and Alapini-Gansou); *Imposing Further Sanctions in Response to the ICC's Ongoing Threat to Americans and Israelis*, U.S. Dep't of State (Aug. 20, 2025) (press release for Judge Prost); *Imposing Further Sanctions in Response to the ICC's Ongoing Threat to Americans and Israelis*, U.S. Dep't of State (Aug. 20, 2026) (fact sheet for Judge Prost).

## LEGAL STANDARD

### I.    Legal Standard Governing Motion to Dismiss

On a Rule 12(b)(6) motion, the Court must accept all well-pleaded allegations contained in the complaint as true and draw all reasonable inferences in favor of the plaintiffs. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. Legal conclusions "must be supported by factual allegations," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Further, "[a] court may take into account any written instrument attached to the complaint, as well as statements and documents 'incorporated in the complaint by reference' without converting a motion to dismiss into one for summary judgment." *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 953 F. Supp. 2d 495, 496 n.1 (S.D.N.Y. 2013) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)) (alterations omitted). "[A] court 'may also look to public records . . . in deciding a motion to dismiss.'" *Rottier v. Paz*, No. 12 Civ. 1324 (PAE), 2013 WL 30686, at *1 n.2 (S.D.N.Y. Jan. 3, 2013) (quoting *Blue Trees Hotel Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004)).

### II.    Legal Standard Governing Preliminary Injunctions

"A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Students for Fair Admissions v. U.S. Mil. Acad. at West Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council,*

*Inc.*, 555 U.S. 7, 20 (2008). "When the government is a party to the suit, [the] inquiries into the public interest and the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021).

<b>ARGUMENT</b>

**I.      Plaintiffs Fail to State IEEPA Statutory Claims**

Plaintiffs advance three theories in support of their claim that Executive Order 14203 and the resulting designations exceed IEEPA's delegation of authority to the President to impose economic sanctions: (1) that the designations violate international law and the *Charming Betsy* doctrine requires this Court to hold that IEEPA does not permit the President to impose them; (2) that the ASPA implicitly limits the President's authority under IEEPA with respect to the ICC; and (3) that Executive Order 14203 exceeds the President's statutory authority because it does not respond to an "unusual and extraordinary threat" within the meaning of 50 U.S.C. § 1701. Each of these arguments fails. As explained below, the international-law principles on which Plaintiffs rely cannot be invoked to constrain via judicial review the President's exercise of congressionally delegated authority; ASPA addresses a narrower concern than the range of concerns that may be addressed through the sanctions authority that IEEPA confers and imposes no limit on that authority; and Executive Order 14203 falls squarely within the broad powers Congress granted to the President under IEEPA to address foreign threats to national security and to our foreign-policy interests. Because Plaintiffs cannot prevail on any of these theories as a matter of law, their motion for a preliminary injunction should be denied and their claims dismissed for failure to state a claim.

**A.      The *Charming Betsy* Canon, Non-Self-Executing Treaties, and Customary International Law Are Not Relevant for Judicial Review of these IEEPA Designations**

Plaintiffs argue that the Executive Branch's exercise of authority under IEEPA is *ultra vires* because the designations violate the United States' obligations under the U.N. Charter, the

8

Geneva Conventions, the Convention Against Torture, and customary international law.[2] *See* Pl. Br. at 28–37. In particular, they argue that, because their designations are allegedly contrary to international law, the *Charming Betsy* doctrine requires this Court to conclude that the Executive Branch has no authority to make the designations. Even if the actions at issue here were inconsistent with the United States' international legal obligations (and they are not), that is incorrect. The *Charming Betsy* canon "is not an inviolable rule of general application, but a principle of interpretation that bears on a limited range of cases." *Serra v. Lappin*, 600 F.3d. 1191, 1198 (9th Cir. 2010). The canon not relevant where the statute is unambiguous. *See United States v. Ahmed*, 94 F. Supp. 3d 394, 429 (E.D.N.Y. 2015). Here, there is no question that IEEPA authorizes the President to impose sanctions following a national emergency declaration, so there is no ambiguity, and Plaintiffs' reliance on the *Charming Betsy* canon is inapposite.  Furthermore, "the Supreme Court has never invoked *Charming Betsy* against the United States in a suit in which it was a party." *ARC Ecology v. U.S. Dep't of Air Force*, 411 F.3d 1092, 1102 (9th Cir. 2005) (citation omitted). Instead, "[w]hen the Executive Branch is the party advancing a construction of a statute with potential foreign policy implications, we presume that the President has evaluated the foreign policy consequences of such an exercise of U.S. law and determined that it serves the interests of the United States." *Id.* (citation and internal quotation marks omitted); *see also Al-Bihani v. Obama*, 619 F.3d 1, 36 (D.C. Cir. 2010) (Kavanaugh, J., concurring in denial of rehearing *en banc*) ("The *Charming Betsy* canon may not be invoked *against the Executive* to conform statutes to non-self-executing treaties or customary international law." (emphasis in original)).

---

[2] Although the Plaintiffs' motion discusses the Rome Statute, the treaty that created and governs the ICC, at length, the United States is not a party to the Rome Statute and Congress has unambiguously expressed its unwillingness to undertake any obligations with respect to that treaty. *See* 22 U.S.C. § 7421(11) ("The United States is not a party to the Rome Statute and will not be bound by any of its terms. . . .").

