# EXHIBIT B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KIMBERLY PROST, SOLOMY BALUNGI BOSSA, and REINE ADELAIDE SOPHIE ALAPINI-GANSOU,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 26-cv-5305<br><br>**[PROPOSED] BRIEF OF AMICUS CURIAE, THE NATIONAL JEWISH ADVOCACY CENTER, IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

**STATEMENT OF INTEREST OF AMICUS CURIAE**

The National Jewish Advocacy Center (NJAC) is a non-profit legal organization dedicated to combating antisemitism and advocating for the rights of Jewish people through legal and public policy initiatives. NJAC addresses the rising tide of antisemitism through litigation, advocacy, and education, while also working to streamline legal efforts to protect the civil rights of Jewish individuals and communities across the United States. The ICC conduct to which Executive Order 14,203 responds directly affects American Jewish communities, as well as Israeli victims and citizens, and NJAC has a strong institutional interest in the practical consequences of the injunction Plaintiffs seek against the sanctions program. NJAC's proposed brief provides two perspectives not otherwise represented in the parties' submissions: the concrete interests of those communities, and an institutional perspective on the ICC's assertion of jurisdiction over nationals of states that

never consented to the Rome Statute. Congress itself addressed this issue in the very statute Plaintiffs invoke against the Executive Order.

The need for such perspectives is acute at this juncture. Plaintiffs have already marshaled substantial third-party support. A brief of former United States Ambassadors-at-Large and international criminal tribunal prosecutors was filed on July 22, 2026, in support of Plaintiffs' motion. (Br. of Former U.S. Ambassadors-at-Large for War Crimes Issues/Global Criminal Justice & Prosecutors of Int'l Criminal Tribunals as Amici Curiae in Supp. of Pls.' Mot. for Prelim. Inj., ECF No. 46.) An expert declaration of Harold Hongju Koh was submitted on Plaintiffs' behalf as well. (Decl. of Harold Hongju Koh ¶¶ 1–2, ECF No. 41.) No comparable amicus perspective has yet appeared on the other side of the motion. NJAC seeks leave to supply one.

No party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than amicus curiae and its counsel contributed money intended to fund the preparation or submission of this brief.[1]

## SUMMARY OF ARGUMENT

Three sitting judges of the International Criminal Court, citizens of Canada, Uganda, and Benin who reside in The Hague, Netherlands, ask this Court to invalidate targeted economic sanctions the President imposed on them under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1706, and Executive Order 14,203, 90 Fed. Reg. 9369 (Feb. 12, 2025). The Complaint pleads seven counts: three *ultra vires* theories under IEEPA, a Fifth Amendment due process claim, a Fifth Amendment takings claim, an Administrative Procedure

[1] Counsel for Plaintiffs has consented to the filing of this brief. Counsel for Defendants has not yet responded to a request for consent.

Act claim, and a claim for declaratory relief. Each count fails as a matter of law, and the defects are fundamental rather than curable by amendment.

First, Plaintiffs' constitutional claims face a threshold obstacle. It is "long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020). Constitutional protections extend to nonresident aliens only when they "have come within the territory of the United States and developed substantial connections with this country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (citation omitted). Judge Bossa alleges no connection to this country beyond a New York credit-union account. Judge Prost adds a United Nations posting in New York that ended in 2015 and past lectures at American universities. Neither alleges present residence, real property, or presence here. The D.C. Circuit has found the connection lacking where a designee's only domestic ties were post-office boxes and a bank account used to send funds abroad. Judge Bossa's allegations do not establish the substantial connections necessary to invoke the Fifth Amendment, while Judge Prost's allegations support, at most, a claim confined to her New York account. Any such property-specific claim fails on the merits for the reasons discussed below.

Second, even if Plaintiffs could invoke the Fifth Amendment as to their blocked accounts, the due process claim fails because post-deprivation process satisfies the Constitution where the Government must act quickly to prevent asset flight, and a contemporaneous statement of reasons plus administrative reconsideration provides all the process due. The takings claim fails because freezing assets is not a compensable taking; blocking does not transfer title, and valid regulatory measures serving substantial national security interests are not takings.

