UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUDGE KIMBERLY PROST et al., Plaintiffs, -v- PRESIDENT DONALD J. TRUMP, *in his official capacity as President of the United States*, et al., Defendants. | 26-CV-5305 (JMF) <br> OPINION AND ORDER |

JESSE M. FURMAN, United States District Judge:

In early 2025, invoking his authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq.*, President Donald J. Trump issued Executive Order 14,203 imposing sanctions on certain people associated with the International Criminal Court or "ICC." The Executive Order declared a national emergency with respect to "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons," defined to include "any United States person, unless the United States provides formal consent to ICC jurisdiction over that person or becomes a state party to the Rome Statute," and "any foreign person that is a citizen or lawful resident of an ally of the United States that has not consented to ICC jurisdiction over that person or is not a state party to the Rome Statute." Exec. Order No. 14,203 of Feb. 6, 2025, 90 Fed. Reg. 9369, 9369-71 (published Feb. 12, 2025); *see* ECF No. 1 ("Compl."), ¶ 95. And it authorized the Secretary of State to designate for sanctions any foreign person the Secretary determined to be "directly engaged in" such an effort. 90 Fed. Reg. at 9370; *see* Compl. ¶ 98. Exercising that authority, Secretary of State Marco A. Rubio has designated for sanctions various people and organizations, including several judges of the ICC.

In this case, brought against President Trump and various others, three of those ICC judges — Judges Kimberly Prost, Solomy Balungi Bossa, and Reine Adelaide Sophie Alapini-Gansou, nationals of Canada, Uganda, and Benin, respectively — challenge Executive Order 14,203, their designations by the Secretary of State, and the sanctions imposed on them. The case is one of four before this Court involving challenges to Executive Order 14,203 and actions taken pursuant to it. In two of the other cases, brought by organizations and people involved in matters pending before the ICC, the Court previously held that certain portions of the Executive Order violated the First Amendment rights of the plaintiffs because they constituted content-based regulations of their speech-based activities and did not survive strict scrutiny. *See Democracy for the Arab World Now, Inc. v. Trump*, No. 26-CV-5957 (JMF), 2026 WL 3061877, at *7-9 (S.D.N.Y. Oct. 13, 2026) ("*DAWN*"); *Rona v. Trump*, 797 F. Supp. 3d 278, 282, 287-93 (S.D.N.Y. 2025).[1] The challenges brought here, however, are fundamentally different from the challenges brought in those cases. Judges Prost, Bossa, and Alapini-Gansou do not bring First Amendment claims. Nor do they challenge only portions of the Executive Order. In their broadest form, Plaintiffs' challenges are to what they call the "Sanctions Regime" — namely, Executive Order 14,203 and its implementing regulations — in its entirety. They argue, among other things, that the President exceeded his powers under IEEPA when he issued Executive Order 14,203; that certain sanctions imposed on Judges Prost and Bossa specifically violated

[1] The fourth case, *American Friends Service Committee v. Trump*, No. 26-CV-6830 (S.D.N.Y. filed Aug. 11, 2026), is pending. *Rona* and *DAWN* were sequels, of sorts, to an earlier case in this District, in which a group of plaintiffs challenged a 2020 Executive Order issued by President Trump during his first term that was a precursor to Executive Order 14,203. In that case, the Honorable Katherine Polk Failla concluded the plaintiffs were likely to succeed on the merits of their claim that the 2020 Executive Order violated their First Amendment rights and preliminarily enjoined the Government from enforcing the 2020 Executive Order against the plaintiffs. *See Open Soc'y Just. Initiative v. Trump*, 510 F. Supp. 3d 198, 209-13, 217 (S.D.N.Y. 2021).

their due process rights under the Fifth Amendment to the U.S. Constitution; and that their designations specifically were arbitrary and capricious and an abuse of discretion.

Now pending are two motions: Plaintiffs' motion, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction enjoining the Sanctions Regime as applied to them, *see* ECF No. 36 ("Pls.' Mot."); *see also* ECF No. 37 ("Pls.' Mem."), and Defendants' motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Complaint in its entirety for failure to state a claim, *see* ECF No. 50; *see also* ECF No. 51 ("Defs.' Opp'n"). Critically, these motions do not call upon the Court to decide whether Executive Order 14,203 specifically, or the Sanctions Regime generally, are wise or good policy. Plaintiffs (and amici) make many forceful arguments that they are not, in no small part because they are in tension, if not conflict, with well-established principles of international law to which the United States has long subscribed and treaties to which it has long adhered. Instead, the principal question presented is whether the Sanctions Regime is a lawful exercise of the powers that Congress granted the President in IEEPA. Mindful of the great deference that courts owe to the political branches in matters relating to foreign policy and national security, the Court concludes that it is — although the Court reserves judgment on whether the designations of, and sanctions against, Plaintiffs themselves were lawful. Accordingly, and for the reasons that follow, Defendants' motion to dismiss is GRANTED as to all but one of Plaintiffs' claims, and Plaintiffs' motion for a preliminary injunction is DENIED.

## BACKGROUND

The Court assumes familiarity with its prior opinions in *Rona* and *DAWN* but nevertheless recounts the facts relevant to this case.

**A. The ICC and the American Servicemembers' Protection Act**

The ICC is a treaty-based international tribunal in the Hague, Netherlands that is dedicated to the investigation and prosecution of genocide, crimes against humanity, war crimes, and other serious crimes. *See* Compl. ¶¶ 29-30. It was established by the Rome Statute of the International Criminal Court (the "Rome Statute"), which entered into force in 2002 and now has 125 States Parties. *See id.* ¶ 29; Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90. The Rome Statute sets forth rules on when cases can be heard, what law applies, how the Court is organized and run, and which legal procedures a country must follow to become an official State Party. *See* Compl. ¶¶ 28-58; Rome Statute pts. 1-13. A state that ratifies or accedes to the Rome Statute consents to the investigation and prosecution of crimes within the Court's jurisdiction that are alleged to have occurred on its territory or to have been committed by its nationals. *See* Compl. ¶ 31; Rome Statute art. 12(2). Neither the United States nor Israel is a State Party to the Rome Statute, and "[n]either country has ever recognized the ICC's jurisdiction." 90 Fed. Reg. at 9369; *see* Compl. ¶ 60. The United States signed the treaty in 2000 but never ratified it because of "concerns that the treaty could inhibit" some of its sovereign powers in the international sphere. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 119 n.16 (2d Cir. 2010), *aff'd*, 569 U.S. 108 (2013) (internal quotation marks omitted); *see* Compl. ¶ 59. In 2002, it informed the United Nations that it did not intend to become a party. *See Kiobel*, 621 F.3d at 119 n.16.

The Rome Statute divides responsibility for ICC proceedings between the Court's prosecutors and its judges. *See* Compl. ¶¶ 33-58. The Office of the Prosecutor ("OTP") conducts preliminary examinations, carries out investigations, and prosecutes cases before the Court. *See id.* ¶¶ 44-51. The Court's judicial work falls to its eighteen judges, who sit in three

Judicial Divisions: Pre-Trial, Trial, and Appeals. *See id.* ¶¶ 33-34. Within the Pre-Trial and Trial Divisions, the judges sit in chambers of three, and the membership of each chamber is generally fixed. *See id.* ¶ 40. Pre-Trial Chambers decide whether the OTP may open an investigation on its own initiative and review the OTP's applications for arrest warrants, whereas Trial Chambers conduct trials and impose sentences. *See id.* ¶¶ 41, 48, 53-54; Rome Statute arts. 57, 58, 64, 76. The Appeals Chamber, which consists of five judges, hears appeals from both. *See* Compl. ¶¶ 40-41; Rome Statute arts. 81-82. The Court's Presidency assigns each judge to a Division and each matter to a Chamber, and it may temporarily assign a Trial Division judge to an appeal when the Court's workload requires. *See* Compl. ¶¶ 38-40, 123.