9

Notwithstanding their mistaken reliance on *Charming Betsy*, Plaintiffs functionally appear to be asking the Court to enforce the referenced provisions of international law to invalidate presidential and agency action. Plaintiffs cannot bring such a challenge. The treaties they cite and the obligations they describe as customary international law are non-self-executing and do not create rights enforceable in U.S. courts. Federal courts are obliged "to enforce the Constitution, laws, and treaties of the United States, not to conform the law of the land to norms of customary international law." *United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991). And despite Plaintiffs' invocation of various treaties in seeking to vacate the designations, "while treaties may comprise international commitments[,] they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms." *Medellín v. Texas*, 552 U.S. 491, 505 (2008) (cleaned up). Plaintiffs do not argue that any of the treaties to which they point are self-executing. Likewise, they do not argue that Congress has implemented these treaties by creating judicially enforceable rights of action against the President's authority—or an agency head's delegated authority—under IEEPA.

Courts have consistently agreed that the international treaties cited by Plaintiffs are non-self-executing treaties. *See id.* at 506, 508 (holding that the provision of the U.N. Charter under which each member state "undertakes to comply with" decisions of the International Court of Justice, does not "create[] binding federal law in the absence of implementing legislation"); *Omar v. McHugh*, 646 F.3d 13, 17 (D.C. Cir. 2011) (explaining that the Convention Against Torture "is non-self-executing and thus does not itself create any rights enforceable in U.S. courts"); *Renkel v. United States*, 456 F.3d 640, 644 (6th Cir. 2006) ("As the [CAT] Articles are not self-executing, they do not create private rights of action; therefore, any private lawsuit seeking to enforce the United States's obligations under the Convention must be based on domestic law."); *Nattah v.*

*Bush*, 770 F. Supp. 2d 193, 204 (D.D.C. 2011) (Geneva Convention is not self-executing). In the absence of an affirmative decision by Congress to incorporate the relevant international law obligations into domestic law in a manner that creates an enforceable right, there is no federal cause of action for violations of non-self-executing treaties such as the U.N. Charter and the Geneva Conventions. *See Medellin*, 552 U.S. at 504 (recognizing "the distinction between treaties that automatically have effect as domestic law, and those that—while they constitute international law commitments—do not by themselves function as binding federal law."); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 812 (D.C. Cir. 1984) (Bork, J., concurring) (discussing "the well-established rule that treaties that provide no cause of action cannot be sued on without (express or implied) federal law authorization"). The same principle applies to customary international law. It is well established that "[customary] [i]nternational law is part of our law," *The Paquete Habana*, 175 U.S. 677, 700 (1900), yet only Congress, and not courts, may "create new rights of action to remedy violations of international law," *Cisco Systems, Inc. v. Doe I*, 146 S. Ct. 1882, 1892 (2026). Customary international law does not, without more, provide an actionable basis by which to challenge the lawfulness of the President's exercise of congressionally delegated authority.

The D.C. Circuit's opinion in *Al-Bihani v. Obama* is instructive. In that case, a habeas petitioner sought release from detention at the Guantanamo Bay naval base, arguing in relevant part that the President's delegated war powers (the authority upon which he was detained) were limited by the international laws of war. *See Al-Bihani v. Obama*, 590 F.3d 866, 870-71 (D.C. Cir. 2010). The panel declined to "quibble over the intricate application of vague treaty provisions and amorphous customary principles" because "[t]he international laws of war as a whole have not been implemented domestically by Congress and are therefore not a source of authority for U.S. courts." *Id.* at 871.

11

The Court here should likewise reject Plaintiffs' effort to expand the *Charming Betsy* canon of construction to enforce non-self-executing treaties and customary international law to limit the President's and agency heads' exercise of congressionally authorized powers.

### B.      The Designations Do Not Conflict With ASPA

Plaintiffs' argument that the American Servicemembers' Protection Act ("ASPA") limits the President's authority under IEEPA fares no better. Pl. Br. at 38–42. Congress enacted the ASPA to address a specific concern—that members of the Armed Forces or high-level government officials may be prosecuted by the ICC. 22 U.S.C. § 7421(8)–(9). The ASPA does not purport to govern the United States' every interaction with the ICC or limit the President's separate authority under IEEPA to respond through economic sanctions to foreign threats to the national security or to foreign-policy interests of the United States. In contrast, Executive Order 14203 seeks to address a broader concern—the ICC's actions against "the United States, Israel, or any other ally of the United States that has not consented to ICC jurisdiction." 90 Fed. Reg. at 9369.

Plaintiffs rely on *Food & Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), to argue that Congress's failure to enact IEEPA-specific sanctions legislation pertaining to the ICC implicitly limits the President's authority. *See* Pl. Br. at 38. That reliance is inapposite. *Brown & Williamson* considered whether an agency could claim regulatory authority that conflicted with the broader statutory framework Congress had enacted. 529 U.S. at 159–60. The Supreme Court concluded that allowing the U.S. Food and Drug Administration to regulate tobacco products would have contradicted Congress's carefully constructed tobacco-specific regulatory framework. *Id.* Here, by contrast, the use of economic sanctions to respond to the conduct of foreign actors supporting the efforts of the ICC is not contradicted by any statutory scheme. To the contrary, Congress has granted the President broad authority under IEEPA to

12

address unusual and extraordinary threats originating outside the United States through economic measures. *See* 50 U.S.C. §§ 1701–02. The President's invocation of that authority therefore does not conflict with any congressional statute.