Third, the IEEPA ultra vires theories fail as a matter of statutory construction and separation of powers, and they fail as to every international-law source Count I invokes. Count I incorporates the Complaint's international-law allegations wholesale (Compl. ¶ 149), which rest on the U.N. Charter, the Geneva Conventions, the Genocide Convention, the International Covenant on Civil and Political Rights, customary international law, and the Rome Statute (Compl. ¶¶ 135–148). Each strand is answered by the same rule of construction on which Plaintiffs' theory depends. The *Charming Betsy* canon is only an interpretive presumption: it directs that a statute be read consistently with international law where fairly possible, and it yields whenever Congress has spoken clearly. IEEPA's authorization to block property is sweeping and unqualified, leaving no ambiguity for any international law canon to fill; because the statute is clear, *Charming Betsy* resolves every strand of Count I in the Government's favor rather than against it. The distinct character of each source only reinforces that conclusion. The Rome Statute is unratified and creates no domestic law. The U.N. Charter, the Genocide Convention, the Geneva Conventions, and the Covenant, even as ratified treaties, are non-self-executing and cannot displace a clear, later-enacted exercise of statutory authority. And customary international law cannot override a controlling statute or executive act. The President's national-emergency and threat determinations are, in any event, entrusted to the political branches and are largely immune from judicial second-guessing, and the American Servicemembers' Protection Act does not repeal IEEPA by implication. Because every federal claim fails, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and declaratory-judgment counts fail with them, and the Complaint should be dismissed.

## ARGUMENT

### I. PLAINTIFFS CANNOT INVOKE THE FIFTH AMENDMENT TO CHALLENGE THEIR DESIGNATIONS BASED ON THE CONNECTIONS ALLEGED.

Counts IV and V are brought only by Judges Prost and Bossa. Although they allege that the sanctions blocked their New York bank accounts, those allegations do not establish the substantial voluntary connections to the United States necessary for nonresident aliens to invoke the Fifth Amendment.

**A. The Governing Rule: Nonresident Aliens Abroad Do Not Possess Constitutional Rights Absent Substantial Voluntary Connections to the United States.**

The Supreme Court has drawn a clear line. The phrase "the people" in the Bill of Rights "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Verdugo-Urquidez*, 494 U.S. at 265 (citation omitted). Cases recognizing constitutional protections for aliens "establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Id.* at 271 (citation omitted). The Court reaffirmed this rule categorically in 2020: "it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." Agency for Int'l Dev., 591 U.S. at 433. The Court warned that a contrary rule would mean that "actions by American military, intelligence, and law enforcement personnel against foreign organizations or foreign citizens in foreign countries would be constrained by the foreign citizens' purported rights under the U.S. Constitution." *Id.* at 434.

The *Verdugo-Urquidez* test is conjunctive: the alien must both enter U.S. territory and develop substantial connections here. As the D.C. Circuit recently emphasized in a challenge to a designation under the very Executive Order at issue in this case, the formulation "means only that 'foreign citizens *in the United States* may enjoy certain constitutional rights.'" *Cali v. Trump*, No. 26-5172, 2026 WL 1765953, at *4 (D.C. Cir. June 15, 2026) (Katsas, J., joined by Henderson, J.,

concurring) (quoting *Agency for Int'l Dev.*, 591 U.S. at 434) (emphasis in original). *National Council of Resistance of Iran v. Department of State* read the same sentence more generously, faulting the Government for inserting the word "only" and declining to decide "how 'substantial' an alien's connections with this country must be." 251 F.3d 192, 201–02 (D.C. Cir. 2001). But *National Council* kept the territorial element. It found the test satisfied because the petitioners could "rightly lay claim to having come within the territory of the United States," *id.* at 202, on the strength of an office in the National Press Building and a bank account. An alien who has never come within the territory has nothing to which the second half of the test can attach, and the Supreme Court's 2020 restatement forecloses a looser reading: foreign citizens "outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev.*, 591 U.S. at 433.