In 2002, Congress enacted the American Servicemembers' Protection Act (the "ASPA"), 22 U.S.C. §§ 7421-7433, because of "fundamental concerns" that "United States armed forces operating overseas could be conceivably prosecuted by the international court even if the United States has not agreed to be bound by the treaty," *id.* §§ 7421(5)-(6). The ASPA emphasizes that "[t]he United States is not a party to the Rome Statute," "will not be bound by any of its terms," and "will not recognize [its] jurisdiction" over "United States nationals," such that "[m]embers of the Armed Forces of the United States should be free from the risk of prosecution by the [ICC]." *Id.* § 7421(8), (11). To these ends, the statute prohibits certain forms of cooperation with the Court — including responses to ICC requests, transmissions of letters rogatory, extraditions of U.S. persons, and other support or assistance — and it forbids any agent of the ICC from "conduct[ing], in the United States or any territory subject to the jurisdiction of the United States, any investigative activity relating to a preliminary inquiry, investigation, prosecution, or other proceeding at the [ICC]." *Id.* § 7423; *see also id.* §§ 7424-7425 (setting forth other restrictions and prohibitions). The ASPA also authorizes the President to "use all

means necessary and appropriate to bring about the release" of any "covered United States persons" or "covered allied persons" that are "detained or imprisoned by, on behalf of, or at the request of the [ICC]." *Id.* § 7427(a)-(b). That grant of authority includes "direct[ing] any agency of the United States Government to provide" legal representation, exculpatory evidence, or other defense through appearance in court, *id.* § 7427(c), but it explicitly excludes "the payment of bribes or the provision of other such incentives to induce the release" of covered persons, *id.* § 7427(d).

The designations at issue in this case stem from two ICC proceedings that the United States has opposed. *See* Compl. ¶ 81. The first is an investigation into crimes allegedly committed in Afghanistan, which is a State Party to the Rome Statute, by the Taliban, Afghan security forces, and United States personnel. *See id.* ¶ 82. A Pre-Trial Chamber declined to authorize the investigation in 2019, but on March 5, 2020, an Appeals Chamber panel that included Judges Prost and Bossa unanimously reversed. *See id.* ¶¶ 109, 117. The Prosecutor later announced that he would "deprioritise" the part of the investigation that involves allegations against United States personnel, and no application for a warrant against any such personnel has been announced. *See id.* ¶ 82. The second is an investigation into alleged crimes in Palestine, which is also a State Party. *See id.* ¶ 83. On November 21, 2024, Pre-Trial Chamber I, on which Judge Alapini-Gansou sits, issued arrest warrants for Israeli Prime Minister Benjamin Netanyahu and former Minister of Defense Yoav Gallant, as well as a senior Hamas official. *See id.* ¶¶ 83, 122-24. In opposition, the United States filed an amicus submission that questioned the Court's jurisdiction, and a jurisdictional challenge by Israel remains pending. *See id.* ¶ 83.

**B. IEEPA and Executive Order 14,203**

IEEPA authorizes the President, upon declaring a national emergency, to "investigate, block . . . regulate . . . or prohibit" transactions involving "any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. §§ 1701(a), 1702(a)(1)(B). Those powers "may only be exercised to deal with an unusual and extraordinary threat . . . and may not be exercised for any other purpose." *Id.* § 1701(b). The statute also states that the threat must "ha[ve] its source in whole or substantial part outside the United States" and "be to the national security, foreign policy, or economy of the United States." *Id.* § 1701(a).

Generally, the President "exercise[s] this authority under IEEPA by issuing an executive order forbidding the dealing in property or interests in property of certain persons, and authorizing federal agencies to 'designate' those persons subject to such proscriptions." *Open Soc'y Just. Initiative v. Trump*, 510 F. Supp. 3d 198, 203 (S.D.N.Y. 2021). Persons designated under such an order are placed on the Specially Designated Nationals List ("SDN List"), which is maintained by the Treasury Department's Office of Foreign Assets Control ("OFAC"), *see* Compl. ¶¶ 1, 98, and violations of the order by either the designated individuals or others can result in significant civil or criminal penalties, *see* 50 U.S.C. § 1705(a)-(c); 90 Fed. Reg. 3687, 3688 (Jan. 15, 2025) (together providing that anyone who "violate[s], attempt[s] to violate, conspire[s] to violate, or cause[s] a violation of any license, order, regulation, or prohibition issued" under IEEPA faces civil penalties of up to the greater of $377,700 or twice the value of the underlying transaction, and that anyone who "willfully" commits, attempts, conspires toward, or aids and abets these unlawful acts faces criminal fines of up to $1,000,000 and imprisonment of up to twenty years). OFAC regulations provide that designated persons may seek

administrative reconsideration by presenting "arguments or evidence" that "the circumstances resulting in the sanction no longer apply" and may apply for specific licenses unblocking particular transactions. 31 C.F.R. §§ 501.801, 501.807(a).

As noted, in 2025 President Trump invoked his authority under IEEPA — along with the National Emergencies Act, the Immigration and Nationality Act of 1952, and 3 U.S.C. § 301 — to issue Executive Order 14,203, *Imposing Sanctions on the International Criminal Court*, 90 Fed. Reg. 9369 (issued Feb. 6, 2025). The Order finds that the ICC has "engaged in illegitimate and baseless actions targeting America and our close ally Israel," and it asserts that "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons" constitutes "an unusual and extraordinary threat." *Id.* at 9369-70. The Order points specifically to the proceedings into war crimes and crimes against humanity allegedly committed in Afghanistan and Palestine as grounds for sanctions. *See id.* at 9369 (asserting that "[t]he ICC has, without a legitimate basis, asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel, and has further abused its power by issuing baseless arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and Former Minister of Defense Yoav Gallant").

Section 1 of the Order blocks the property of "any foreign person determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General," to have: (A) "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality"; (B) "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity in subsection (a)(ii)(A) of this section or any person whose property or interests in property are blocked pursuant to this order"; or (C) been "owned

or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property or interests in property are blocked pursuant to this order." *Id.* at 9370, § 1(a)(ii). Section 3 of the Order prohibits "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any blocked person and "the receipt of any contribution or provision of funds, goods, or services from any such person." *Id.* § 3.

In July 2025, OFAC promulgated regulations implementing the Order. *See* 90 Fed. Reg. 28,012-21 (July 1, 2025), codified at 31 C.F.R. pt. 528. The regulations prohibit "[a]ll transactions prohibited pursuant to E.O. 14203" as well as "[a]ll transactions prohibited pursuant to any further Executive orders issued pursuant to the national emergency declared in E.O. 14203." 31 C.F.R. § 528.201. They also include provisions that authorize, among other things, certain legal services to designated persons. *See* 31 C.F.R. § 528.506 n.1 ("U.S. persons seeking administrative reconsideration or judicial review of their designation or the blocking of their property and interests in property may apply for a specific license from OFAC to authorize the release of certain blocked funds for the payment of professional fees and reimbursement of incurred expenses for the provision of such legal services where alternative funding sources are not available.").