### C.      Executive Order 14203 Falls Within the President's Delegated Authority Under 50 U.S.C. § 1701

Plaintiffs contend that Executive Order 14203 exceeds the President's authority under 50 U.S.C. § 1701(b) because, in their view, the Order does not respond to an "unusual and extraordinary threat." *See* Pl. Br. at 42–47. That argument misreads both the statutory text and the governing principles that apply to executive branch determinations in the context of foreign affairs and national security. IEEPA authorizes the President to exercise specified economic powers, upon declaring a national emergency, to address "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States," to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a). Once such a declaration is made, the statute empowers the President to employ economic sanctions and related authorities to address that threat. *Id.* § 1702(a)(1)(B). Executive Order 14203 expressly invokes this authority and determines that recent actions by the ICC—including efforts to investigate, arrest, detain, or prosecute "protected persons," such as United States personnel and officials of allied countries that have not consented to ICC jurisdiction—constitute "an unusual and extraordinary threat to the national security and foreign policy of the United States." 90 Fed. Reg. at 9370. That determination satisfies the statutory prerequisites for the exercise of IEEPA authority.

Plaintiffs argue that Executive Order 14203 cannot satisfy 50 U.S.C. § 1701 because (1) the ICC has, in the past, exercised jurisdiction over alleged crimes that took place on the territories of parties to the Rome Statute, regardless of whether the accused's country was a party to the Rome Statute and (2) Congress has already responded to the threat posed by the ICC by passing the

ASPA. *See* Pl. Br. at 29–31. As the Government previously explained, ASPA does not impose any limits on the President's authority to impose economic sanctions under IEEPA. *See supra* pp. 14-15. And nothing in IEEPA requires the President to identify a threat that has never previously existed. 50 U.S.C. § 1701(a). The statute requires that the President determine that an "unusual and extraordinary threat" exists and declare a national emergency to address it. *See id.* Executive Order 14203 identifies precisely such a threat. *See* 90 Fed. Reg. at 9369–70. The order explains that the ICC has asserted jurisdiction and opened preliminary investigations concerning personnel of the United States and certain allies, including Israel. *Id.* It further states that the ICC has issued arrest warrants targeting Israeli senior officials. *Id.* Moreover, the ICC's recent actions concerning Israel after the October 7, 2023 attacks and the ensuing conflict in Gaza materially altered the geopolitical and legal landscape surrounding the ICC's activities and reasonably led the President to conclude that the ICC's conduct posed an unusual and extraordinary threat. *See* 90 Fed. Reg. at 9369; *see also* Statement of ICC Prosecutor Karim A.A. Khan KC: Applications for Arrest Warrants in the Situation in the State of Palestine, Int'l Crim. Ct. (May 20, 2024) (publicly announcing the then-ICC Prosecutor's applications for arrest warrants before entry of Executive Order 14203).

Plaintiffs' theory also disregards the substantial deference owed to the executive branch in matters of foreign affairs and national security. *See Regan v. Wald*, 468 U.S. 222, 223 (1984) (emphasizing the "traditional deference to executive judgment in the realm of foreign policy"); *Rusaviainvest, OOO v. Yellen*, No. 18 Civ. 5676 (PGG), 2023 WL 6198256, at *5 (S.D.N.Y. Sept. 21, 2023) (noting that executive "actions taken in the realm of national security and foreign affairs are entitled to heightened deference" and that courts have shown "extreme deference" when reviewing executive national-security determinations) (quoting *Islamic Am. Relief Agency v.*

*Gonzales,* 477 F.3d 728, 734 (D.C. Cir. 2007)); *United States v. Taleb-Jedi*, 566 F. Supp. 2d 157, 168 (E.D.N.Y. 2008) (recognizing deference in reviewing executive actions in the realm of national security); *Karpova v. Snow*, 402 F. Supp. 2d 459, 466 (S.D.N.Y. 2005) (recognizing "particularly great deference" in executive actions in foreign relations and that executive actions in imposing economic sanctions "enjoy this extremely high level of deference"). The determination reflected in Executive Order 14203 that recent ICC actions threaten the national security and foreign policy of the United States is the type of judgment committed to the political branches.

Plaintiffs' interpretation would transform § 1701 into a vehicle for courts to second-guess the President's assessment of international developments and determine whether a particular threat is sufficiently "new" or "extraordinary." *See Regan*, 468 U.S. at 223, 228 (emphasizing the "traditional deference to executive judgment in the realm of foreign policy"). Nothing in the statutory text supports such judicial oversight of foreign policy judgments. The statute requires only that the President identify an "unusual and extraordinary threat" originating outside the United States and declare a national emergency to address it. 50 U.S.C. § 1701(a). Executive Order 14203 does exactly that. *See* 90 Fed. Reg. at 9369–70. Because the Order identifies actions of the ICC that threaten the national security and foreign policy of the United States and invokes authorities Congress expressly provided to address such threats, Plaintiffs cannot demonstrate that Executive Order 14203 exceeds the President's authority under IEEPA.

## II.    Plaintiffs Fail to State a Plausible Fifth Amendment Due Process Claim

Plaintiffs contend that the blocking of Prost's and Bossa's New York bank accounts violated their due process rights because, "prior to the deprivation . . . , neither Judge Prost nor Judge Bossa was given notice of the blocking, nor afforded any opportunity to be heard to

challenge it."[3] Pl. Br. at 51–52. That argument misapprehends the flexible requirements of due process, which do not require the Government to provide pre-deprivation notice before blocking assets under IEEPA. Because Plaintiffs received the process they were due, they cannot show a likelihood of success, and their due process claim must be dismissed for failure to state a claim.