**B. Plaintiffs Prost's and Bossa's New York Accounts Do Not Establish the Substantial Connections Required to Invoke the Fifth Amendment**

The Complaint alleges that both reside abroad and that the sanctions froze their New York accounts. (Compl. ¶¶ 13–15, 132(a), 133(a).) Judge Alapini-Gansou asserts no constitutional claim; the Complaint alleges only that her French account was affected. (Id. ¶ 134(a)). Neither Judge Prost nor Judge Bossa alleges present residence, real property, or presence in the United States. Judge Bossa alleges nothing beyond a credit-union account she has held since 2003. (*Id.* ¶ 133(a).) Judge Prost alleges, as biography and as injury rather than as a basis for constitutional standing, that she served at United Nations headquarters in New York from 2010 to 2015 and had "previously and frequently spoken in the United States" at several universities. (*Id.* ¶¶ 105, 132(h)–(j).) Those allegations make the threshold question closer for Judge Prost than for Judge Bossa, and amicus does not pretend otherwise; the district court in the *Cali* litigation, discussed below, counted a residence that ended in 2015 among the connections it found sufficient. Even so, the

most those allegations can support is what Judge Katsas described: a claim confined to the property located here. They do not entitle Judge Prost to challenge the designation itself.

Judge Bossa's allegations do not establish the substantial connections the Constitution requires, and Judge Prost's establish at most a property-specific claim. The Fifth Amendment's protections extend to aliens only once they "have come within the territory of the United States and developed substantial connections with this country," and not to a foreign national whose ties reflect "no previous significant voluntary connection with the United States." *Verdugo-Urquidez*, 494 U.S. at 271; *see also Agency for Int'l Dev.*, 591 U.S. at 433 (2020) (reaffirming "that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution.").

Plaintiffs Prost and Bossa allege that they personally maintained deposit accounts at New York banks and that the Government blocked those accounts. That is a more direct tie to U.S. property than the connection rejected in *32 County Sovereignty Committee v. Department of State*, 292 F.3d 797, 799 (D.C. Cir. 2002), where American members' rental of post-office boxes and use of a bank account to transmit funds abroad did not show that the designated entities "possessed any controlling interest in property located within the United States." *Id.* at 799–800.[2] But a blocked bank account, standing alone, does not amount to the "substantial connections" or "significant voluntary connection" that *Verdugo-Urquidez* requires before a nonresident foreign national may invoke the Fifth Amendment. The existence of a frozen New York account does not transform Plaintiffs, foreign nationals who reside and work abroad, into members of the national community entitled to challenge their designations as such.

In *32 County Sovereignty*, the court contrasted the petitioners' limited contacts with those alleged in *National Council*, where the designees had "an overt presence within the National Press

---

[2] *32 County Sovereignty* and several other cases in the brief come from the D.C. Circuit, which decides most such challenges and whose decisions, though not binding, are persuasive here.

Building" in addition to "an interest in a small bank account[,]" 251 F.3d at 201. *National Council* thus required presence in addition to property, and it expressly declined to say how substantial an alien's connections must be. *Id.* at 201–02. Prost and Bossa allege the account without the presence. Their own deposit accounts are a closer tie than the *32 County* petitioners' fund-transmission conduits, but the D.C. Circuit has never held that a bank account alone makes a nonresident alien a member of the national community entitled to challenge a designation as such. *See People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) (putting "to one side situations in which an organization's bank deposits were seized as a result of the Secretary's designation").

The decision in *L.C. ex rel. Cali v. Trump* confirms the point. The district court found "substantial connections" because the designated individual had lived in the United States from 2012 to 2015, owned property in Washington, D.C., held a U.S. mortgage, paid U.S. property taxes, had a U.S.-citizen daughter, had been affiliated with American universities, and traveled here regularly for professional and speaking engagements. No. 1:26-cv-00688 (RJL), 2026 WL 1329750, at *5, 8 (D.D.C. May 13, 2026).

The D.C. Circuit then stayed that injunction in substantial part, permitting the Government to implement and enforce the designation, with Judge Katsas, joined by Judge Henderson, explaining that even property ownership might at most support a narrow Fifth Amendment challenge tied to the specific encumbered property and "would involve no extraterritorial application of the Bill of Rights." *Cali,* 2026 WL 1765953, at *5 (Katsas, J., joined by Henderson, J., concurring). Unlike Plaintiffs, the designee in *Cali* maintained substantial additional ties to the United States, including ownership of real property in Washington, D.C., a U.S. mortgage, payment of U.S. property taxes, and a U.S.-citizen daughter. Neither Plaintiff alleges comparable