**C. The Designations of, and Sanctions Against, Plaintiffs**

On June 5, 2025, Secretary of State Rubio designated Judges Bossa and Alapini-Gansou for sanctions "pursuant to Section 1(a)(ii)(A) of EO 14,203." Compl. ¶¶ 118-19, 125-26. On August 20, 2025, he designated Judge Prost pursuant to the same authority. *See id.* ¶¶ 110-11. On each occasion, the Department of State also issued a press release and fact sheet announcing the sanctions. *See* Defs.' Opp'n 6 n.1. The June 5, 2025 fact sheet stated that Judge Bossa had been designated because she "ruled to authorize the ICC's investigation against U.S. personnel in

Afghanistan," Compl. ¶ 118, and that Judge Alapini-Gansou had been designated because she "ruled to authorize the ICC's issuance of arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Minister of Defense Yoav Gallant," *id.* ¶ 125; *see also Press Statement: Imposing Sanctions in Response to the ICC's Illegitimate Actions Targeting the United States and Israel*, U.S. DEP'T OF STATE (June 5, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/06/imposing-sanctions-in-response-to-the-iccs-illegitimate-actions-targeting-the-united-states-and-israel [https://perma.cc/N4MT-SF79]. The August 20, 2025 fact sheet stated that Judge Prost had been designated "for ruling to authorize the ICC's investigation into U.S. personnel in Afghanistan." Compl. ¶ 110; *see also Press Statement: Imposing Further Sanctions in Response to the ICC's Ongoing Threat to Americans and Israelis*, U.S. DEP'T OF STATE (Aug. 20, 2025), https://www.state.gov/releases/2025/08/imposing-further-sanctions-in-response-to-the-iccs-ongoing-threat-to-americans-and-israelis-2 [https://perma.cc/AN7F-H2TK]. On March 6, 2026, the Department of State also published a "Public Notice" in the Federal Register containing a list of those who had earlier been designated and the legal basis for each designation. *See* 91 Fed. Reg. 11,117 (Mar. 6, 2026) ("Notice of Department of State Sanctions Action"). The entry for each judge states that she was "[d]esignated pursuant to section 1(a)(ii)(A) of E.O. 14203, for having directly engaged in any effort by the International Criminal Court (ICC) to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality." *Id.*

Plaintiffs allege that they received neither notice nor an opportunity to be heard before the sanctions took effect. *See* ECF No. 38 ("Prost Decl."), ¶ 36; ECF No. 39 ("Bossa Decl."), ¶ 33; ECF No. 40 ("Alapini-Gansou Decl."), ¶ 41; Compl. ¶¶ 165-66; *see also* 90 Fed. Reg. at 9372, § 9 (providing that "there need be no prior notice of a listing or determination" under the

Order). They further allege that the sanctions have caused "significant harm" to their finances, reputations, and other aspects of their personal and professional lives. Compl. ¶¶ 132-34; *see* Prost Decl. ¶¶ 38-41; Bossa Decl. ¶¶ 34-36; Alapini-Gansou Decl. ¶¶ 42-50. For instance, Judges Prost and Bossa maintain bank accounts in New York — at HSBC Bank USA and the United Nations Federal Credit Union, respectively — that have now been frozen. *See* Compl. ¶¶ 132-33; Prost Decl. ¶ 38; Bossa Decl. ¶ 34. Other banks and businesses, including some outside the United States, have similarly limited or ended their dealings with the three judges. *See* Prost Decl. ¶ 38; Bossa Decl. ¶ 35; Alapini-Gansou Decl. ¶ 47; Compl. ¶¶ 132-34. As a result, they can no longer use their credit cards, and Judges Prost and Alapini-Gansou attest that they are "in effect, without health insurance," because the insurer for the ICC's health plan will not pay their medical claims. Prost Decl. ¶¶ 38-39; *see* Compl. ¶¶ 132, 134; Bossa Decl. ¶¶ 34-35; Alapini-Gansou Decl. ¶¶ 47, 49. Additionally, Judges Prost and Bossa aver that they can no longer attend speaking engagements in the United States, and Judge Alapini-Gansou, who used to walk to work each day, reports that she must now be driven there as a security measure. *See* Compl. ¶¶ 132-34; Prost Decl. ¶ 40; Alapini-Gansou Decl. ¶ 43. Plaintiffs declare that, notwithstanding the sanctions, they continue to perform their judicial duties "faithfully" and "impartially." Prost Decl. ¶ 42; Bossa Decl. ¶ 38; Alapini-Gansou Decl. ¶ 51.

**D. This Lawsuit**

Plaintiffs name as Defendants President Trump, the Department of State, the Department of the Treasury, the Department of Justice, and OFAC, as well as the officials who head those agencies, to wit Secretary of State Rubio, Secretary of the Treasury Scott K. H. Bessent, Attorney General Todd Blanche, and OFAC Director Bradley T. Smith (collectively, the "Government"). *See* Compl. ¶¶ 16-24 (naming each official in his official capacity). They bring

seven counts and seek both declaratory and injunctive relief. First, Plaintiffs allege that the Sanctions Regime is *ultra vires* because it violates international law and treaty obligations of the United States (Count I), because it conflicts with the ASPA (Count II), and because the President did not have authority to impose sanctions under IEEPA (Count III). *Id.* ¶¶ 149-61. Next, Judges Prost and Bossa allege that the freezing of their New York bank accounts deprived them of due process (Count IV), *id.* ¶¶ 162-66, and constituted a taking without just compensation (Count V), *id.* ¶¶ 167-69. Finally, Plaintiffs allege that their designations violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) (Count VI), *id.* ¶¶ 170-71, and seek declaratory relief (Count VII), *id.* ¶¶ 172-73, Prayer for Relief ¶¶ A-C.

Plaintiffs now move for a preliminary injunction. *See* Pls.' Mot. 1; Pls.' Mem. 57. Specifically, Plaintiffs request an order that "enjoin[s] Defendants and their officers, directors, members, agents, servants, employees, and all others acting in concert . . . from implementing and enforcing [E.O. 14,203], its implementing regulations and all designations thereunder," and that "direct[s] Defendants Smith and OFAC to remove Plaintiffs from OFAC's Specially Designated Nationals List." Pls.' Mot. 1; *see* Pls.' Mem. 1, 57. The arguments in their supporting memorandum of law largely track the counts in their Complaint, except that their Fifth Amendment section focuses on their due-process claim and relegates their takings claim to a footnote. *See* Pls.' Mem. 53 n.21. The Government opposes Plaintiffs' motion and cross-moves, pursuant to Rule 12(b)(6), to dismiss the Complaint in its entirety. *See* ECF Nos. 50-51.

## LEGAL STANDARDS

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint and requires a court to determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018). A complaint that offers only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if the plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (describing a preliminary injunction as "one of the most drastic tools in the arsenal of judicial remedies"). "When 'a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction.'" *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (quoting *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016)); *see also New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020) (noting that "[w]here, as here, the government is a party to the suit, the final two factors" in the traditional, four-part *Winter* test — whether the balance of equities tips in the movant's favor, and whether an injunction is in the public interest — "merge" into one cohesive factor); *cf. Winter*, 555 U.S. at 20 (setting forth the traditional, four-part test). Ordinarily, "[a] showing of irreparable harm is

'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "[I]n cases alleging constitutional injury," however, "[l]ikelihood of success on the merits is . . . 'the dominant, if not the dispositive, factor'" because "a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm." *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (quoting *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)).

## DISCUSSION

The Court begins with the Government's motion to dismiss because, if it were granted, Plaintiffs' motion for a preliminary injunction would be moot. For the reasons that follow, the Court concludes that all but one of Plaintiffs' claims — namely, their APA claim — must be dismissed and that the one surviving claim does not support preliminary injunctive relief.

### A. The Government's Motion to Dismiss

As noted, Plaintiffs bring seven claims: three claims that the Sanctions Regime is *ultra vires* (Counts I through III); claims, on behalf of Judges Prost and Bossa, for violations of the Due Process Clause (Count IV) and the Takings Clause (Count V); a claim, against all Defendants other than President Trump, for violations of the APA (Count VI); and a claim for declaratory relief (Count VII). The Government moves to dismiss all of them.