At baseline, "foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020). Though certain "aliens may invoke the Fifth Amendment to safeguard their property interests located in the United States," *Cali v. Trump*, No. 26-5172, 2026 WL 1765953, at *5 (D.C. Cir. Jun. 15, 2026) (Katsas, J., concurring) (citing *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 489, 492 (1931)), even assuming Plaintiffs can invoke the Fifth Amendment here, the blocking orders comported with due process.

Notice and a hearing need not always precede a deprivation of property. "Due process is flexible and calls for such procedural protections as the particular situation demands." *Chunn v. Amtrak*, 916 F.3d 204, 207 (2d Cir. 2019) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)). While "'[d]ue process ordinarily requires an opportunity for some kind of a hearing prior to the deprivation of a significant property interest,'" it is "generally 'sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination.'" *Id.* at 207–08. Thus, "in certain circumstances, the lack of such pre-deprivation process will not offend the constitutional guarantee of due process, provided there is sufficient post-deprivation process." *Spinelli v. City of New York*, 579 F.3d 160, 170 (2d Cir. 2009) (alterations omitted). In particular, the "'[n]ecessity of quick action by the State or the impracticality of providing any meaningful pre-deprivation process, when coupled with the

---

[3] The Due Process Claims are limited to Prost and Bossa. Compl. ¶¶ 162–69.

16

availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process.'" *Id.* (alterations omitted).

These principles apply to the blocking of assets under IEEPA, and courts have repeatedly held that the government "'need not provide pre-deprivation notice and hearing, given [its] compelling interest in the immediate blocking of assets upon designation.'" *Lopez Bello v. Smith*, 651 F. Supp. 3d 20, 39 (D.D.C. 2022) (emphasis omitted), *aff'd sub nom. Bello v. Gacki*, 94 F.4th 1067 (D.C. Cir. 2024); *see also Zevallos v. Obama*, 10 F. Supp. 3d 111, 127 (D.D.C. 2014) ("courts generally hold that OFAC need not provide pre-deprivation notice and hearing") (collecting cases), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015). The reason is straightforward: "Money is fungible, and any delay or pre-blocking notice would afford a designated [party] the opportunity to transfer, spend, or conceal its assets, thereby making the IEEPA sanctions program virtually meaningless." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 77 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003); *see also Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 985 (9th Cir. 2012) (plaintiff "wisely does not challenge OFAC's decision not to provide pre-deprivation notice" because "the potential for 'asset flight' almost certainly justifies OFAC's decision not to provide notice before freezing the assets" (emphasis omitted)); *United States v. Premises & Real Prop. at 4492 S. Livonia Rd., Livonia, N.Y.*, 889 F.2d 1258, 1263 (2d Cir. 1989) (pre-seizure notice may be dispensed with where the seized property is "of a sort that could be removed to another jurisdiction . . . if advance warning of confiscation were given" (quoting *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 (1974))).

Plaintiffs contend that there was no "risk that either judge would contribute her assets to an illegal or illicit entity" and that "[n]either judge has ever been suspected of, charged with, or

17

convicted of a crime." Pl. Br. 52–53. But the asset-flight rationale does not turn on any individualized showing of criminality or imminent illicit use. It flows instead from the fungibility and movability of money and the reality that any advance notice would allow a designated person to move funds beyond the reach of a blocking order, rendering the order meaningless.

To the extent Prost or Bossa challenge the adequacy of the post-deprivation notice, their own allegations establish that they received contemporaneous notice of the reasons for their designations. Specifically, the Complaint acknowledges that the State Department advised that Prost and Bossa were designated because they took actions to "authorize the ICC's investigation" into U.S. personnel in Afghanistan. Compl. ¶¶ 110, 118. When the sanctions were imposed, the State Department issued fact sheets and press releases containing the rationales for the designations, making clear the ICC judges were designated under Executive Order 14203 for having directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality. *See supra* p. 8 n.1. A notice in the Federal Register was later published. 91 Fed. Reg. at 11,117–18. Furthermore, the judicial rulings that resulted in the sanctions are known to Plaintiffs and are in fact a matter of public record.[4] Plaintiffs thus understand "the 'who,' 'what,' 'when' and 'where' of the allegations'" on which the sanctions were based, and they are certainly not left "stumbling toward a moving target." *Bazzi v. Gacki*, 468 F. Supp. 3d 70, 80 (D.D.C. 2020); *Lopez Bello*, 651 F. Supp.

---

[4] *Situation in the Islamic Republic of Afghanistan*, ICC-02/17-138, Judgment on the Appeal Against the Decision on the Authorisation of an Investigation into the Situation in the Islamic Republic of Afghanistan (Prost and Bossa ruling to reverse decision below and authorize ICC prosecutor to investigate alleged crimes connected to Afghanistan, including alleged conduct by U.S. personnel); *see also Situation in the State of Palestine: ICC Pre-Trial Chamber I rejects the State of Israel's challenges to jurisdiction and issues warrants of arrest for Benjamin Netanyahu and Yoav Gallant*, ICC (Nov. 21, 2024); Compl. ¶¶ 123–24 (admitting that Alapini-Gansou was part of the Pre-Trial Chamber I that issued arrest warrants for Netanyahu and Gallant).