connections, and their New York bank accounts alone do not establish the substantial connections necessary to challenge their designations as such. Whether an alien has sufficient connections is a "fact-dependent, case-by-case assessment," *Olenga v. Gacki*, 507 F. Supp. 3d 260, 274 (D.D.C. 2020). Judge Katsas also acknowledged what the district court had gotten right: aliens "may invoke the Fifth Amendment to safeguard their property interests located in the United States." *Cali*, 2026 WL 1765953, at *5 (Katsas, J., joined by Henderson, J., concurring) (citing *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 489, 492 (1931)). Amicus does not contend otherwise, and the concession is a narrow one. A New York account may give Prost and Bossa a claim about the account. It does not make them members of the national community entitled to challenge the designation itself, and it does nothing for Judge Alapini-Gansou, who alleges no U.S. property at all. The account-specific claim then fails on its own terms for the reasons given in Parts II and III. Counts IV and V should therefore be dismissed.

## II. EVEN IF PLAINTIFFS COULD INVOKE THE FIFTH AMENDMENT, THE DUE PROCESS CLAIM FAILS BECAUSE POST-DEPRIVATION PROCESS AND A CONTEMPORANEOUS STATEMENT OF REASONS SATISFY THE CONSTITUTION.

Should the Court reach the merits of the due process claim (Count IV), it fails independently. The measure of process due for an asset-blocking designation is the three-factor test of *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976), which the D.C. Circuit applies to asset-blocking designations. *See, e.g.*, *Fares v. Smith*, 901 F.3d 315, 323 (D.C. Cir. 2018). That test weighs (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation through the procedures used and the probable value of any additional safeguards; and (3) the Government's interest, including the function involved and the burdens that added

procedures would impose. On balance, those factors confirm that the process afforded was constitutionally adequate.

The first factor weighs in Plaintiffs' favor but is not dispositive. Plaintiffs allege that the sanctions blocked their New York bank accounts, and the designation's effect on private interests may be significant. But under *Mathews* and *Fares*, a weighty private interest does not by itself establish a due process violation; it is only the first of three factors. The second factor does not establish a due process violation. Plaintiffs' theory is that Defendants failed to provide fair notice of the basis and reasons for the sanctions. But the Complaint alleges that the Government publicly identified the specific ground for each designation, namely that Prost and Bossa were sanctioned for authorizing the ICC's investigation into U.S. personnel in Afghanistan. Although that notice may not have disclosed all of the evidence supporting the designations, Plaintiffs also had access to OFAC's administrative-reconsideration process. Plaintiffs do not identify an additional procedural safeguard that would materially reduce the risk of error. Their allegation that the Government lacks substantial evidence connecting each judge to the sanctioned conduct is a disagreement with the merits of the designations, not itself a procedural deficiency. The third factor decisively favors Defendants. Designations under IEEPA implicate the Executive's core national-security and foreign-affairs functions, and Plaintiffs identify no additional procedure whose incremental value would justify burdening those functions. Accordingly, Count IV fails as a matter of law.

Two settled principles independently defeat Count IV. First, the Government need not provide pre-deprivation notice where advance warning would enable asset flight; "[p]ost-deprivation process satisfies due process if the government must act quickly." *Lopez Bello v. Gacki*, 94 F.4th 1067, 1074 (D.C. Cir. 2024); *accord Zevallos v. Obama*, 793 F.3d 106, 116 (D.C.

Cir. 2015) (providing notice before blocking assets "would create a substantial risk of asset flight"). Second, due process is satisfied where the Government furnishes the unclassified basis for the designation and an opportunity to respond, including through administrative reconsideration. In *Holy Land Foundation for Relief & Development v. Ashcroft*, the court held that Treasury "provided [the designee] with the requisite notice and opportunity for response necessary to satisfy due process requirements[,]" and confirmed the Government may rely on "a broad range of evidence, including intelligence data and hearsay declarations." 333 F.3d 156, 164, 162 (D.C. Cir. 2003). Notice that supplies the facts of the allegations ensures the designee is not "forced to stumble towards a moving target." *Zevallos*, 793 F.3d at 118.