#### 1. The *Ultra Vires* Claims (Counts I through III)

The Court will begin with Counts I through III, which argue that the Sanctions Regime exceeds Congress's delegation of authority under IEEPA — that is, it is *ultra vires* — in three respects. *See* Compl. ¶¶ 149-61; *see also* Pls.' Mem. 27. First, Plaintiffs contend that "[t]he

Sanctions Regime is *ultra vires* under IEEPA . . . because it conflicts with international law and the obligations of the United States thereunder." Compl. ¶ 153. Second, Plaintiffs allege that the Sanctions Regime "is *ultra vires* because it conflicts with other acts of Congress, to wit, *inter alia*, the American Service-Members' Protection Act." *Id.* ¶ 155. And third, Plaintiffs contend that the Sanctions Regime "is *ultra vires*" because Executive Order 14,203 "is not based on a national emergency" or "an unusual and extraordinary threat, as required by IEEPA." *Id.* ¶¶ 160-161. The Court will address each of these theories, albeit in reverse order.

**a. Purported Lack of an Emergency Predicate**

The Court will begin with the third theory because it is the most straightforward: Plaintiffs argue that IEEPA, on its own terms, did not authorize the President to issue Executive Order 14,203. The President's sanctions authority under IEEPA, they note, "'may not be exercised for any . . . purpose' other than 'deal[ing] with an *unusual* and *extraordinary* threat' to the foreign policy interests of the United States 'with respect to which a *national emergency* has been declared.'" Pls.' Mem. 42 (quoting 50 U.S.C. § 1701(b)) (alterations in original) (emphases added). "[T]he Sanctions Regime is *ultra vires* under IEEPA," they argue, "because the ICC's exercise of jurisdiction over alleged international crimes, including with respect to nationals of non-States Parties to the Rome Statute, is neither 'unusual' nor 'extraordinary.'" *Id.* at 43. It is not "unusual" because "both [Afghanistan and Palestine] have acceded to the Rome Statute," the ICC "has routinely exercised such territorial jurisdiction since its inception," and the United States has previously supported such exercises of territorial jurisdiction. *Id.* at 44. And it is not "extraordinary" because, as ASPA demonstrates, Congress has long "understood that the ICC could exercise jurisdiction over nationals of non-States Parties to the Rome Statute." *Id.* at 45.

Plaintiffs are correct that Section 1701(b) "meaningfully constrains the President's discretion." *United States v. Dhafir*, 461 F.3d 211, 216 (2d Cir. 2006) (cleaned up). Tellingly, however, Plaintiffs do not cite, and the Court has not found, a single case in IEEPA's fifty-year history in which a court has invalidated an emergency declaration or a sanctions designation on the ground that the underlying threat was insufficiently "unusual" or "extraordinary." *See* Pls.' Mem. 42-47; ECF Nos. 60-61 ("Pls.' Reply"), at 11-14.[2] No doubt, that is due in no small part to the "great deference" courts owe to the President when he "act[s] in the area of foreign policy pursuant to congressional authorization," as he did here. *Karpova v. Snow*, 497 F.3d 262, 270 (2d Cir. 2007). Indeed, "[t]he Supreme Court has held that matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *United States v. Nejad*, No. 18-CR-224 (AJN), 2019 WL 6702361, at *11 (S.D.N.Y. Dec. 6, 2019) (Nathan, J.) (quoting *United States v. Amirnazmi*, 645 F.3d 564, 581 (3d Cir. 2011), itself quoting *Haig v. Agee*, 453 U.S. 280, 292 (1981)).

[2] Plaintiffs rely on *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025), *aff'd in part, vacated in part sub nom. V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) (en banc), *aff'd sub nom. Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026). *See* Pls.' Mem. 42-44; Pls.' Reply 12. There, the Court of International Trade set aside two sets of tariffs — the "Worldwide and Retaliatory Tariffs" and the "Trafficking Tariffs" — that President Trump had imposed pursuant to IEEPA. *V.O.S. Selections*, 772 F. Supp. 3d at 1358, 1363-64. But the court did not hold that the threats invoked by the President were insufficiently "unusual" or "extraordinary." *See id.* at 1370, 1383 (summarizing the two grounds for the court's ruling). The plaintiffs in *V.O.S. Selections* made the unusual-or-extraordinary argument only as to the Worldwide and Retaliatory Tariffs, *see id.* at 1376-77, and the court declined to address it, having concluded that those tariffs were unlawful on another ground — namely, that they "respond[ed] to an imbalance in trade" and so were subject to the more restrictive conditions set forth in a separate statute, *id.* at 1375, 1377 n.12, 1383. As to the Trafficking Tariffs, the plaintiffs did not make the unusual-or-extraordinary argument at all; instead, the court held that the tariffs "do not deal with the threats set forth in" the orders that imposed them. *Id.* at 1380 & n.14, 1383. The Supreme Court ultimately affirmed on the ground that "IEEPA does not authorize the President to impose tariffs" at all, and thus did not address whether the threats at issue were unusual and extraordinary. *Learning Res.*, 607 U.S. at 255.

In fact, the deference here is owed not only to the President but also to Congress. For one thing, in issuing Executive Order 14,203, the President was acting pursuant to an express authorization from Congress, so his acts — in Justice Jackson's famous formulation — are "supported by the strongest of presumptions and the widest latitude of judicial interpretation." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). On top of that, however, "Congress built into the IEEPA a check on the emergency economic powers the statute endows the President with: Congress may vote to terminate the national emergency, thereby extinguishing the emergency economic powers authorized pursuant to it." *Nejad*, 2019 WL 6702361, at *11 (citing 50 U.S.C. §§ 1622(b), 1706(b)). In that sense, judgments under IEEPA are attributable not only to the President but also to Congress, underscoring the need for judicial deference. *See Regan v. Wald*, 468 U.S. 222, 242 (1984) (citing the deference owed to the political branches in rejecting a challenge to restrictions on travel to Cuba where the plaintiffs "argue[d] that there [wa]s no emergency . . . and that the relations between Cuba and the United States [we]re subject to only the normal tensions inherent in contemporary international affairs" (internal quotation marks omitted)).

"Mindful of the 'interrelated issues of foreign policy, congressional authorization, and statutorily mandated oversight' implicated by" this arrangement, the Court declines Plaintiffs' "invitation to second-guess Congress' *and* the Executive's judgment." *Nejad*, 2019 WL 6702361, at *11 (quoting *Amirnazmi*, 645 F.3d at 577). To be clear, in so holding, the Court does not adopt the Government's position that the President's determination under Section 1701 is "not susceptible to judicial review" at all, whether as a political question or otherwise. ECF No. 62 ("Defs.' Reply"), at 5. There may be some case in which a President's invocation of IEEPA is so far removed from any genuine threat to the "national security, foreign policy, or

economy of the United States," 50 U.S.C. § 1701(a), that a court should conclude that the President exceeded the authority that Congress gave him in declaring a national emergency, *see id.* § 1701(b). The point is simply that, given the deference owed to the political branches in this context, such cases are going to be rare. *Cf. Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (refusing to engage in a "searching inquiry into the persuasiveness of the President's justifications" for imposing entry restrictions under the Immigration and Nationality Act because such an inquiry would be "inconsistent with the broad statutory text and the deference traditionally accorded the President in th[e] sphere" of international affairs and national security). And whatever the outer boundary of the President's discretion to determine that a threat is "unusual and extraordinary" under IEEPA may be — a question the Court need not and does not answer here — the determination in Executive Order 14,203 falls within it. *See* 90 Fed. Reg. at 9369-70; *cf. Dames & Moore v. Regan*, 453 U.S. 654, 661 (1981) (declining "to lay down . . . general 'guidelines' covering other situations not involved" in that case). Indeed, as noted, Presidents (and Congress) have voiced "fundamental concerns" about the ICC's potential jurisdiction over United States personnel since at least 2000, 22 U.S.C. § 7421(5)-(6), and the President here permissibly exercised his discretion when he determined that the ICC's "recent actions against Israel and the United States set a dangerous precedent" that warranted a stronger response, 90 Fed. Reg. at 9369.

In short, whatever the Court's own assessment of the circumstances may be, Plaintiffs' allegations do not permit the Court to hold that the President acted *ultra vires* when he declared a national emergency to address what he determined to be an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States," to the national

security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a). It follows that Count III fails as a matter of law and must be dismissed.