18

3d at 43 ("press releases have . . . been considered 'sufficiently detailed' summaries to satisfy the notice standard when they adequately explain the OFAC's reasons to designate a plaintiff").

Plaintiffs also have access to post-deprivation process, which they apparently never pursued. Specifically, a "designated person may 'seek administrative reconsideration' of his designation and request to be removed, or 'delist[ed],' from the Specially Designated Nationals and Blocked Persons List." *Zevallos v. Obama*, 793 F.3d 106, 110 (D.C. Cir. 2015) (quoting 31 C.F.R. § 501.807). "A request for reconsideration—also sometimes called a delisting request—may include arguments or evidence rebutting Treasury's 'basis . . . for the designation,' or 'assert that the circumstances resulting in the designation no longer apply.'" *Id.* (quoting 31 C.F.R. § 501.807). Put differently, "the designated person must argue that whatever rationale led Treasury to designate him . . . was never true or is no longer true." *Id.* OFAC will then "'conduct[ ] a review of the request for reconsideration' and 'provide a written decision to the blocked person.'" *Id.* (quoting 31 C.F.R. § 501.807(d)). Furthermore, a "designated person can request delisting as many times as he likes." *Id.* Courts have repeatedly held that this post-deprivation process satisfies due process. *See, e.g.*, *United States v. Oseguera Gonzalez*, 507 F. Supp. 3d 137, 157 (D.D.C. 2020) ("established administrative procedures to obtain delisting" under 31 C.F.R § 501.807 and the ability to bring APA claim "provide what the due process clause requires"); *Fares v. Smith*, 249 F. Supp. 3d 115, 125 (D.D.C. 2017) (no due process violation in part because "Plaintiffs could submit rebuttal evidence at a later time, and they in fact may do so as many times as they please" under 31 C.F.R. § 501.807); *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2013 WL 2451067, at *6 (S.D.N.Y. June 6, 2013) ("Defendants cannot attack the SDN listing on due process grounds [w]ithout first availing themselves of the processes they are due" under 31 C.F.R. § 501.807).

19

### III.    Plaintiffs Fail to State a Plausible Takings Claim

Plaintiffs claim that the blocking of Prost's and Bossa's New York bank accounts constitutes a taking in violation of the Fifth Amendment. Pl. Br. at 53 n.21; Compl. ¶¶ 167–69. But the "case law is clear that blockings under Executive Orders are temporary deprivations that do not vest the assets in the Government." *Holy Land Found. for Relief & Dev.*, 219 F. Supp. 2d at 78. Thus, "blockings do not, as a matter of law, constitute takings within the meaning of the Fifth Amendment" and courts have "consistently rejected these claims in the IEEPA . . . context." *Id.* (collecting cases); *IPT Co. v. U.S. Dep't of Treasury*, No. 92 Civ. 5542 (JFK), 1994 WL 613371, at *5 (S.D.N.Y. Nov. 4, 1994) ("defendant's blocking is not a taking as title to the property has not vested in the Government"); *see also Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 159 (D.D.C. 2010) ("It is well-established that the blocking of assets pursuant to an executive order is not a taking within the meaning of the Fifth Amendment."). For this reason, Plaintiffs' takings claim fails as a matter of law and should be dismissed.

### IV.    Plaintiffs Fail to State a Plausible APA Claim

Plaintiffs claim that their designations violated the APA because they "were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Compl. ¶ 171. As an initial matter, Plaintiffs' "contrary to law" theory is duplicative of their *ultra vires* and constitutional claims, and those claims should be dismissed for the reasons discussed above. *See supra* pp. 10-22; *see Nat'l Org. for Women-New York City v. United States Dep't of Def.*, 755 F. Supp. 3d 350, 365 (S.D.N.Y. 2024) (APA claims based on contrary-to-law theory "rise and fall" with plaintiffs' other statutory and constitutional claims); *Rusaviainvest*, 2023 WL 6198256, at *8 ("Plaintiff's effort to filter its constitutional argument through the APA achieves nothing."). As explained below, their remaining APA theories—that the designations were arbitrary and capricious and an abuse of discretion—are equally meritless. Measured against the deferential

20

standard governing APA review of sanctions decisions, the designations must be upheld: they were reasonable, reasonably explained, and grounded in the criteria of Executive Order 14203 and in conduct the Complaint itself describes. For these reasons, the APA claims should be dismissed.

### A.      "Extremely Deferential" Standard of Review

"Under the APA, courts review agency action to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Animals v. Romero*, 948 F.3d 579, 585 (2d Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)). Judicial review of "agency action," *Friends of Animals*, 948 F.3d at 585, does not extend to exercises of presidential power because, "[a]s a general matter, the Executive Office of the President is not an 'agency' under the APA." *Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*, 821 F. Supp. 3d 62, 72 (D.D.C. 2026); *see also Serv. Emps. Int'l Union Loc. 200 United v. Trump*, 420 F. Supp. 3d 65, 75 (W.D.N.Y. 2019) ("while a president's actions may be reviewable on other bases, such as constitutionality, they are not subject to the requirements of the APA").

Under the APA's "narrow and particularly deferential" standard, *Environmental Defense v. EPA*, 369 F.3d 193, 201 (2d Cir. 2004), the Court "may not substitute its own policy judgment for that of the agency," but instead "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The agency's decision "need not be a model of analytic precision to survive a challenge, and [a] reviewing court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Zarmach*, 750 F. Supp. 2d at 154–55 (quoting *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) (quotation marks omitted, alterations in original)).