## **III. THE TAKINGS CLAIM FAILS BECAUSE BLOCKING ASSETS IS NOT A COMPENSABLE TAKING.**

Count V alleges that blocking Plaintiffs' New York accounts effected a taking without just compensation. It fails because a freeze is not a taking. The governing distinction is between blocking and vesting: "Vesting occurs when title to assets is transferred to the government; blocking does not transfer title but rather prohibits temporarily, transactions involving those assets." *Tran Qui Than v. Regan*, 658 F.2d 1296, 1304 (9th Cir. 1981). A blocking program therefore "does not constitute a constitutionally cognizable taking without just compensation." *Id.*

The Federal Circuit has applied that principle directly to IEEPA-based sanctions, holding that "valid regulatory measures taken to serve substantial national security interests may adversely affect individual contract-based interests and expectations, but those effects have not been recognized as compensable takings for Fifth Amendment purposes." *Paradissiotis v. United States*, 304 F.3d 1271, 1275 (Fed. Cir. 2002). As that court explained, "[e]conomic sanctions would hardly be sanctions if the foreign targets of the sanctions could simply stand in line to be

compensated for the losses those sanctions caused them." *Id.* The Federal Circuit reaffirmed *Paradissiotis* as recently as 2024 in the context of modern OFAC sanctions under a current executive order. *See Tindall v. United States*, No. 2024-1143, 2024 WL 960452, at *3 (Fed. Cir. Mar. 6, 2024) (nonprecedential), *cert. denied*, 145 S. Ct. 282 (2024). The Seventh Circuit is in accord: if a freeze is sustained on the merits, the designee "does not have any grievance," and any takings remedy in any event lies under the Tucker Act in the Court of Federal Claims, not in a district-court challenge to the designation. *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 754 (7th Cir. 2002).

The Complaint alleges that the sanctions froze the U.S. bank accounts of Judges Prost and Bossa, impaired Judge Alapini-Gansou's French bank account, and disrupted each of the Plaintiffs' access to banking, credit, and related services (Compl. ¶¶ 132-134), but it does not allege that title to any asset passed to the United States. A temporary freeze that leaves title intact is not a taking, and to the extent Plaintiffs seek just compensation, that claim belongs in the Court of Federal Claims, not here. Count V should be dismissed.

## IV. THE IEEPA *ULTRA VIRES* CLAIMS FAIL BECAUSE THE STATUTE PLAINLY AUTHORIZES THE SANCTIONS AND INTERNATIONAL LAW CANNOT OVERRIDE A CONTROLLING STATUTE.

Counts I through III attack the sanctions as exceeding the authority IEEPA delegates to the President. Each fails.

### A. IEEPA's Plain Text Authorizes the Blocking of Foreign Nationals' Property, Leaving No Room for Any International-Law Canon (Count I).

Count I asserts that the sanctions are *ultra vires* because they allegedly violate international law. (Compl. ¶¶ 149-153.) The premise misunderstands both IEEPA and the canon it invokes.

IEEPA authorizes the President to "nullify, void, prevent or prohibit . . . exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). "The language of IEEPA is sweeping and unqualified." *Charles T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*, 651 F.2d 800, 806–07 (1st Cir. 1981); *accord Dames & Moore v. Regan*, 453 U.S. 654, 671–72 (1981). Plaintiffs are foreign nationals, and their New York accounts are property in which a national of a foreign country has an interest. The statute reaches them by its terms.

The Charming Betsy canon, on which Plaintiffs' international-law theory depends, requires ambiguous legislation to be interpreted consistently with international law. However, the canon "comes into play only where Congress's intent is ambiguous." *Guaylupo-Moya v. Gonzales*, 423 F.3d 121, 135 (2d Cir. 2005) (quoting *United States v. Yousef*, 327 F.3d 56, 92–93 (2d Cir. 2003)). Where a statute is clear, "Article III courts . . . must enforce the intent of Congress irrespective of whether the statute conforms to customary international law[,]" because "clear congressional action trumps customary international law and previously enacted treaties." *Id.* at 136 (quoting *Yousef*, 327 F.3d at 93). Binding Second Circuit law thus forecloses Count I: IEEPA's unambiguous authorization to block property leaves nothing for the canon to construe.

**B. No Treaty or Norm Plaintiffs Invoke Supplies a Domestic Rule of Decision Capable of Invalidating the Sanctions.**

Plaintiffs' international-law theory rests on instruments and norms that create no judicially enforceable domestic law here. A non-self-executing treaty is "not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms." *Medellín v. Texas*, 552 U.S. 491, 505 (2008)

(quoting *Igartúa-De La Rosa v. United States*, 417 F.3d 145, 150 (1st Cir. 2005) (en banc) (Boudin, C. J.)).