**b. Asserted Conflict with ASPA**

Next, Plaintiffs contend that the Sanctions Regime is *ultra vires* because "it conflicts with how Congress decided to address concerns relating to the ICC," namely through the ASPA. Pls.' Mem. 38. Citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), Plaintiffs argue that the Executive Branch lacks authority to impose the Sanctions Regime pursuant to IEEPA because ASPA speaks directly "to the precise question" at issue, Pls.' Reply 11 — namely, how to "balance[] protecting against the risk of the ICC exercising jurisdiction over U.S. and allied persons with U.S. support for ICC investigations and prosecutions," Pls.' Mem. 38 — and it "did not provide the President sanctions authority to mitigate the risk that it had identified," *id.* at 39. Put differently, because Congress was "aware of the concerns the Sanctions Regime purportedly seeks to address," and it "chose to address them through a narrow, enumerated set of restrictions related to the ICC's operations in the United States and a narrow grant of specific authorities to the President," the President exceeded his authority in issuing Executive Order 14,203. *Id.* at 39.

The fatal flaw in this argument is IEEPA, pursuant to which the President issued Executive Order 14,203. In other words, far from acting "in contravention of the will of Congress," as Plaintiffs suggest, the President acted "pursuant to an express . . . authorization from Congress." *Dames & Moore*, 453 U.S. at 668 (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring)). In that regard, this case could not be more unlike *Brown & Williamson*, upon which Plaintiffs rely. There, the Supreme Court held that tobacco products are not "drugs" or "devices" subject to regulation by the Food and Drug Administration ("FDA")

under the Food, Drug and Cosmetic Act ("FDCA"). *Brown & Williamson*, 529 U.S. at 133. In so holding, however, the Court pointed to tobacco's "unique place in American history and society" and "unique political history." *Id.* at 159. Congress, the Court observed, had enacted "six separate pieces of legislation . . . addressing the problem of tobacco use and human health" over a thirty-five year period — a period in which the FDA, no less, had "consistent[ly] and repeated[ly] state[d] that it lacked authority under the FDCA to regulate tobacco." *Id.* at 143-44. What is more, "on several occasions over this period, . . . Congress considered and rejected bills that would have granted the FDA such jurisdiction." *Id.* at 144. These circumstances are, of course, completely absent in this case. Through IEEPA, Congress explicitly *granted* the authority invoked by the President here. And no President, before or after the ASPA, has suggested that the sanctions authority granted by IEEPA excludes people and matters relating to the ICC.

Nor, as a matter of statutory construction, is there any basis to read the ASPA, as Plaintiffs suggest, to carve out of the broad authority granted under IEEPA authority to impose sanctions in connection with the ICC. It is well established that, when "[p]resented with two statutes, [courts] will regard each as effective — unless Congress' intention to repeal is clear and manifest, or the two laws are irreconcilable." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020) (cleaned up); *see, e.g.*, *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143-44 (2001) ("[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974))). Plaintiffs point to no "clear and manifest" evidence of Congress's intention to limit (that is, partially repeal) the President's authority under IEEPA through the ASPA, and there is nothing irreconcilable between the two

statutes or between the ASPA and the Sanctions Regime. *See, e.g.*, *Rattigan v. Holder*, 689 F.3d 764, 770 (D.C. Cir. 2012) (applying the "coexistence" canon to an alleged conflict between a statute and an Executive Order).

Plaintiffs' sole argument to the contrary rests on the fact that the ASPA "does not authorize the payment of bribes or the provision of other such incentives to induce the release" of covered persons. 22 U.S.C. § 7427(d); *see* Pls.' Mem. 41 (noting that "Congress expressly withheld authority to use inducements to influence ICC-related action" and arguing that "the use of incentives to induce decisions by ICC judges and prosecutors — specifically the threat to their personal, including financial interests — is precisely what EO 14,203 seeks to effect"). But a lack of authorization is not the same thing as a prohibition and, in any event, that provision applies only to actions the President may take to induce the release of a covered person — which is not the predicate for Executive Order 14,203 or the Sanctions Regime. On top of that, Plaintiffs' argument disregards the plain meaning of "bribes and other *such* incentives," 22 U.S.C. § 7427(d) (emphasis added), which suggests a prohibition on illicit payoffs, kickbacks, and other corrupt financial inducements that are intended to reward someone for taking a certain course of action. *See Bribe*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "bribe" as "[a] price, reward, gift, or favor given or promised with a view to pervert the judgment of or influence the action of a person in a position of trust"). Sanctions are not a reward for taking a certain action; they are punitive economic measures designed to coerce or penalize the designated person or entity. Because these types of coercive measures can hardly fit the definition of a "bribe" or related "incentive," there is no conflict between the prohibitions set forth in the ASPA and the broad authority contained in IEEPA.

In short, Plaintiffs' reliance on the ASPA to argue that the Sanctions Regime is *ultra vires* is misplaced. Accordingly, Count II must be and is also dismissed.

**c. Alleged Violations of International Law**

Finally, relying on an expert report from Harold Hongju Koh, Yale Law School Professor and former Legal Adviser to the State Department, Plaintiffs argue that the Sanctions Regime is *ultra vires* because it "breaches four categories of international law obligations: cooperation with the U.N. through complying with binding Security Council resolutions; respect for the privileges and immunities of the ICC and its officials; preventing and punishing international crimes as required under the Geneva, Genocide, and Torture Conventions and parallel customary rules; and respect for judicial independence and the right to a fair trial." Pls.' Reply 1; *see* Pls.' Mem. 27-37; *see also* ECF No. 41 ("Koh Decl."), ¶¶ 43-51, 53, 56-57. As the basis for this argument, Plaintiffs invoke the "*Charming Betsy* doctrine," which they characterize as providing that "an act of [C]ongress ought never to be construed to violate the law of nations, if any other possible construction remains." Pls.' Mem. 27 (quoting *Weinberger v. Ross*i, 456 U.S. 25, 32 (1982), itself quoting *Murray v. The Charming Betsy*, 2 Cranch 64, 118 (1804)). "Neither the text nor the legislative history of IEEPA," Plaintiffs assert, "contains a clear and unequivocal authorization to violate international law or in any way suggests that Congress bestowed the President with authority to abrogate prior treaties or international obligations entered into by the United States." *Id.* at 37 (cleaned up). "IEEPA's delegation of authority," they conclude, "must accordingly be construed in a manner consonant with international law." *Id.*

The principles of international law cited by Plaintiffs and Professor Koh certainly "reflect high and noble aspirations for the United States and the nations of the world," *Guaylupo-Moya v. Gonzales*, 423 F.3d 121, 135 (2d Cir. 2005), and Plaintiffs' argument that the Sanctions Regime

conflicts with them are not without force. But it does not follow that the Sanctions Regime is *ultra vires*. That is because, under binding Second Circuit precedent, the *Charming Betsy* doctrine is not a canon of statutory construction that applies across the board. Instead, it "comes into play *only* where Congress's intent is ambiguous." *United States v. Yousef*, 327 F.3d 56, 92 (2d Cir. 2003) (emphasis added); *accord Oliva v. U.S. Dep't of Just.*, 433 F.3d 229, 235 (2d Cir. 2005) ("*The Charming Betsy* . . . canon of statutory interpretation . . . does not apply where the statute at issue admits no relevant ambiguity."); *Guaylupo-Moya*, 423 F.3d at 135-36 (same). "If a statute makes plain Congress's intent . . . then Article III courts, which can overrule Congressional enactments only when such enactments conflict with the Constitution, must enforce the intent of Congress irrespective of whether the statute conforms to customary international law." *Yousef*, 327 F.3d at 93 (citation omitted); *accord Guaylupo-Moya*, 423 F.3d at 135-36 (holding that "clear congressional action supersedes" both customary international law and prior treaty obligations "to the extent they are inconsistent" (citing cases)).