21

That already-deferential standard is even more deferential here, because the sanctions designations at issue lie "at the intersection of national security, foreign policy, and administrative law." *Islamic Am. Relief Agency*, 477 F.3d at 734. In this area, judicial review "is extremely deferential." *Id.*; *see also Fulmen Co. v. OFAC*, 547 F. Supp. 3d 13, 23 (D.D.C. 2020) ("OFAC, in particular, is entitled to even greater deference—indeed, 'extreme[ ] deferen[ce]'—because its decisions implicate national security and foreign policy."). This deference reflects the constitutional allocation of authority: "Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Regan*, 468 U.S. at 242.

**B.    The Designations Were Reasonable and Easily Withstand APA Review**

Applying these principles, the designations easily clear the APA's deferential bar. Executive Order 14203 authorizes the designation of any foreign person determined "to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person." 90 Fed. Reg. at 9370. The Secretary of State designated Prost and Bossa for ruling to authorize the ICC's investigation into U.S. personnel in Afghanistan, and designated Alapini-Gansou for "rul[ing] to authorize the ICC's issuance of arrest warrants targeting" Israeli officials. Compl. ¶¶ 110, 118, 125. The Complaint does not dispute that Plaintiffs made these rulings; to the contrary, it describes the circumstances of the rulings in detail. *See id.* ¶¶ 109, 117, 123–24. The Secretary's determination that authorizing an ICC investigation is directly engaging in an "effort by the ICC to investigate" and that authorizing arrest warrants is directly engaging in an "effort by the ICC to . . . arrest . . . or prosecute" were reasonable. 90 Fed. Reg. at 9370. There is thus a "'rational connection between the facts found and the choice made,'" *Islamic Am. Relief Agency,* 477 F.3d at 732, and the Secretary's "'path may reasonably be discerned,'" *Zarmach*, 750 F. Supp.

22

2d at 154. Accordingly, the designations comfortably pass the "extremely deferential" APA review bar. *See Islamic Am. Relief Agency*, 477 F.3d at 734.

### C.      Plaintiffs' Contrary Arguments Lack Merit

Plaintiffs' arguments to the contrary do not disturb this conclusion. First, Plaintiffs suggest that ICC judges, as "neutral arbiters," do not "directly engage[]" in investigations or arrests. Compl. ¶¶ 111, 119, 126; Pl. Br. at 48. But Executive Order 14203 authorizes the designation of any foreign person determined to have "directly engaged in *any effort* by the ICC to investigate, arrest, detain, or prosecute a protected person." 90 Fed. Reg. at 9370 (emphasis added). Treating an ICC judge who authorizes an investigation, or authorizes the issuance of arrest warrants, as having "directly engaged in [an] effort by the ICC to investigate[] [or] arrest" is, at a minimum, a reasonable construction of the Executive Order that the Secretary of State is charged with administering. *Id.* Even if Secretary's reading is not "the only one permitted by the language of the order[], . . . it is quite clearly a reasonable interpretation; courts must therefore respect it." *Karadzic v. Gacki*, 602 F. Supp. 3d 103, 111–12 (D.D.C. 2022) (quoting *Udall v. Tallman*, 380 U.S. 1, 4 (1965)). Plaintiffs' preference for a narrower reading of "directly engaged in any effort" is, at bottom, a disagreement with a reasonable interpretive choice committed to the Secretary— not a basis to set the designations aside. *See Islander E. Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 152 (2d Cir. 2008) ("we do not ourselves weigh the evidence or choose among competing inferences that might be drawn therefrom").

Plaintiffs also argue that the State Department "does not possess, substantial evidence" that Plaintiffs directly engaged in efforts by the ICC to investigate, arrest, or prosecute protected persons. Pl. Br. at 22, 32, 35; Compl. ¶¶ 111, 119, 126. This argument is framed as an evidentiary challenge. But Plaintiffs do not dispute that they issued the rulings on which their designations

rest. To the contrary, the Complaint recounts the rulings in detail, and the rulings are a matter of public record. *See* Compl. ¶¶ 109, 117, 124; *supra* p. 8 n.1. What Plaintiffs presumably dispute is not evidence of the rulings but the Secretary of State's determination that the ICC judges, by virtue of these rulings, "directly engaged in any effort by the ICC" to investigate, arrest, or prosecute protected persons. 90 Fed. Reg. at 9370. As explained above, however, the Secretary's determination is, at a minimum, a sensible application of the Executive Order that he is charged with administering. *See Karadzic*, 602 F. Supp. 3d at 111–12; *Islander E. Pipeline Co.*, 525 F.3d at 152; *see also Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 146 F.4th 1144, 1163 (D.C. Cir. 2025) (question is not whether the agency's "conclusion was the only reasonable one on this record or even the most reasonable one, but whether it was a sensible one"); *Lab. Council for Latin Am. Advancement v. EPA*, 12 F.4th 234, 245 (2d Cir. 2021) ("'[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'").