The Genocide Convention and the Geneva Conventions illustrate the rule. Congress implemented the Genocide Convention through a criminal statute that disclaims any private right: nothing in it may "be construed as creating any substantive or procedural right enforceable by law by any party in any proceeding." 18 U.S.C. § 1092. As to the Geneva Conventions, Congress has spoken in terms that end the inquiry: "[n]o person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States, or a current or former officer, employee, member of the Armed Forces, or other agent of the United States is a party as a source of rights in any court of the United States or its States or territories." 28 U.S.C. § 2241 note (Treaty Obligations Not Establishing Grounds for Certain Claims). This is a civil action against officers and agencies of the United States. Neither Convention supplies Plaintiffs a rule of decision.

Plaintiffs' remaining treaty sources fail the same way. The International Covenant on Civil and Political Rights binds the United States internationally, but "the United States ratified the Covenant on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004). And the U.N. Charter's undertakings run to governments. The Supreme Court held that Article 94, which commits each member to comply with judgments of the International Court of Justice, "is not a directive to domestic courts," *Medellín*, 552 U.S. at 508; Articles 2(5) and 25, on which Plaintiffs rely (Compl. ¶ 136), are undertakings of the same kind, addressed to the political branches and enforceable, if at all, by them.

The United States never ratified the Rome Statute, which established the ICC; *a fortiori*, it cannot supply a domestic-law rule of decision that overrides a federal statute. As to customary international law, the D.C. Circuit has squarely held that "under domestic law, statutes supersede customary international law[]" and that "no enactment of Congress can be challenged on the ground that it violates customary international law." *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939 (D.C. Cir. 1988). "International-law norms that have not been incorporated into domestic U.S. law by the political branches are not judicially enforceable limits on the President's authority under the AUMF." *Al-Bihani v. Obama*, 619 F.3d 1, 10 (D.C. Cir. 2010) (Kavanaugh, J., concurring in denial of rehearing en banc). The same is true of the President's authority under IEEPA. Count I asks this Court to hold that a foreign tribunal's authority and unincorporated international norms outrank an Act of Congress. That is not the law.

**C. The National-Emergency and "Unusual and Extraordinary Threat" Determinations Are Committed to the Political Branches (Count III).**

Count III alleges that no genuine national emergency or "unusual and extraordinary threat" supports the Executive Order. (Compl. ¶¶ 156-161.) But "federal courts have historically declined to review the essentially political questions surrounding the declaration or continuance of a national emergency." *United States v. Amirnazmi*, 645 F.3d 564, 581 (3d Cir. 2011) (quoting *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1080 (9th Cir. 1982)). Matters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Regan v. Wald*, 468 U.S. 222, 242 (1984) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)). The Court in *Regan v. Wald* refused to demand a crisis of any particular magnitude, observing that the

respondents "apparently feel that only a Cuban missile crisis in the offing" would do, and sustained the President's judgment under "the traditional deference to executive judgment '[i]n this vast external realm.'" *Id.* at 242–43 (quoting *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936)). Congress also built the standard into IEEPA itself, which "meaningfully constrains" the President by requiring a declared emergency and a foreign-origin "unusual and extraordinary threat," *Amirnazmi*, 645 F.3d at 576; the existence of that statutory standard is not an invitation for courts to re-weigh the President's foreign-policy judgment. Nor is the President's judgment an idiosyncratic one. Congress made the same judgment in the very statute Plaintiffs invoke in Count II, finding that "a treaty is binding upon its parties only and that it does not create obligations for nonparties without their consent to be bound," that "[t]he United States is not a party to the Rome Statute and will not be bound by any of its terms," and that "[t]he United States will not recognize the jurisdiction of the International Criminal Court over United States nationals." 22 U.S.C. § 7421(11). A court asked to decide whether the ICC's exercise of exactly that jurisdiction is an "unusual and extraordinary threat" would be second-guessing the concurrent judgment of both political branches.