Here, "Congress's intent is controlling" — even if Plaintiffs are correct that the Sanctions Regime conflicts with international law or treaty obligations of the United States. *Guaylupo-Moya*, 423 F.3d at 136. That is because IEEPA's text is unambiguous. Upon declaring a national emergency with respect to "*any* unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," the President may "block . . . regulate . . . or prohibit[] *any* . . . transactions involving[] *any* property in which *any* foreign country or a national thereof has *any* interest by *any* person, or with respect to *any* property, subject to the jurisdiction of the United States." 50 U.S.C. §§ 1701(a), 1702(a)(1)(B) (emphases added); *see, e.g.*, *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that

is, 'one or some indiscriminately of whatever kind.'" (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 97 (1976))); *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 517 (2d Cir. 2023) ("Any means every; its meaning is expansive rather than restrictive." (internal quotation marks omitted)). Applying this (or similar) language, both the Supreme Court and the Second Circuit have upheld Executive Orders and OFAC regulations implementing them across a wide range of sanctions programs. *See, e.g.*, *Dames & Moore*, 453 U.S. at 662-63, 669-74 (holding that the President was authorized by IEEPA to nullify attachments of Iranian assets and direct their transfer in response to the seizure of American personnel as hostages at the American Embassy in Tehran); *Karpova*, 497 F.3d at 270 (rejecting an argument that OFAC's Iraqi Sanctions Regulations exceeded the authority Congress gave to the President where the regulations were implementing an Executive Order issued under both IEEPA and the United Nations Participation Act). The fact that Congress may not have anticipated the use of IEEPA in the precise manner at issue here, as Plaintiffs argue, "does not demonstrate ambiguity"; "[i]t demonstrates breadth." *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 212 (1998) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)).

Conspicuously, Plaintiffs do not actually argue that IEEPA is ambiguous, let alone advance a plausible alternative reading of the statute to the one on which the Government relies. Instead, relying on a 1988 district court case, and citing a handful of cases in which courts "construe[d] statutes so as not to conflict with international law," Plaintiffs contend that the *Charming Betsy* doctrine demands that courts "'interpret statutes in a manner consonant with' international law" absent "a 'clear[] and unequivocal[]' congressional statement to the contrary." Pls.' Mem. 37 (quoting *United States v. Palestine Liberation Org.*, 695 F. Supp. 1456, 1465 (S.D.N.Y. 1988) (alterations in original)); *accord* Pls.' Reply 2-3. To the extent that the 1988

case held that courts have such a duty without regard for whether a statute is ambiguous, however, it is plainly no longer good law in this Circuit. And all of the examples cited by Plaintiffs were cases that predated the Second Circuit authority cited above or cases in which the courts first found ambiguity (or both). *See McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 19-22 (1963) (holding that the National Labor Relations Act did not reach the foreign crews of ships that fly the flags of foreign nations because the Court found no "affirmative intention of the Congress clearly expressed" to that effect); *Cheung v. United States*, 213 F.3d 82, 90-92 (2d Cir. 2000) (turning to the *Charming Betsy* canon only after concluding that the terms of the extradition statutes at issue "neither compel[led] nor exclude[d] the interpretation urged by either" party); *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1105, 1114 (9th Cir. 2001) (invoking the *Charming Betsy* canon after noting that, "[o]n its face, the statute's text compels neither [side's preferred] interpretation"); *see also Khan v. Holder*, 584 F.3d 773, 783-84 (9th Cir. 2009) (referencing the *Charming Betsy* canon but concluding that there was no conflict between the statute and the international agreement at issue).

In short, "it is Congress's clear intent that controls in this case." *Guaylupo-Moya*, 423 F.3d at 135. That is, even assuming *arguendo* that the Sanctions Regime conflicts with international law and prior treaty obligations of the United States, given the broad and unambiguous language that Congress used in IEEPA, "the *Charming Betsy* canon has no application in this case." *United States v. Ahmed*, 94 F. Supp. 3d 394, 429 (E.D.N.Y. 2015). Accordingly, Count I of Plaintiffs' Complaint must be and is also dismissed.

**2. The Due Process Claim (Count IV)**

Count IV of Plaintiffs' Complaint alleges that "[t]he blockings of Plaintiffs Prost and Bossa's bank accounts in New York constitute deprivations of property" and that the

Government's "failure to provide Plaintiffs Prost and Bossa with prompt, adequate, and fair notice of the basis, conclusions, and reasons relied upon to sanction them violated their right to due process under the Fifth Amendment." Compl. ¶¶ 164, 166. More specifically, Plaintiffs advance two theories of procedural due process violations. First, Plaintiffs contend that due process required notice and a hearing *before* the blockings. *See* Pls.' Mem. 52. Second, they argue that, "[e]ven where pre-deprivation notice is not required, the Due Process Clause still requires that 'the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.'" Pls.' Reply 25 (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972)). In Plaintiffs' view, they did not receive adequate post-deprivation process because "the State Department's later press release and fact sheets simply state[d] that Judges Prost and Bossa were designated for their judicial 'ruling to authorize the ICC's investigation into U.S. personnel in Afghanistan,'" and the Government offered no other reasons or evidence. *Id.* (quoting Defs.' Opp'n 6).

Neither argument passes muster. Plaintiffs' first argument — that they were entitled to *pre*-deprivation notice and an opportunity to be heard — fails because courts have repeatedly held that the Government "need not provide pre-deprivation notice and hearing" for sanctions imposed under IEEPA "given [its] compelling interest in the immediate blocking of assets upon designation." *López Bello v. Smith*, 651 F. Supp. 3d 20, 39 (D.D.C. 2022) (emphasis omitted) (internal quotation marks omitted), *aff'd sub nom. Bello v. Gacki*, 94 F.4th 1067 (D.C. Cir. 2024); *accord Zevallos v. Obama*, 10 F. Supp. 3d 111, 127 (D.D.C. 2014) (collecting cases), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015). As these courts have explained, pre-deprivation notice "would . . . be antithetical to the objectives of these sanctions programs." *Global Relief Found., Inc. v. O'Neill*, 207 F. Supp. 2d 779, 804 (N.D. Ill. 2002), *aff'd*, 315 F.3d 748 (7th Cir. 2002).

That is because "[m]oney is fungible, and any delay or pre-blocking notice would afford a designated [party] the opportunity to transfer, spend, or conceal its assets, thereby making the IEEPA sanctions program virtually meaningless." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 77 (D.D.C. 2002), *aff'd,* 333 F.3d 156 (D.C. Cir. 2003); *accord Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 985 (9th Cir. 2012) (finding that "the potential for 'asset flight' almost certainly justifies OFAC's decision not to provide notice before freezing the assets"); *see also, e.g.*, *United States v. Premises & Real Prop. at 4492 S. Livonia Rd., Livonia, N.Y.*, 889 F.2d 1258, 1263 (2d Cir. 1989) (observing that pre-deprivation notice and hearing may not be required where the property to be seized is "'of a sort that could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given'" (quoting *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 (1974))).

In arguing otherwise, Plaintiffs contend that "[t]here is no evidence that there was a risk that either judge would contribute her assets to an illegal or illicit entity that threatens harm [sic] the public welfare." Pls.' Mem. 52. But Plaintiffs do not cite, and the Court has not found, any case requiring the Government to make an individualized showing of criminality or imminent illicit use of proceeds to justify the imposition of IEEPA sanctions without notice or a hearing. That is because, as the Government argues, "the asset-flight rationale does not turn on any individualized showing of criminality or imminent illicit use." Defs.' Opp'n 18. Instead, it turns on characteristics inherent to sanctions: the fungibility and movability of money, and the reality that advance notice of sanctions would enable the target of sanctions to easily evade them. *Cf. Calero-Toledo*, 416 U.S. at 668 (approving the seizure of a yacht without pre-deprivation notice even though it was "conceded" that the yacht owner "was in no way involved in the criminal

enterprise" (cleaned up)). Indeed, the Executive Order itself finds that, "because of the ability to transfer funds or other assets instantaneously," prior notice of a blocking would render it "ineffectual." 90 Fed. Reg. at 9372, § 9; *cf. Holy Land Found.*, 219 F. Supp. 2d at 77 (relying on the equivalent finding in Executive Order 13,224 to conclude that "prompt action by the Government was necessary to protect against the transfer of assets").