Plaintiffs also argue that their designations "are based on agency action that 'entirely failed to consider'" the effect of the designations on the international criminal-justice system. Pl. Br. at 48–49. "While agency action may be overturned as arbitrary and capricious if the agency 'entirely failed to consider an important aspect of the problem' at issue, . . . a court will not 'lightly' reach that conclusion" and instead "'must be very confident that the decisionmaker overlooked something important.'" *State v. Dep't of Just.*, 951 F.3d 84, 122 (2d Cir. 2020) (citations omitted). There are no allegations that plausibly support that conclusion here. Plaintiffs point to nothing in IEEPA that requires officials to weigh the collateral effects of sanctions against their anticipated foreign-policy benefits. *See Vassiliades v. Rubio*, 792 F. Supp. 3d 1, 18–19 (D.D.C. 2025) (observing that "IEEPA does not require courts to entangle themselves with questions about

24

whether the Executive has used the statutory authority wisely, effectively, reasonably, or proportionately"; that Congress imposed no "proportionality requirement"; that sanctions may be "harsh" and imposed without an "individualized determination"). In any event, the point of Executive Order 14203 was to deliver "tangible and significant consequences" on the ICC. 90 Fed. Reg. at 9370. The effect of the sanctions is thus not an aspect of the problem the Executive Branch ignored; it was the Executive Order's very purpose. Furthermore, there was "no need" for the Secretary of State "to discuss the relative detriments and benefits" of the designations: the "sole question" was whether Plaintiffs' conduct satisfied the order's criteria, and "[h]aving made that decision," the Secretary was not required to excuse Plaintiffs on a finding "that the detrimental effects . . . outweigh the benefits." *See State*, 951 F.3d at 122.

Plaintiffs recast their disagreement with the Secretary as an abuse of discretion, asserting that the designations' true "purpose" is to "target the personal, including financial[,] interests of judges as a means of pressuring them." Pl. Br. at 49–50. But that is not the case. The aim of Executive Order 14203 is to vindicate the "sovereign prerogatives" of the United States and its allies and to impose "tangible and significant consequences on those responsible for the ICC's transgressions"—reflecting the United States' insistence that "the ICC and parties to the Rome Statute must respect the decisions of the United States and other countries not to subject their personnel to the ICC's jurisdiction." 90 Fed. Reg. at 9369–70. Pressing ICC judges to honor these sovereign prerogatives is just the kind of judgment the political branches are entitled to make. *Olenga v. Gacki*, 507 F. Supp. 3d 260, 281–82 (D.D.C. 2020) (the President "could reasonably conclude that the deterrence of international bad actors . . . requires the imposition of sanctions," and "[s]uch a determination is precisely the type of judgment that is properly left to the President and his advisors and falls outside the judicial ken"). Whether, as a policy matter, sanctions are a

25

wise or effective means to that end is not a question for courts to resolve. *See Regan*, 468 U.S. at 242 ("[m]atters relating to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference" (quotation marks omitted)); *Vassiliades*, 792 F. Supp. 3d at 20 ("IEEPA does not prohibit the President from using sanctions harshly when trying to deal with the relevant threat. And the Executive's 'evaluation of the facts' and 'informed judgment' about these methods of addressing that threat are 'afforded significant 'respect.'" (some quotation marks omitted)).

## V.        Plaintiffs' Long Delay in Seeking Relief Negates Any Asserted Irreparable Harm

Delay in seeking emergency relief undercuts any claim of irreparable harm. *See, e.g., Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (holding that plaintiff's approximately nine-month delay in seeking a preliminary injunction "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." (citation omitted)). Here, the lack of irreparable harm requires denying Plaintiffs' motion for a preliminary injunction. Executive Order 14203 was issued on February 6, 2025, and the Secretary of State designated Plaintiffs approximately a year ago. *See* Compl. ¶ 110 (Prost designated on August 20, 2025); Compl. ¶ 118 (Bossa designated on June 5, 2025); Compl. ¶ 125 (Alapini-Gansou designated on June 5, 2025). Yet Plaintiffs did not file this action until June 24, 2026, or file a motion for preliminary relief until July 2, 2026. Plaintiffs offer no explanation for this delay in their filings.

Plaintiffs' unexplained decision to tarry in seeking relief is fundamentally inconsistent with their claim that a preliminary injunction is necessary now—after Plaintiffs have been designated for approximately a year, and a year and a half after Executive Order 14203 was signed. "[C]ourts in this Circuit typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Monowise Ltd. Corp. v. Ozy Media, Inc.*, 17 Civ. 8028 (JMF), 2018

26

WL 2089342, at *2 (S.D.N.Y. May 3, 2018) (citation and internal quotation marks omitted); *see also, e.g.*, *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F. Supp. 602, 609 (S.D.N.Y. 1979) (holding that a party's delay of nearly a year "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury"); *Monowise Ltd. Corp.*, 2018 WL 2089342, at *2 (holding that a party's eight month "delay in seeking relief defeats any possible showing of irreparable harm"); *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, No. 11 Civ. 325 (RJH), 2011 WL 1419612, at *7 (S.D.N.Y. Apr. 11, 2011) (holding that a three month "delay in seeking the injunction in this case counsels against a finding of irreparable harm"); *Livery Round Table, Inc. v. New York City FHV & Limousine Comm'n*, No. 18 Civ. 2349 (JGK), 2018 WL 1890520, at *9 (S.D.N.Y. Apr. 18, 2018) (holding that "it is difficult to credit the plaintiffs' argument that they will suffer immediate and irreparable injury without the issuance of a preliminary injunction in view of the length of time that the plaintiffs waited to seek relief" and "[a] delay of about three months undercuts a showing of immediate and irreparable injury"); *Hessel v. Christie's Inc.*, 399 F. Supp. 2d 506, 521 (S.D.N.Y. 2005) (holding that the balance of hardships did not tip in the plaintiff's favor partially because "there is no reason that [plaintiff] could not have made this application two months ago"). More generally, courts routinely reject claims of irreparable harm where, as here, a plaintiff's own conduct demonstrates a lack of urgency. *See, e.g.*, *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) ("[a] district court should generally consider delay in assessing irreparable harm"); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ("any such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief"); *Citibank, N.A.*, 756 F.2d at 276 ("delay alone may justify denial of a preliminary injunction"; holding that delay of suit for nine months after receiving notice in the