**D. The American Servicemembers' Protection Act Does Not Displace IEEPA (Count II).**

Count II asserts that the Executive Order conflicts with the American Servicemembers' Protection Act ("ASPA"), 22 U.S.C. §§ 7421–7433. (Compl. ¶¶ 154-155.) That theory cannot be squared with settled principles governing statutory interplay. Repeals by implication are not favored, and "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974). The two statutes address different tools: the ASPA

constrains U.S. *cooperation* with the ICC, while IEEPA authorizes *sanctions*; nothing in the ASPA prohibits the President from exercising IEEPA authority as to ICC-affiliated persons, and the statute's text points the other way. Congress authorized the President "to use all means necessary and appropriate to bring about the release" of Americans and allied personnel detained by or on behalf of the ICC. 22 U.S.C. § 7427(a). A statute that contemplates that response to the ICC's assertion of jurisdiction over Americans cannot be read to forbid the far milder step of blocking the assets of the officials who authorize it. Plaintiffs read the proviso that this authority "does not authorize the payment of bribes or the provision of other such incentives to induce the release" of a detainee, 22 U.S.C. § 7427(d), as a congressional ban on economic pressure against the Court, and they invoke *expressio unius* to convert the ASPA's enumerated restrictions into a repeal of IEEPA. (Pls.' Mem. of Law in Supp. of Mot. for Prelim. Inj. 38–42, ECF No. 37.) A clause that forbids the United States to pay bribes does not forbid it to block assets; the two measures run in opposite directions. And an inference of exclusion drawn from one statute cannot repeal a delegation Congress made in another without the "clear and manifest" intention *Mancari* demands. 417 U.S. at 551. Where the President acts pursuant to IEEPA's express authorization, his action is "'supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion . . . rest[s] heavily upon any who might attack it.'" *Dames & Moore*, 453 U.S. at 674 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)). And congressional silence in the foreign-affairs and national-security context does not "imply 'congressional disapproval' of action taken by the Executive." *Id.* at 678 (quoting *Haig v. Agee*, 453 U.S. 280, 291 (1981)). Count II identifies no provision of the ASPA that withdraws the sweeping authority IEEPA confers, and it should be dismissed.

**E. The Supreme Court's 2026 IEEPA Decision Confirms That Sanctions and Asset-Blocking Remain Squarely Authorized.**

In February 2026, the Supreme Court held that IEEPA does not authorize the President to impose *tariffs*. *Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026). That holding does not aid Plaintiffs. To the contrary, the Court expressly distinguished IEEPA's sanctions and blocking authorities from the tariff power it rejected, explaining that the statute's operative verbs "authoriz[e] a distinct action a President might take in sanctioning foreign actors or controlling domestic actors engaged in foreign commerce—blocking imports, for example, or prohibiting transactions." *Id.* at 250. The blocking of designated persons' property, the archetypal IEEPA sanction sustained in *Dames & Moore* and *Regan v. Wald*, remains firmly within the statute. The most recent word from the Supreme Court thus confirms, rather than undermines, the lawfulness of the sanctions Plaintiffs challenge.

## V. THE APA AND DECLARATORY-JUDGMENT COUNTS FAIL WITH THE UNDERLYING CLAIMS.

Review under 5 U.S.C. § 706(2)(A) is deferential and confined. Under this "narrow" standard of review, a "court is not empowered to substitute its judgment for that of the agency." *Town of Southold v. Wheeler*, 48 F.4th 67, 77 (2d Cir. 2022) (internal quotation marks omitted).

The Second Circuit has applied that standard to action taken by OFAC under authority conferred by the IEEPA, holding that "so long as the agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action, even a decision that is not perfectly clear, provided the agency's path to its conclusion may reasonably be discerned." *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007).

Consistent with that limited role, a court may set agency action aside only where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Deference is at its greatest where, as here, the challenged determination was made in the exercise of the Executive's foreign-affairs and national-security responsibilities: the Second Circuit "review[s] with great deference such executive branch determinations." *Karpova*, 497 F.3d at 269.

Count VI pleads an independent claim under the APA; Count VII seeks only declaratory relief. (Compl. ¶¶ 170-173.) Count VI alleges that the designations "were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (Compl. ¶ 171.) That is a restatement of the statutory standard, not an allegation of anything the agency did wrong. Reciting the elements of a claim does not state one. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The *State Farm* categories describe flaws in reasoning and process. A plaintiff who identifies none of them has not stated a claim, because the reviewing court is "not empowered to substitute its judgment for that of the agency." *Town of Southold*, 48 F.4th at 77 (internal quotation marks omitted).