For much the same reason, there is nothing "manufactured" about the risk of asset flight. *See* Pls.' Reply 25 (arguing that "the Government's interest is coercion, not asset preservation," and that "[a]sset-flight is therefore a manufactured exigency"). As the Government observes, "changing behavior is a valid goal of sanctions," Defs.' Reply 7 (quoting *Goetz v. Palluconi*, 775 F. Supp. 3d 189, 212 (D.D.C. 2025) (cleaned up)), and "sanctions on bank accounts would hardly accomplish that goal if the accounts could be emptied before the sanctions take effect," *id.* Moreover, if the availability of pre-deprivation notice turned on individualized circumstances, it would put the officials tasked with imposing sanctions in the difficult position of trying to anticipate whether a court might later second-guess their decisions on that score. There is no reason to put them in that position given the ability of one upon whom sanctions have been imposed to challenge them after the fact.

That raises the question of whether Judges Prost and Bossa have been afforded sufficient *post*-deprivation due process. The Court concludes that they have. First, despite their assertions, they received enough notice of the reasons for their designations to satisfy the requirements of the Due Process Clause. When the sanctions were imposed, the State Department issued fact sheets and press releases stating that the judges had been designated for directly engaging in efforts by the ICC to investigate, arrest, detain, or prosecute nationals of the United States or Israel without the consent of either country. Thereafter, the Government published notice to a

similar effect in the Federal Register. *See* 91 Fed. Reg. at 11,117-18. Plaintiffs are correct that the Government "offered no other reasons for their designations, disclosed no evidence, and identified no criminal or other illicit conduct by either judge." Pls.' Reply 25. But that argument confuses the adequacy of notice with the adequacy of the substantive reasons underlying the designations. As the Complaint itself makes plain, the notices were sufficient for Plaintiffs to understand "the 'who,' 'what,' 'when' and 'where' of the allegations'" on which their designations were based. *Bazzi v. Gacki*, 468 F. Supp. 3d 70, 79 (D.D.C. 2020).

Second, Judges Prost and Bossa were afforded an adequate opportunity to challenge their designations after the fact. As noted, OFAC's regulations allow a designated person to "submit a petition for administrative reconsideration" of their designations. 31 C.F.R. § 501.807. Under the relevant procedures, a designated person "may submit arguments or evidence" to rebut the basis for the designation or to show that the circumstances that led to it no longer apply, and OFAC must review the request and issue a written decision. *Id.* Moreover, a designated person "can request delisting as many times as he likes," and denial of a delisting request is subject to judicial review under the APA. *Zevallos*, 793 F.3d at 110, 112. Courts have consistently upheld these procedures against due process challenges. *See, e.g.*, *United States v. Oseguera Gonzalez*, 507 F. Supp. 3d 137, 157 (D.D.C. 2020) (holding that the "established administrative procedures to obtain delisting" under Section 501.807, together with the availability of judicial review under the APA, "provide what the due process clause requires"); *Fares v. Smith*, 249 F. Supp. 3d 115, 125 (D.D.C. 2017) (finding no due process violation where, among other things, the plaintiffs could "submit rebuttal evidence . . . as many times as they please"), *aff'd*, 901 F.3d 315 (D.C. Cir. 2018).

Judges Prost and Bossa concede that they have not availed themselves of this administrative reconsideration process. *See* Defs.' Opp'n 19; Pls.' Reply 25-26. But they contend that resorting to it would be "plainly futile" because "the Government has predetermined the issues." Pls.' Reply 25-26 (relying on *McCarthy v. Madigan*, 503 U.S. 140, 148 (1992)). In support of that claim, Plaintiffs cite the fact that, "just weeks after Plaintiffs filed this lawsuit, Secretary Rubio announced a 'sweeping campaign' to 'dismantle the threat posed by the International Criminal Court to U.S. sovereignty.'" *Id.* at 26. "An agency that is escalating sanctions against a court it describes as an adversary," they assert, "has plainly 'predetermined the issue before it' and is 'highly unlikely' to change its position." *Id.* (first quoting *McCarthy*, 503 U.S. at 148; and then quoting *Atl. Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d 771, 782 (D.C. Cir. 1984)).

The difficulty with this argument is that, according to the Second Circuit, "a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." *N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 169 (2d Cir. 2001) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)); *see, e.g.*, *In re 650 Fifth Ave.*, No. 08-CV-10934 (KBF), 2013 WL 2451067, at *6 (S.D.N.Y. June 6, 2013) (holding that designated parties "cannot attack the[ir] SDN listing on due process grounds [w]ithout first availing themselves of the processes they are due" under Section 501.807 and the APA). The developments Plaintiffs cite certainly underscore that the Executive Branch regards the ICC as a threat and intends to keep using sanctions as a deterrent. But that much was already clear from the Executive Order itself. Moreover, a decisionmaker is not disqualified "simply because he has taken a position, even in public, on a policy issue related to the dispute." *Hortonville Joint Sch. Dist. No. 1 v. Hortonville*

*Educ. Ass'n*, 426 U.S. 482, 493 (1976). Instead, the question is whether a decisionmaker can still judge "a particular controversy fairly on the basis of its own circumstances," *id.* (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941)), and adjudicators enjoy "a presumption of honesty and integrity" on that score, *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Conclusory allegations of bias and futility aside, Plaintiffs have not made a showing sufficient to overcome that presumption here, particularly given that a request for reconsideration turns on the arguments and evidence that each particular designee presents. *See* 31 C.F.R. § 501.807. In any event, even if the reconsideration process were ultimately to reveal traces of bias or arbitrary and capricious decision-making, OFAC's determination would be subject to judicial review under the APA. That is further reason to require Judges Prost and Bossa to avail themselves of the full process available rather than assuming a constitutional violation. *Cf. Locurto v. Safir*, 264 F.3d 154, 174-75 (2d Cir. 2001) (holding public employees who alleged officials deciding their cases had prejudged the merits failed to state due process claim where neutral adjudicator was available in later court proceeding).

In short, Count IV must be and is dismissed.

### 3. The Takings Claim (Count V)

Next, Count V of Plaintiffs' Complaint alleges that "the blockings of Plaintiffs Prost and Bossa's bank accounts in New York constitute the takings of the[ir] private property" without just compensation, Compl. ¶ 169, for which they principally seek declaratory and injunctive relief, *see id.* Prayer for Relief ¶¶ A-G. This claim fails for two alternative reasons.

First, "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984);

*see id.* ("Generally, an individual claiming that the United States has taken his property can seek just compensation under the Tucker Act, 28 U.S.C. § 1491."). Second, and in any event, the weight of authority establishes that the blocking of assets under IEEPA is not a cognizable taking. *See, e.g.*, *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 47 n.1, 54 (2d Cir. 2010); *see also Holy Land Found.*, 219 F. Supp. 2d at 78 (observing that "[t]he case law is clear that blockings under Executive Orders are temporary deprivations that do not vest the assets in the Government" and therefore "do not, as a matter of law, constitute takings within the meaning of the Fifth Amendment"). As courts have explained, "[e]conomic sanctions would hardly be sanctions if the foreign targets of the sanctions could simply stand in line to be compensated for the losses those sanctions caused them." *Paradissiotis v. United States*, 304 F.3d 1271, 1275 (Fed. Cir. 2002). True, one court has suggested that a "long-term blocking order" could "some day . . . ripen[] into a vesting of property" sufficient to support a takings claim. *Holy Land Found.*, 219 F. Supp. 2d at 78. But that suggestion was dictum and, in any event, is not binding on this Court. *See also Can v. United States*, 820 F. Supp. 106, 113 (S.D.N.Y. 1993) (reviewing cases and concluding that a "blocking program does not become a seizure and does not constitute a vesting merely because the program remains in place for a lengthy period of time, even if the blocking persists for multiple decades"), *aff'd*, 14 F.3d 160 (2d Cir. 1994). Moreover, even in that case, the court concluded it was "premature to determine that the temporary deprivation [was] equivalent to a vesting" because the plaintiff's assets had "only been blocked for eight months." *Holy Land Found.*, 219 F. Supp. 2d at 78. So too here, where the blockings have lasted for little more than a year. Accordingly, Count V must be and is dismissed.