27

press, and 10 weeks after receiving actual notice, negates a presumption of irreparable harm"); *Guevera v. Village of Freeport*, No. 25 Civ. 4061 (SJB) (JMW), 2025 WL 3484935, at *5 (E.D.N.Y. Dec. 4, 2025) (holding that a two-month "delay remains sufficient to rebut the presumption of irreparable harm"); *Christopher Norman Chocolates, Ltd. v. Schokinag Chocolates N. Am., Inc.*, 270 F. Supp. 2d 432, 438 (S.D.N.Y. 2003) (denying plaintiff's application for preliminary injunctive relief due to plaintiff's eight-month delay to file suit and lack of persuasive explanation by plaintiff on the reason for such delay). Here, the delay completely undermines Plaintiffs' claim of irreparable harm. Accordingly, the Court should deny Plaintiffs' motion for a preliminary injunction.

## VI.    The Balance of the Equities and the Public Interest Do Not Favor Issuing a Preliminary Injunction

As explained above, cannot establish a likelihood of success on the merits of their claims, nor irreparable harm. Because Plaintiffs cannot establish the first two factors necessary to obtain a preliminary injunction, "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Benefit Guarantee Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009). Because Defendants are government officials sued in their official capacities and federal agencies, the balance of equities and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The government's interests are especially substantial when the challenged action concerns economic measures adopted in response to asserted threats to the Nation's national security and foreign policy. Courts have long recognized both the executive branch's "sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010), and the heightened deferential standard owed to the political branches in matters of foreign policy. *See, e.g.*, *Regan*, 468 U.S. at 242; *Rusaviainvest*, 2023 WL 6198256, at *5; *Taleb-Jedi*, 566 F. Supp. 2d at 168;

28

*Karpova*, 402 F. Supp. 2d at 466. The government's interests are concrete and substantial. The President determined that efforts by the ICC to investigate, arrest, detain, or prosecute protected persons without the consent of their country of nationality constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. *See* 90 Fed. Reg. at 9369–70. The President further found that the ICC had "engaged in illegitimate and baseless actions targeting America and our close ally Israel," that such actions "directly endanger[] current and former United States personnel," threaten "to infringe upon the sovereignty of the United States," and undermine "the critical national security and foreign policy work of the United States Government and our allies." *Id.* at 9369. Executive Order 14203 reflects the President's judgment regarding how best to address that threat. *See id.* at 9369-70. That judgment is also reflected in the designation at the center of this case. The U.S. Secretary of State publicly stated that Prost, Bossa, and Alapini-Gansou were designated for having "directly engaged in efforts by the International Criminal Court (ICC) in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel, without consent from the United States or Israel." *Supra* p. 8 n.1 (citing press releases).

Courts have long recognized that sanctions determinations under IEEPA involve national security and foreign affairs judgments and are therefore subject to a deferential standard of review. *See, e.g.*, *Regan*, 468 U.S. at 242; *Rusaviainvest*, 2023 WL 6198256, at *5; *Karpova*, 402 F. Supp. 2d at 466; *Islamic Am. Relief Agency*, 477 F.3d at 734; *Zarmach, Inc.*, 750 F. Supp. 2d at 157–58. Preventing the executive branch from implementing such measures would directly undermine those interests. *See Rusaviainvest*, 2023 WL 6198256, at *5 (explaining that courts show "extreme deference to [executive] blocking orders, which fall 'at the intersection of national security, foreign policy, and administrative law'" (quoting *Islamic Am. Relief Agency*, 477 F.3d at 734); *see also*

29

*Holy Land Found. for Relief & Dev.*, 219 F. Supp. 2d at 84 ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference.").

Plaintiffs cannot show that the balance of equities tips in their favor. Their argument that the government has no interest in enforcing an unconstitutional law depends on the premise that Executive Order 14203 is unlawful. Pl. Br. at 56. But for the reasons explained above, Plaintiffs have not made that showing. Plaintiffs cannot convert their constitutional theory into an equitable interest that outweighs the government's national security and foreign policy interests. For those reasons, the balance of equities and the public interest weigh strongly against granting preliminary relief.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction and dismiss Plaintiffs' Complaint.

Dated: New York, New York
      July 30, 2026

      Respectfully submitted,

      JAMES M. MCDONALD
      United States Attorney for the
      Southern District of New York
      *Attorney for Defendants*

By:   */s/ Danielle J. Marryshow*
      DANIELLE J. MARRYSHOW
      MARK OSMOND
      Assistant United States Attorneys
      86 Chambers Street, 3rd Floor
      New York, New York 10007
      Tel: (212) 637-2689/2713

30

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies that this memorandum complies with the Court's July 2, 2026 Order, Dkt. No. 35, granting the parties leave to exceed Local Rule 7.1(c)'s word-count limitation. As measured by the word processing system used to prepare it, this memorandum contains 9,785 words.

/s/ Danielle J. Marryshow
Assistant United States Attorney