Plaintiffs identify no such defect. The Complaint's only evidentiary allegations are that the State Department "has not presented, and upon information and belief does not possess, substantial evidence" as to each Plaintiff. (Compl. ¶¶ 111, 119, 126.) Those allegations do not assert that the agency weighed an impermissible factor, overlooked an important aspect of the problem,

explained itself in a manner contrary to the material before it, or acted implausibly. They assert instead, on information and belief, a conclusion about the strength of the agency's support. The Complaint itself supplies the facts on which the designations rest. It pleads that the Afghanistan investigation encompassed crimes "allegedly committed by the Taliban, Afghan security forces, and U.S. personnel"; that Judge Prost sat on the Appeals Chamber panel whose decision "authorized the Prosecutor to initiate the investigation"; that Judge Bossa "participated as a member of the Appeals Chamber panel" that "authorized the Prosecutor to investigate"; and that Judge Alapini-Gansou sat on the Pre-Trial Chamber that "issued warrants of arrest" for Benjamin Netanyahu and Yoav Gallant. (Compl. ¶¶ 109(a), (c), 117, 122–124.) What remains is a disagreement over whether a judge who authorizes an investigation or issues a warrant has "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute" a protected person. That disagreement concerns what the Executive Order means. The Complaint pleads no count contending that the designations exceed the Order's terms, and Count VI's one-sentence recital cannot carry a claim Plaintiffs did not plead. That is precisely the sort of unelaborated challenge the Second Circuit has declined to credit, rejecting objections advanced "without elaboration." *Town of Southold*, 48 F.4th at 84. Because the deficiency lies in what Plaintiffs have pleaded rather than in what any administrative record may contain, the Court need not look beyond the Complaint to resolve Count VI.

The legal premise of Count VI is independently mistaken. Plaintiffs' theory reduces to the proposition that a designation is unlawful unless the Government has publicly produced proof satisfying them. Nothing in the APA imposes that requirement, and the breadth of material on which a designating agency may act defeats the inference Plaintiffs ask the Court to draw. Although amicus has located no Second Circuit decision addressing the evidentiary standards

governing OFAC designations, the D.C. Circuit, which decides most such challenges, has held that "the government may decide to designate an entity based on a broad range of evidence, including intelligence data and hearsay declarations." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003). That court has likewise described such review as deferential to the agency, and "extremely deferential" for matters related to national security. *Diegelmann v. Bessent*, 181 F.4th 142, 145 (D.C. Cir. 2026) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734–35 (D.C. Cir. 2007)). Courts in this District apply the same deference to OFAC blocking actions. *See Rusaviainvest, OOO v. Yellen*, No. 18 Civ. 5676 (PGG) (S.D.N.Y. Sept. 21, 2023) ("Agency actions taken in the realm of national security and foreign affairs are entitled to heightened deference when subjected to judicial review under the APA."). Those decisions are not controlling in this Circuit, but they are consistent with the binding instruction that executive determinations of this character are reviewed "with great deference." *Karpova*, 497 F.3d at 269. On any of these formulations, an allegation that the Government has not publicly disclosed evidence satisfactory to Plaintiffs identifies no cognizable defect in the agency's decision-making.

Count VII adds nothing. It seeks a declaration that the Sanctions Regime is ultra vires, violates the APA, and violates the Fifth Amendment. (Compl. ¶¶ 172-173.) It is wholly derivative of Counts I through VI and rises and falls with them. Because those counts fail for the reasons set out above, the declaratory-judgment count fails for the same reasons.

Counts VI and VII should be dismissed.

## CONCLUSION

For the foregoing reasons, amicus curiae respectfully submits that the Complaint should be dismissed in its entirety.

Dated: October 15, 2026

Respectfully submitted,

*/s/ David J. Benger*
David J. Benger
Mark Goldfeder
Bencion Schlager
NATIONAL JEWISH ADVOCACY CENTER
3 Times Square, Suite 512
New York, NY 10036
David@njaclaw.org
Mark@njaclaw.org
Ben@njaclaw.org

*Attorneys for Amicus Curiae,* NATIONAL JEWISH ADVOCACY CENTER