**4. The APA Claim (Count VI)**

Count VI of the Complaint, which is brought against all Defendants other than President Trump, alleges that the designations of Plaintiffs violate the APA because they "were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Compl. ¶¶ 170-71 (citing 5 U.S.C. § 706(2)(A)).[3] More specifically, Plaintiffs assert that "[t]he designations must be set aside for" any of three reasons. Pls.' Mem. 47. First, they contend that the designations are arbitrary and capricious in several respects: (1) they "rest on factors that have no basis in IEEPA," *id.*; (2) "they are not based on substantial evidence . . . that Judges Prost, Bossa, or Alapini-Gansou 'directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality,' as required for designation under Section 1(a)(ii)(A) of EO 14,203," *id.* at 47-48 (cleaned up); and (3) "they are based on agency action that 'entirely failed to consider an important aspect of the problem,'" *id.* at 48 (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Second, "the designations are a textbook abuse of discretion" because "[t]heir purpose is to target the personal, including financial[,] interests of judges as a means of pressuring them into disregarding their oaths of office." *Id.* at 49. And third, Plaintiffs assert that the designations "are contrary to law" because "[t]hey are *ultra vires* exercises of authority under IEEPA, violate the Fifth Amendment, and violate numerous treaties and rules of customary international law." *Id.* at 51.

The Court's conclusions above defeat the third of these arguments. But Plaintiffs' other APA arguments cannot be resolved on this record. To evaluate challenges under the APA, a

---

[3] The APA claim does not name President Trump as a Defendant because the President is not an "agency" within the meaning of the APA, so his actions are not reviewable under the statute. *See Franklin v. Massachusetts*, 505 U.S. 788, 796, 800-01 (1992).

court must review the "whole record" — that is, the "full administrative record that was before the Secretary at the time he made his decision." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419-20 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *see* 5 U.S.C. § 706 (requiring that "the court shall review the whole record or those parts of it cited by a party" in determining whether an agency action violated the APA). "The full administrative record includes not only materials directly considered by the agency decisionmaker, but also all materials that might have influenced the agency's decision, including any work and recommendations of subordinates on which the agency decisionmaker based his or her decision." *New York v. Wolf*, No. 20-CV-1127 (JMF), 2020 WL 2049187, at *1 (S.D.N.Y. Apr. 29, 2020) (internal quotation marks omitted); *see also, e.g.*, *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 631-35 (S.D.N.Y. 2019), *aff'd in relevant part*, 588 U.S. 752 (2019). Given the broad authority Congress granted to the President in IEEPA and the deference owed to the Executive Branch in matters relating to national security and foreign affairs, the administrative record may "play little role here"; indeed, it may "add nothing." *Vassiliades v. Rubio*, 792 F. Supp. 3d 1, 21 (D.D.C. 2025). If only "out of an abundance of caution," however, the Court concludes that the administrative record must be considered in evaluating Plaintiffs' arguments that their designations were arbitrary and capricious and an abuse of discretion. *Id.*

Accordingly, the Government's motion to dismiss Plaintiffs' APA claim must be and is granted to the extent the claim is based on the theory that Plaintiffs' designations are "contrary to law," but the motion is otherwise denied as premature.

**5. The Declaratory Judgment Claim (Count VII)**

Count VII in the Complaint invokes the Declaratory Judgment Act in asserting that "this Court 'may declare the rights and other legal relations of any interested party seeking such

declaration.'" Compl. ¶ 173 (quoting 28 U.S.C. § 2201). It is well established, however, that "[t]he [Declaratory Judgment Act] is procedural only . . . and does not create an independent cause of action." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012) (internal quotation marks omitted) (first quoting *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950); and then quoting *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007)); *accord In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993). Accordingly, to the extent Plaintiffs bring a standalone claim under the Declaratory Judgment Act, it must be and is dismissed. *See, e.g.*, *Peary v. DC Comics, Inc.*, No. 25-CV-910 (JMF), 2025 WL 1224219, at *3 (S.D.N.Y. Apr. 24, 2025); *Eagle Equity Funds, LLC v. Centrais Elétricas Brasileiras S/A - Eletrobras*, No. 19-CV-9344 (JMF), 2021 WL 371449, at *7 n.8 (S.D.N.Y. Feb. 3, 2021).

**B. Plaintiffs' Motion for a Preliminary Injunction**

In short, all of Plaintiffs' claims other than their claim, under the APA, that their designations are arbitrary and capricious and an abuse of discretion are dismissed. In light of that, the Court need not dwell long on Plaintiffs' motion for a preliminary injunction. The only remaining basis for that motion is the surviving APA claim, but the very feature that makes adjudication of the Government's motion to dismiss that claim premature prevents Plaintiffs from demonstrating that they are likely to succeed on the merits of that claim. That is, given the broad authority Congress granted to the President in IEEPA and the deference owed to the Executive Branch in matters relating to national security and foreign affairs, the Court cannot — in the absence of the administrative record — deem Plaintiffs likely to succeed on the merits of their claim. Accordingly, Plaintiffs' motion for a preliminary injunction must be and is denied.

## CONCLUSION

Although the United States is not a State Party to the Rome Statute, it has supported many of the ICC's efforts throughout its nearly thirty-year history. *See, e.g.*, ECF No. 46 ("Amicus Brief of Former U.S. Ambassadors-at-Large for War Crimes Issues/Global Criminal Justice and Prosecutors of International Criminal Tribunals"), at 10-15. More broadly, for decades — even before Justice Robert H. Jackson appeared at the International Military Tribunal in Nuremberg — the United States has been a leader in recognizing "the vital importance of judicial and prosecutorial independence to the functioning of international criminal justice." *Id.* at 8. Indeed, "safeguarding" such independence "has long been a consistent thread of U.S. policy, whatever disagreements the United States has separately pressed over the ICC's jurisdictional reach in particular situations." *Id.* at 9. Executive Order 14,203 and the Sanctions Regime are sharp — and some would say, regrettable — departures from these traditions. But they are departures that this Court is not free to second guess. Accordingly, and for the reasons stated above, Plaintiffs' broadest challenges to the Executive Order and the Sanctions Regime fail as a matter of law. So too do the Fifth Amendment claims of Judges Prost and Bossa. As to all these claims, and the declaratory judgment claim, the Government's motion to dismiss must be and is GRANTED.

That leaves only Plaintiffs' claims under the APA that their designations were arbitrary and capricious or an abuse of discretion, with respect to which both the Government's motion to dismiss and Plaintiffs' motion for a preliminary injunction are DENIED. As to those claims, the parties shall promptly confer and, no later than **December 4, 2026**, file a joint letter proposing next steps, including but not limited to deadlines, as appropriate, for the filing of the

administrative record, the production of a privilege log, and summary judgment motion practice; and indicating whether the Court should hold a conference to discuss these or any other issues.

The Clerk of Court is directed to terminate ECF Nos. 36 and 50.

SO ORDERED.

Dated: November 23, 2026
New York, New York

JESSE M. FURMAN
United States District Judge